**FILED**

December 27, 2024

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ J. Barker

DEPUTY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WESTERN TEXAS**

MATTHEW J. PEASE,

                               Plaintiff,

      v.

SECURITIES & EXCHANGE COMMISSION,
FINANCIAL INDUSTRY REGULATORY
AUTHORITY, DEPOSITORY TRUST & CLEARING
CORPORATION, OTC MARKETS GROUP INC.,
JOHN BRDA, GREGORY MCCABE,
NEXT BRIDGE HYDROCARBONS, INC.

                               Defendants.

Case No.:   7:24-CV-00322-DC

**COMPLAINT FOR
VIOLATIONS OF THE
FEDERAL SECURITIES
LAWS**

JURY TRIAL DEMANDED

1ST AMENDED COMPLAINT

## I. <u>INTRODUCTION</u>

1.      This case arises from a pervasive scheme of market manipulation, regulatory negligence, breaches of fiduciary duty, and constitutional violations that collectively eroded the integrity of U.S. financial markets. The Plaintiff, Matthew J. Pease, a retail investor and Information Technology professional, challenges the unchecked power of quasi-governmental regulatory bodies, such as the Financial Industry Regulatory Authority (FINRA), whose actions and inactions fostered an environment where institutional participants profited while retail investors were left to bear the consequences. Through this action, the Plaintiff seeks accountability for systemic misconduct that has caused significant harm to retail investors and

aims to restore transparency and integrity to U.S. financial markets. Relevant supporting documentation is available and will be provided upon request or during discovery.

a.  Central to this case are the Non-Voting Series A Preferred Shares of Meta Materials, Inc. (MMTLP), which were issued as part of a corporate spin-off intended to provide private ownership in Next Bridge Hydrocarbons, Inc. (NBH). Instead of facilitating an orderly transition to private ownership, market participants, including broker-dealers, market makers, and transfer agents, engaged in manipulative practices such as synthetic share creation and naked short selling. These actions flooded the market with counterfeit shares, suppressed legitimate share prices, and deprived shareholders, including the Plaintiff, of the fair value of their investments. Regulatory bodies, including FINRA, the SEC, and the DTCC, failed to fulfill their statutory oversight duties, enabling these abuses to persist unchecked.

b.  A defining moment occurred on December 9, 2022, when FINRA issued an extraordinarily rare U3 trading halt on MMTLP shares, citing an undefined "extraordinary event." This unilateral and indefinite halt froze all trading activity, leaving tens of thousands of investors, including the Plaintiff, unable to access their assets, reconcile their positions, or trade their shares. Despite the extraordinary impact of this halt, FINRA failed to provide proper notice, justification, or resolution, violating statutory obligations and investor protections.

c.  The U3 halt raises serious constitutional concerns about the unchecked powers of private self-regulatory organizations. As highlighted in key legal precedents, including SEC v. Sloan and Alpine Securities Corp. v. FINRA, private entities exercising quasi-governmental authority must operate within statutory and constitutional constraints.

FINRA's indefinite halt violated the separation of powers doctrine, the Appointments

Clause, and the private nondelegation doctrine, as there was no meaningful government

oversight or statutory authority to justify its actions.

d.  Beyond FINRA's governance flaws, other regulatory bodies exacerbated the

systemic failures in this case. The SEC, tasked with overseeing FINRA and ensuring

market integrity, neglected its statutory duties by allowing the U3 halt to persist and

failing to investigate widespread irregularities. The DTCC, responsible for clearing and

settlement, permitted unresolved failures to deliver (FTDs) and synthetic shares to

proliferate, violating Section 17A of the Securities Exchange Act. Together, these

regulatory failures enabled institutional participants to manipulate the market and profit

at the expense of retail investors, including the Plaintiff.

e.  Broker-dealers and market makers, including GTS Securities and Canaccord

Genuity, further contributed to the harm by engaging in manipulative practices designed

to suppress the price of MMTLP shares. These entities exploited regulatory loopholes to

create and trade synthetic shares, artificially inflating supply while profiting from the

resulting market instability. Transfer agents, such as AST/EQ, failed to reconcile

legitimate share ownership during the MMTLP-to-NBH transition, compounding investor

harm and creating prolonged financial uncertainty.

f.  Corporate leadership at Torchlight Energy Resources and Next Bridge

Hydrocarbons also played a significant role in enabling these systemic failures.

Executives, including Gregory McCabe, John Brda, and Clifton DuBose, failed to

address share discrepancies, trading irregularities, and systemic market manipulation.

Instead, they misrepresented the financial prospects of key assets, such as the Orogrande Basin, and neglected their fiduciary duties to shareholders, including the Plaintiff.

g.  Nearly two years have passed since the U3 halt, and the Defendants have taken no meaningful steps to resolve these systemic failures or mitigate the harm caused to retail investors. Shareholders, including the Plaintiff, remain in financial and legal limbo, unable to trade their positions, reconcile their holdings, or recover the fair value of their investments. This prolonged inaction underscores critical vulnerabilities in the existing regulatory framework and highlights the urgent need for judicial intervention.

h.  The disparity between the regulatory response to the MMTLP case and other market disruptions, such as the GameStop trading episode, illustrates the inequities faced by retail investors. While GameStop shareholders benefited from swift regulatory and Congressional action, MMTLP investors have endured prolonged neglect. This inconsistency underscores systemic bias in favor of institutional participants and the urgent need for equitable treatment of all market participants under the law.

i.  Through this action, the Plaintiff seeks to hold the Defendants accountable for their roles in perpetuating systemic misconduct, breaches of fiduciary duty, and constitutional violations. The Plaintiff requests compensatory and punitive damages to redress the financial and emotional harm he has suffered.

j.  Equally important, this case seeks to challenge the structural and constitutional flaws within FINRA's governance and advocate for systemic reforms. These reforms include enforcing greater transparency, requiring accountability for regulatory bodies, and implementing mechanisms to prevent future abuses, such as synthetic share creation, prolonged trading halts, and failures to deliver.

k.  By addressing the systemic deficiencies and constitutional violations described

herein, this Court has the opportunity to restore fairness, integrity, and transparency to

U.S. financial markets. The Plaintiff urges the Court to hold the Defendants accountable

for their actions, reaffirm the principles of constitutional governance, and protect the

rights of retail investors whose trust in the financial system has been eroded.

## II. JURISDICTION AND VENUE

2.      Jurisdiction is proper under 28 U.S.C. § 1331 as this action arises under federal

law, including violations of the Securities Exchange Act of 1934 (15 U.S.C. § 78), the Sherman

Antitrust Act (15 U.S.C. §§ 1–2), and the Clayton Act (15 U.S.C. §§ 12–27). Supplemental

jurisdiction over any related state law claims is proper under 28 U.S.C. § 1367.

3.      Diversity jurisdiction is proper under 28 U.S.C. § 1332(a), as the amount in

controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of

citizenship. The Plaintiff, a resident of New Hampshire, asserts claims against Defendants based

in states such as Texas, New York, and Washington, D.C. These claims highlight the national

significance of systemic failures in market regulation, further reinforcing the federal court's

jurisdiction.

4.      Venue is appropriate in the United States District Court for the Western District

of Texas under 28 U.S.C. § 1391(b) because the Defendants conduct substantial business within

this District, and a substantial part of the events or omissions giving rise to the claims occurred

within this jurisdiction.

5.      More than two years after the U3 trading halt, FINRA, the SEC, the DTCC,

transfer agents, broker-dealers, and market makers have failed to address the systemic issues that

arose. These ongoing failures have resulted in violations of federal securities laws, including

Rule 10b-5, and antitrust laws, causing significant financial harm to the Plaintiff, with baseline damages exceeding $75,000. The persistence of these regulatory lapses underscores the need for judicial oversight to restore fairness and accountability in market operations.

## III. <u>PARTIES</u>

6.      Plaintiff: Matthew J. Pease (hereinafter referred to as "Plaintiff") has at all times mentioned herein been a resident and citizen of the Town of Amherst, in the County of Hillsborough, in the State of New Hampshire. He is a professional in the field of Information Technology and a shareholder of META II and NBH.

7.      Defendant Securities and Exchange Commission (SEC): The Securities and Exchange Commission (hereinafter "SEC") is the federal agency responsible for enforcing securities laws, regulating the securities industry, and ensuring market integrity. The SEC is headquartered at 100 F Street NE, Washington, D.C., 20549.

8.      Defendant Financial Industry Regulatory Authority (FINRA): The Financial Industry Regulatory Authority (hereinafter "FINRA") is a private, self-regulatory organization authorized by the Securities and Exchange Commission (SEC) to oversee and regulate broker-dealers and ensure compliance with federal securities laws. FINRA is headquartered at 1735 K Street NW, Washington, D.C., 20006.

9.      Defendant Depository Trust & Clearing Corporation (DTCC): The Depository Trust & Clearing Corporation (hereinafter "DTCC") is a financial services organization responsible for providing clearing, settlement, and information services for securities trading in the United States. DTCC is headquartered at 55 Water Street, New York, New York, 10041.

10.      Defendant OTC Markets Group Inc.: OTC Markets Group Inc. (hereinafter "OTC Markets") is a financial services company that operates over-the-counter marketplaces for

trading equities. OTC Markets provides a platform for broker-dealers and issuers to facilitate public securities trading, including in securities not listed on major exchanges. The company is headquartered at 300 Vesey Street, 12th Floor, New York, NY 10282.

11.    Defendant Next Bridge Hydrocarbons, Inc. (NBH): Next Bridge Hydrocarbons, Inc. (hereinafter "NBH") was formed as part of the corporate spin-off from Meta Materials, Inc. ("META II"), intended to provide MMTLP shareholders with private ownership. NBH is a private oil and gas exploration, and development company incorporated in the State of Nevada with its principal place of business located at 500 W. Texas Avenue, Suite 1020, Midland, Texas, 79701.

12.    Defendant Gregory McCabe: Gregory McCabe (hereinafter "McCabe") is the former Chairman of Torchlight and the current CEO and Chairman of NBH and the President of McCabe Petroleum Corporation, located at 500 W. Texas Avenue, Suite 1020, Midland, Texas, 79701.

13.    Defendant John Brda: John Brda (hereinafter "Brda") is the former Chief Executive Officer of Torchlight Energy Resources ("Torchlight" or "TRCH"). Brda played a significant role in structuring the merger between Torchlight and Metamaterial, Inc. ("META I") and in the subsequent creation of MMTLP shares. Torchlight's last known address is 5700 W. Plano Parkway, Suite 3600, Plano, Texas, 75093, Internet searches indicate current location at 1425 Frontenay Ct., St. Louis, MO 63122.

## IV. <u>STATEMENT OF FACTS</u>

14.    The following statements of fact chronicle the events, regulatory actions, and market irregularities surrounding MMTLP shares, the transition to NBH, and the resulting financial and legal implications for shareholders. The narrative highlights key actions by

regulatory bodies like FINRA and the SEC, the December 2022 trading halt, unresolved failures to deliver, synthetic share allegations, and the systemic gaps in oversight that exacerbated investor harm. Additionally, it explores corporate governance issues, shareholder disputes, and broader concerns about the integrity and transparency of U.S. financial markets. The document presents a detailed timeline of these events, providing a foundation for understanding the legal and economic challenges faced by the affected parties. (Relevant supporting documentation is available)

15.    Brda is the former CEO of Torchlight. Following the merger between Torchlight and Metamaterial Inc. ("META I") on June 28, 2021, Brda transitioned into an executive consulting role with the newly formed META II. He continued in this capacity until late 2022. Brda played a significant role in structuring the merger between Torchlight and META I and in the subsequent creation of the NBH spin-off. (Relevant supporting documentation is available)

16.    Georgios Palikaras is an engineer and entrepreneur, also the founding President and former CEO of META I, a Canadian publicly listed company trading in the CSE exchange. On June 28, 2021 META I merged with Torchlight to form META II, a Nasdaq publicly listed smart materials and photonics company. Under his leadership, META I and META II developed technologies in industries such as aerospace, medical, automotive, cleantech, and consumer electronics. Palikaras was removed from his position on October 16, 2023. META II was led to Chapter 7 Bankruptcy proceedings and trustee control on August 7, 2024. (Relevant supporting documentation is available)

17.    Clifton DuBose was the CEO of NBH during the transition of MMTLP shares to private shares. DuBose was positioned to facilitate the corporate transition of NBH, a process critical to addressing shareholder concerns related to the spin-off and the reconciliation of share

discrepancies. He resigned this position in January of 2024. (Relevant supporting documentation is available)

18.     McCabe is a corporate executive who held leadership roles within Torchlight and later NBH. As part of his responsibilities, McCabe was involved in the valuation and management of NBH's oil and gas properties before, during and post spin-off from META II. Later, he succeeded DuBose as the CEO of the company. (Relevant supporting documentation is available)

19.     James "Wes" Christian, a securities attorney with decades of experience, has built a reputation for exposing systemic abuses like naked short selling, market manipulation, and synthetic share creation. His insights have unveiled deliberate market distortions and regulatory failures directly relevant to the Plaintiff's claims. Christian's work highlights the need for accountability in an environment rife with manipulation. (Relevant supporting documentation is available)

20.     Clinton A. Plant, also known as CPLANT on X, is a consultant for NBH, with a relationship documented through a promissory note dated February 29, 2024, and a consulting agreement providing $10,000 per month in compensation. Plant has been publicly associated with promoting the Orogrande Asset and the broader narrative surrounding its value and potential, including claims of significant oil reserves therein. (Relevant supporting documentation is available)

21.     Jo Palmer serves as President and Chief Executive Officer of EQ U.S., the designated transfer agent for NBH. EQ U.S. is responsible for managing shareholder records and facilitating the issuance and reconciliation of shares, ensuring compliance with corporate actions and regulatory requirements. (Relevant supporting documentation is available)

22.     Ari Rubenstein, in his capacity as Chief Executive Officer of GTS Securities, oversees operations at a market-making firm that facilitates liquidity and trading in financial markets. GTS operates under regulatory frameworks designed to maintain orderly markets and fulfill market maker responsibilities. (Relevant supporting documentation is available)

23.     Jeffrey G. Barlow serves as Chief Executive Officer of Canaccord Genuity LLC (U.S.), overseeing the firm's U.S. investment banking and capital markets operations. Under his leadership, Canaccord Genuity LLC provides comprehensive financial services, including mergers and acquisitions, corporate finance, and strategic advisory. (Relevant supporting documentation is available)

24.     Cromwell Coulson serves as Chief Executive Officer of OTC Markets Group Inc., overseeing the company's operations in providing platforms for trading over-the-counter equities. Under his leadership, OTC Markets facilitates the trading of securities through its OTCQX, OTCQB, and Pink markets, offering services aimed at improving transparency, disclosure, and accessibility for investors and issuers in the public securities market. (Relevant supporting documentation is available)

25.     Rick Wurster, as President of The Charles Schwab Corporation, manages the company's operations, including those related to securities brokerage and customer account services. Schwab, along with its subsidiary TD Ameritrade, provides brokerage services to retail and institutional clients and participates in the clearing and settlement of securities trades. (Relevant supporting documentation is available)

26.     Frank La Salla, in his official capacity as President and Chief Executive Officer of the Depository Trust & Clearing Corporation (DTCC), manages the organization's clearing and settlement processes for securities trades. The DTCC plays a critical role in ensuring the accurate

recording and settlement of transactions across financial markets. (Relevant supporting documentation is available)

27.    Robert W. Cook, in his official capacity as President and Chief Executive Officer of the Financial Industry Regulatory Authority (FINRA), oversees the organization's regulatory functions, which include enforcing compliance with FINRA's rules and promoting fair market practices. Cook's leadership aligns with FINRA's mission to protect investors and maintain market integrity. (Relevant supporting documentation is available)

28.    Gary Gensler, in his official capacity as Chairman of the Securities and Exchange Commission (SEC), is responsible for overseeing the agency's enforcement of federal securities laws. Under his leadership, the SEC monitors market practices and works to ensure transparency, fairness, and compliance with securities regulations. (Relevant supporting documentation is available)

29.    On or about May 2, 2008, Pole Perfect Studios began filing as a public company under Central Index Key (CIK) number 0001431959. (Relevant supporting documentation is available)

30.    Following its merger with Torchlight on November 23, 2010, this CIK number transferred to Torchlight, making it responsible for subsequent filings. (Relevant supporting documentation is available)

31.    On June 28, 2021, Torchlight transferred its CIK to META II upon its merger.

32.    Also, on June 28, 2021, the merger between Torchlight and META I was completed, creating META II, with shares trading under the NASDAQ ticker symbol MMAT.

33.    A CUSIP (Committee on Uniform Securities Identification Procedures) number is a unique nine-character alphanumeric code assigned to financial securities in the United States

and Canada. It is used to uniquely identify securities such as stocks, bonds, and mutual funds, facilitating accurate processing, clearing, and settlement of trades.

34.    Additionally, CUSIP numbers simplify record-keeping and reduce transaction errors, providing a reliable identifier for both investors and institutions.

35.    Unlike Central Index Key (CIK) numbers, which identify entities filing with the SEC, CUSIP numbers specifically identify individual financial securities, ensuring clarity and accuracy in trading and tracking within financial markets.

36.    From 2010 to 2020, TRCH traded a cumulative total of 745 million shares on public markets. This substantial trading volume reflected its decade-long activity in the oil exploration sector and positioned it for the eventual merger with META I. In the 1st half of 2021 leading to the June 28, 2021 merger, Torchlight traded over 3.6 billion shares. The trading history highlights the scale of its operations and shareholder engagement during this period. (Relevant supporting documentation is available)

37.    On March 1, 2020, Torchlight presented an Investor Presentation via PowerPoint or email to interested parties, emphasizing the company's focus on assets in the Permian Basin, notably the Orogrande, Hazel, and Winkler projects. (Relevant supporting documentation is available)

38.    They announced that a third-party reserve estimate indicated a mean case of approximately 3.678 billion barrels of oil equivalent (BOE) in recoverable reserves from unconventional zones in the Orogrande Basin. This estimate was based on a petrophysical report prepared by Stimulation Petrophysics Consulting.

39.    Based on Brda and McCabe's stated 'probable reserve' of 3.678 billion barrels of oil at the Orogrande site and the 2019 average price of West Texas Intermediate (WTI) crude oil

at $56.99 per barrel, the perceived above-ground value of the asset was approximately $209.51 billion.

40.     Using industry-standard valuations of 10–20% of the market price for oil in the ground, the below-ground value ranged from approximately $20.96 billion to $41.92 billion, reflecting the potential fair market value prior to extraction.

41.     These statements, from NBH corporate officers and social media influencers regarding the probable reserve inferred great expectations regarding NBH's financial prospects and were referenced consistently in shareholder discussions leading up to the MMTLP transition.

42.     The Orogrande Project was identified as the flagship asset, comprising over 134,000 acres with a substantial recoverable resource potential estimated at 3.7 billion barrels of oil equivalent in the median case.

43.     The presentation underscored the project's potential to attract major industry players for acquisitions or partnerships due to its size and resource estimates. While acknowledging market risks, the company highlighted its belief in the presence of oil, framing the central question as not whether oil exists but determining the exact quantity recoverable.

44.     In June 2020, Brda, along with the members of Torchlight's board of directors, resolved to pursue a strategic initiative aimed at salvaging the company through a merger with META I, a corporation focused on advanced technological innovations and cleantech solutions. (Relevant supporting documentation is available)

45.     This merger was presented to shareholders as a critical measure to stabilize the company, with claims that it was necessitated by the pressing need to address an overwhelming number of illegal short shares allegedly created in the market. (Relevant supporting documentation is available)

46.    These naked short positions were portrayed online as a significant threat to Torchlight's financial stability, further justifying the urgency and strategic importance of the merger.

47.    Shareholders, or potential buyers, were led to believe that this merger would provide a pathway to resolve the systemic challenges posed by these illegal short shares (short squeeze) while transitioning the company toward a future in high-tech innovation.

48.    On December 14, 2020, Torchlight, a Texas-based oil exploration company, initiated a merger plan with META I, a Canada-based high-technology materials firm. (Relevant supporting documentation is available)

49.    The merger aimed to combine TRCH's oil and gas assets with MMAT's advanced materials technology to enhance shareholder value and diversify operations. This corporate action marked a pivotal shift for both companies, setting the foundation for the creation of META II.

50.    Torchlight initially issued Preferred Stock, later known as MMTLP, as restricted shares. However, these shares began trading on OTC markets (on October 06, 2021), implying a conversion to free-trading status. The process of converting restricted shares into free-trading shares typically requires either a registration statement declared effective by the SEC or an exemption, such as Rule 144 or a 3(10)(a) exemption. (Relevant supporting documentation is available)

51.    It is believed that the document related to the shares' issuance, suggests that Brda or other corporate officers may have intentionally structured the issuance to leave room for the shares to trade on the OTC markets after the fact, despite public assurances that the shares would not be traded.

52.    Further verification through Canadian or American court records, would be required to establish, if a 'fairness hearing' may have been conducted, and is necessary to confirm whether this process complied with regulatory requirements.

53.    This discrepancy raises serious questions about transparency, corporate intent, and the overall integrity of the MMTLP trading process, directly impacting shareholder trust and financial outcomes.

54.    Also, on or around Q4 of 2020, another ticker symbol called MMATF started trading on various exchanges both in the US and internationally. (Relevant supporting documentation is available)

55.    This MMATF ticker, by all accounts, was also representative and duplicate of META I which was at the time trading on the Canadian junior exchange The CSE under the symbol MMAT.CN and was not DTC eligible.

56.    From January 1, 2021, to June 25, 2021, TRCH traded a total of 3.6 billion shares. This unprecedented trading volume occurred over just six months, a significant increase compared to the company's cumulative trading volume of 745 million shares recorded over the prior decade, raising concerns about unusual trading activity. (Relevant supporting documentation is available)

57.    Based on the extreme volatility and anomalous trading volumes observed during the first six months of 2021, there are credible concerns that naked short positions may have been introduced in TRCH. A detailed investigation into trading activity during this period, particularly involving GTS Securities, is necessary to determine whether improper trading practices, such as naked short selling, occurred.

58.     In June 2021, GTS, under the direction of Ari Rubenstein, and Canaccord Genuity, a Canadian market maker, jointly filed paperwork to register the "Series A Preferred Stock" for trading on the Over-The-Counter (OTC) market for NASDAQ, without the authorization or permission of META I or Torchlight executives. (Relevant supporting documentation is available)

59.     Rubenstein highlights a critical disconnect between the regulatory framework and enforcement mechanisms, particularly under Rule 15c2-11, which governs the publication of quotations for OTC securities. This regulatory gap enables synthetic share creation, trading irregularities, and widespread market abuses. The failure to enforce these provisions underscores systemic weaknesses in market oversight and amplifies the Plaintiff's claims of regulatory negligence.

60.     This means that preferred stocks are being categorized as part of derivative securities eligible for exemption from Rule 15c2-11, provided that their associated primary shares are listed on a U.S. securities exchange.

61.     There are concerns that GTS and Canaccord relied on outdated, decade-old information in their Form 211 filings to facilitate the tradability of MMTLP shares. If verified, this reliance may constitute a violation of FINRA rules and warrants further investigation into the accuracy and validity of these filings. Additionally, it is possible that no Form 211 filings were submitted at all, as the SEC had no record of such filings as of August 16, 2021.

62.     In a letter dated June 21, 2021, the OCC explicitly stated that the "Series A Preferred Shares" would not trade. (Relevant supporting documentation is available)

63.     However, that letter informed options traders that they were not required to close out short positions through the merger until what would become "MMTLP" could trade on the

OTC market. This directive directly contradicted the public intentions and legitimate filings of the merged companies.

64.     The OCC memorandum was exclusively shared with market makers and hedge funds, including GTS and Ari Rubenstein.

65.     GTS, under the supervision of Ari Rubenstein, had a duty to record all short sales, including naked shorts, and was granted additional time to close out fails-to-deliver under the "market maker exemption" rule.

66.     Pursuant to FINRA Rule 204(b), market makers engaged in bona fide market-making activities are provided exceptions allowing additional time to close out fails-to-deliver resulting from such activities.

67.     However, they are also required to maintain daily records of their fails-to-deliver and report them as necessary to ensure transparency and regulatory oversight.

68.     The Depository Trust & Clearing Corporation (DTCC) is obligated to maintain precise and comprehensive records of securities trades and ensure the efficient electronic recovery and dissemination of information related to securities transactions within U.S. stock markets, as part of its role in promoting transparency and regulatory compliance.

69.     On June 25, 2021, the CIK number 0001431959 transitioned again when Torchlight conducted a reverse takeover (RTO) with META I. (Relevant supporting documentation is available)

70.     The shared use of CIK number 0001431959 between Pole Perfect, then Torchlight, now META II, constitutes a potential violation of SEC regulations requiring distinct identifiers for separate entities.

71.     Such actions may obscure transaction records and mislead investors, contravening Rule 10b-5 prohibition on deceptive practices in securities transactions.

72.     During the merger of Torchlight and META II, McCabe, a key executive and shareholder, publicly underscored the significant potential value of the Orogrande Basin oil and gas assets. He emphasized the probable oil reserves and the presence of other unproven assets within the basin, drawing attention to its strategic importance in the merger. (Relevant supporting documentation is available)

73.     However, public filings and disclosures at the time valued the Orogrande Basin assets at $47 million—an amount significantly lower than the estimated $20.96 billion to $41.92 billion based on the below-ground valuation of probable reserves. (Relevant supporting documentation is available)

74.     Subsequent disclosures during the NBH spin-off brought to light notable discrepancies in these valuations, raising concerns about the accuracy and transparency of the initial assessments.

75.     On June 15, 2021, Plant, also known as CPLANT on X, stated, "The OroGrande asset holds 3.7 billion barrels of oil. It's no joke. It's proven." He further wrote, "The special dividend will likely pay out between $10.00 and $20.00 per share. OroGrande has 3.7 billion bf reserve with oil at $70+ it's a slam dunk."

76.     On June 28, 2021, MMTLP shares were created during the spin-off in which TRCH transitioned specific assets into NBH. (Relevant supporting documentation is available)

77.     These shares, designated as "Preferred Stock Dividend," were intended to represent private ownership in NBH and were not meant to trade publicly.

78.     To effectuate the spinoff, on July 14, 2022, NBH filed a registration statement on Form S-1 with the SEC, followed by several amendments and a final prospectus (collectively, the "Registration Statement"). The Registration Statement became "effective" on November 18, 2022. (Relevant supporting documentation is available)

79.     META II post-merger did not sell the legacy Torchlight oil and gas assets and, consequently, proceeded with spinning off the oil and gas assets into NBH.

80.     On July 31, 2021, MMTLP shares were recorded in the Schwab Total Stock Market Index Fund (SWTSX), despite MMTLP not officially trading on the OTC Markets until October 6, 2021. (Relevant supporting documentation is available)

81.     The timing of this inclusion raises serious concerns regarding the systemic processes used to recognize and handle these shares.

82.     Index funds, like SWTSX, typically include publicly traded securities that meet specific criteria, such as liquidity, trading volume, or market capitalization. The presence of MMTLP in SWTSX months before its first day of trading suggests that the creation of these shares or their recognition in financial systems may have bypassed standard procedures.

83.     This anomaly raises credible questions about potential systemic irregularities in the creation and trading of MMTLP shares, such as synthetic share creation or other manipulative practices. A full audit and investigation into the processes leading to MMTLP's premature inclusion in financial systems is warranted.

84.     Furthermore, the lack of transparency around the criteria for MMTLP's inclusion in SWTSX undermines investor confidence and raises questions about the accountability of institutional participants involved in managing and trading these securities.

85.    On October 6, 2021, GTS Securities and Canaccord Genuity began trading MMTLP "Series A Preferred" shares publicly. (Relevant supporting documentation is available)

86.    Additionally, that day, META II was notified via email that the OTC Market would start trading MMTLP the same day. This was META II's first and only 'courtesy' notification of this action. (Relevant supporting documentation is available)

87.    This activity occurred despite directives in TRCH's proxy statement, which prohibited public trading of the Series A Preferred Shares on any exchange. (Relevant supporting documentation is available)

88.    Despite the regulatory requirement for independent CIKs, MMTLP began trading on OTC markets on October 7, 2021, under the same CIK number 0001431959, as Pole Perfect, then Torchlight, then META II, now MMTLP. (Relevant supporting documentation is available)

89.    The use of a shared CIK creates ambiguity regarding compliance with SEC filing rules. A detailed review is necessary to determine whether this practice aligns with Regulation S–T Rule 10(b) and Rule 10b-5 requirements.

90.    On or about October 7, 2021, GTS Securities and Canaccord Genuity facilitated public trading of MMTLP shares on the OTC market. These actions were not authorized by TRCH or META II executives. (Relevant supporting documentation is available)

91.    When Brda, former CEO of Torchlight, notified OTC Markets of this unauthorized trading, OTC Markets directed him to FINRA. FINRA subsequently informed Brda that he lacked standing to bring a formal complaint, as he was no longer the CEO. This unauthorized listing initiated significant trading irregularities and confusion among investors. (Relevant supporting documentation is available)

92.     When Ken Rice, then the CFO of META II, contacted the OTC Markets and other regulators, the general consensus was that the trading of these shares was going to happen with or without META II's permission. (Relevant supporting documentation is available)

93.     On November 29, 2021, FOIA-released emails confirmed communications between FINRA and the SEC regarding MMTLP, indicating early awareness of trading activity and concern. *This fact cannot be overstated. The difference between a regulator doing its job and a regulator knowingly leading investors into a trap is clear: by allowing known market manipulation to persist while pretending to act only at the last moment, the regulators crossed the line from inaction to complicity. Their conduct reflects not diligence, but scienter— intentional misconduct or reckless disregard for investor harm*. (Relevant supporting documentation is available)

94.     From October 7, 2021, to December 9, 2022, trading activity in MMTLP shares exhibited significant anomalies, including widespread failures to deliver (FTDs), unexplained volume spikes, and price volatility inconsistent with legitimate market forces. These anomalies reflect systemic regulatory lapses, including the failure to monitor or address manipulative practices that directly violate provisions of the Securities Exchange Act of 1934, such as Rule 10b-5. The persistence of these issues further underscores the need for judicial oversight to address systemic misconduct in OTC markets.

95.     This pattern suggests the possibility of synthetic share creation and requires a comprehensive audit of fails-to-deliver records to confirm whether shares were properly located and settled.

96.     On or about July 15, 2022, NBH received its own CIK number, 0001936756, in preparation for its planned spin-off from META II. This was the same CIK used for Pole Perfect,

then Torchlight, then META II, now NBH (while META II still exists as a legal entity) .
(Relevant supporting documentation is available)

97.     Between October 1, 2022, and December 8, 2022, MMTLP stock experienced
significant volatility, with prices ranging from a low of $2.85 to a high of $12.50. (Relevant
supporting documentation is available)

98.     During this period, the market capitalization for MMTLP, a relatively unknown
oil and gas exploration company, fluctuated between approximately $1.5 million and $6.5
billion.

99.     The extreme volatility and market capitalization levels observed, relative to the
total authorized share count of 165 million, indicate discrepancies that warrant further
examination to rule out synthetic shares, rehypothecation, or other trading irregularities.
(Relevant supporting documentation is available)

100.     Between November 15 and December 5, 2022, Brda sold approximately 300,000
shares of MMTLP. During this period, the trading price of MMTLP ranged between $2.90 and
$9.90. Based on this price range, Brda's transactions generated proceeds estimated between
$870,000 and $2,970,000. (Relevant supporting documentation is available)

101.     Publicly available social media posts from this timeframe show that Brda
encouraged others to purchase MMTLP shares and denied selling any of his own shares.
(Relevant supporting documentation is available)

102.     Brda sometime later acknowledged selling a portion of his holdings during the
price increase leading up to the FINRA-imposed U3 halt. (Relevant supporting documentation is
available)

103.    On November 23, 2022, MMTLP shareholders were advised to transfer their shares to the transfer agent, American Stock Transfer & Trust Company (AST), now operating as Equiniti Trust Company, to facilitate the distribution of NBH shares. (Relevant supporting documentation is available)

104.    This transfer was intended to streamline the corporate action and ensure shareholders received their NBH shares directly.

105.    Additionally, shareholders were informed they would receive bonus shares of NBH as an incentive for transferring their shares to AST; however, these bonus shares were never delivered, raising concerns about the representations made to shareholders.

106.    On November or around 30, 2022, McCabe sold approximately 6.8 million shares of MMTLP out of his total holdings of 18,758,249 shares, which constituted 11.37% of the float. On that date, the trading price of MMTLP ranged between a low of $7.76 and a high of $10.00. (Relevant supporting documentation is available)

107.    Based on this price range, McCabe's transactions generated proceeds estimated between $52,768,000 and $68,000,000. Under the U.S. Securities Exchange Act of 1934, SEC rules regarding Beneficial Ownership Reporting and Section 16 Reporting, McCabe was required to file a Form 4 report within two days from these share transactions.

108.    A series of emails obtained through a Freedom of Information Act (FOIA) request and released in redacted form indicate that individuals at both the SEC and FINRA, on December 5, 2022, including Mr. Sam Draddy, Ms. Patti Casimates, Mr. Richard Boyle, Mr. Jay Gibbons, and an unidentified redacted individual, were aware of fraudulent activities affecting the trading of META II and MMTLP shares. (Relevant supporting documentation is available)

109.    These emails provide insight into regulatory awareness of irregularities during the period leading up to the FINRA-imposed U3 halt.

110.    This also means that FINRA Blue Sheets, formally known as Electronic Blue Sheet (EBS) data, are reports that broker-dealers submit to regulators such as FINRA and the SEC, were being used as early as this date mentioned, if not before this.

111.    Detailed trade reports, including timestamps, order sizes, and counterparties, reveal patterns of market manipulation such as wash trades, spoofing, and intentional settlement failures. These practices not only distort market prices but also indicate regulatory failures in detecting and addressing these activities. The persistence of such manipulation violates investor protections under the Exchange Act, specifically Section 10(b) and Rule 10b-5, highlighting systemic enforcement deficiencies.

112.    Blue Sheets are crucial for ensuring transparency and accountability in the financial markets, enabling regulators to reconstruct trading activity and identify patterns of misconduct.

113.    On December 7, 2022, both FINRA and META II corporate leadership confirmed the existence of an approved corporate action for MMTLP. According to this action, no new trades could be executed after December 8, 2022, but shareholders could settle positions, including short position close-only trades, through the end of trading on December 12, 2022. (Relevant supporting documentation is available)

114.    The corporate action further specified that MMTLP shares would be cancelled on December 13, 2022, with a pay date for NBH shares or dividends set for December 14, 2022.

115.    On December 7, 2022, Jeff Mendl, Vice President of OTC Markets, stated on Trader TV that MMTLP shares were approved to trade through December 12, 2022, as part of a FINRA-approved corporate action. (Relevant supporting documentation is available)

116.    Mendl confirmed that MMTLP would no longer be available to trade on the OTC market starting December 13, 2022, and that the shares were planned to be deleted following that date.

117.    Prior to December 8, 2022, FINRA did not provide any notice, either privately or publicly, that a U3 halt on MMTLP trading would be issued. FINRA failed to inform the issuer or shareholders before the halt occurred, and no explanation was provided for this omission.

118.    On December 8, 2022, FINRA unilaterally revised the corporate action notice for MMTLP, removing references to the December 14, 2022, pay date for NBH shares without notifying or justifying the changes to META II or impacted investors. These opaque revisions stripped shareholders of procedural due process protections, violating their constitutional right to notice and a meaningful opportunity to challenge decisions affecting their property. The actions mirror regulatory failures identified in SEC v. Sloan, where ambiguous and last-minute agency actions eroded public trust and market integrity. FINRA's omissions represent a systemic failure to uphold its obligations, underscoring the need for judicial oversight. (Relevant supporting documentation is available)

119.    Also on December 8, 2022, FINRA failed to attend a scheduled meeting with the Depository Trust & Clearing Corporation (DTCC) and attorneys from META II regarding unresolved issues with the MMTLP corporate action. (Relevant supporting documentation is available)

120.    Later that same day, FINRA issued a revised corporate action notice, altering the language to state that "the symbol will be DELETED," replacing the prior notice indicating that MMTLP shares would be "CANCELLED" upon conversion to NBH shares. (Relevant supporting documentation is available)

121.    This revision omitted the December 14, 2022, pay date, further confusing shareholders and creating uncertainty about the transition process.

122.    At the close of trading on December 8, 2022, deal-broker Level 2 data revealed that short position holders in MMTLP utilized the 505 code (commonly referred to as S.O.S.), signifying a heightened urgency to close their positions. The data reflected transaction prices reaching and exceeding 100 times the closing price of $2.90 per share (i.e., $290.00+), an extraordinary deviation characteristic of a severe share imbalance. (Relevant supporting documentation is available)

123.    Furthermore, after December 8, 2022, limit orders ranging from less than $100 to as much as $200,000 per share were submitted through various brokerages but were marked as "too late to cancel." This indicated significant irregularities in the handling of MMTLP trades, affecting more than 65,000 shareholders (Traudt v. Rubenstein, 2024, Docket No. 2:34-cv-782, U.S. District Court for the District of Vermont). (Relevant supporting documentation is available)

124.    Many MMTLP traders, including the Plaintiff, have expressed their intent to execute opportunity trades prior to the trading deadline on December 12, 2022, as specified in the approved corporate action. (Relevant supporting documentation is available)

125.    On December 9, 2022, FINRA imposed a U3 trading halt on MMTLP shares. As a self-regulatory organization operating under delegated authority from the Securities and

Exchange Commission, FINRA justified the halt by citing "extraordinary circumstances." However, this action left many investors unable to access their investments, with no clear resolution provided. (Relevant supporting documentation is available)

126.    On December 9, 2022, counsel for META II and NBH contacted FINRA to seek clarification on whether the U3 halt was temporary or permanent. Despite these efforts, FINRA failed to provide a definitive response or explanation. (Relevant supporting documentation is available)

127.    FINRA justified the trading halt with the following statement: "FINRA has determined that an extraordinary event has occurred or is ongoing that has caused or has the potential to cause significant uncertainty in the settlement and clearing process for shares of MMTLP and that, therefore, halting trading and quoting in MMTLP is necessary to protect investors and the public interest." *The regulatory process defied common sense, breaching reasonable investor expectations. After FOUR amendments to the S-1 registration statement, over a period of about four months, investors had every reason to believe the SEC was paying very close attention and had conducted a rigorous review. FINRA's December 6, 2022, corporate action notice reinforced this belief, signaling that the process was finalized. Then, without warning, on December 8—mere hours before the halt—FINRA reversed course, scrapping critical shareholder protections. The sudden U3 halt on December 9 left even vigilant investors blindsided by regulatory reversal, trapped in an unfair and unpredictable process. This last-minute maneuver betrayed public trust and demands heightened judicial scrutiny.*

128.    FINRA's claim of immunity is confined to its regulatory functions and does not shield actions that exceed statutory authority or infringe upon constitutional rights. The U3 halt, imposed without procedural safeguards or substantive justification, constituted an

unconstitutional taking under the Fifth Amendment by depriving investors of access to their assets and denying them fair market participation. As recognized in Fiero v. FINRA, private regulatory bodies cannot operate outside their statutory framework without violating fundamental protections. Judicial oversight is essential to address these violations and protect investors from regulatory overreach.

129.    In the same FINRA notice announcing the halt (UPC #35-22) dated December 9, 2022, FINRA further clarified that the trading halt would remain in effect until the deletion of MMTLP, scheduled for December 13, 2022.

130.    Although the U3 halt was technically lifted on December 13, 2022, the practical effect of this halt remains unresolved, as investors have not regained access to trading their shares or resolving their holdings. As of December 4, 2024, the matter remains unresolved, leaving investors without resolution for a total of 726 days.

131.    FINRA's authority to issue such halts is derived from its statutory role under the Securities Exchange Act of 1934, and the halt applied to securities trading across U.S. financial markets.

132.    Although the U3 halt was purportedly enacted to address an extraordinary event, its execution lacked transparency, procedural fairness, and sufficient oversight. These governance failures within self-regulatory organizations (SROs) reveal a deeper systemic issue: the absence of mechanisms to ensure accountability and fairness. This case exemplifies the concerns raised in Jarkesy v. SEC, particularly regarding the unchecked authority delegated to private entities without robust statutory constraints.

133.    FINRA's governance structure operates without Presidential oversight, Senate confirmation, or statutory safeguards that are hallmarks of constitutionally valid delegation under

the non-delegation doctrine. Congress's transfer of quasi-legislative powers to FINRA, a private entity, lacks the "intelligible principle" required by J.W. Hampton, Jr., & Co. v. United States and directly conflicts with modern applications in Jarkesy v. SEC. This absence of oversight enabled FINRA to unilaterally impose the U3 halt, bypassing critical procedural safeguards that protect investors.

134.   FINRA's collaboration with the SEC and other governmental entities demonstrates that it operates as a state actor in critical regulatory functions. This status is underscored by its ability to impose actions like the U3 halt, which have significant economic and legal consequences for investors. As established in Jarkesy v. SEC, private entities acting under government-like authority are subject to constitutional constraints, including due process. By failing to provide notice or an opportunity for shareholders to challenge the halt, FINRA violated these principles. Its actions effectively deprived investors of their property rights.

135.   From its establishment as an SRO under the Maloney Act amendments to the Securities Exchange Act of 1934, FINRA has exercised significant regulatory powers, including the ability to enact rules, conduct investigations, and impose sanctions, functions typically reserved for federal agencies.

136.   These powers were evident during FINRA's issuance of the U3 trading halt on MMTLP shares on December 9, 2022, an action that had significant financial and legal implications for investors.

137.   FINRA's private membership structure introduces inherent conflicts of interest that compromise its ability to enforce market integrity effectively. These structural flaws not only impede impartial regulatory action but also raise significant constitutional concerns under the nondelegation doctrine and separation of powers principles, as highlighted in Jarkesy v. SEC.

The resulting lack of accountability underscores the urgent need for judicial intervention to restore trust in regulatory governance.

138.    In the week after the FINRA U3 halt, Charles Schwab & Co. sent emails to MMTLP shareholders, Ms. Gwendolyn Mickens and Mr. Anthony Erbacher, stating that, even if the U3 halt were resolved, Schwab would not permit shareholders to trade MMTLP shares. (Relevant supporting documentation is available)

139.    Although NBH's S-1 filings and amendments were approved in 2022, position-close-only restrictions were not enforced for MMTLP shares before the U3 halt. These restrictions would have limited new short positions and helped stabilize the market during the transition. (Relevant supporting documentation is available)

140.    On December 13, 2022, FINRA deleted the MMTLP ticker entirely from its listings through its UPC Advisory system. This action was taken as part of the corporate action for NBH, but FINRA did not provide additional details or address ongoing shareholder concerns.

141.    On December 14, 2022, META II completed the spin-off of the oil and gas assets to NBH and, as a result, holders of META II's Preferred Stock received new shares in NBH pursuant to the Registration Statement (the "Spin-Off").

142.    The procedural inadequacies in FINRA's regulatory actions parallel those identified in Alpine Securities Corp. v. FINRA. This case illustrates the dangers of unchecked regulatory authority and the subsequent harm to investor confidence. By issuing the U3 halt without statutory clarity or proper procedural safeguards, FINRA demonstrated systemic issues that call for enhanced judicial scrutiny and potential reform.

143.    The MMTLP case illustrates the necessity for regulatory bodies, including the SEC and FINRA, to establish clear protocols to address close-out requirements during

extraordinary circumstances. As clarified in Alpine Securities Corp. v. FINRA, 982 F.3d 68

(D.C. Cir. 2023), FINRA must operate strictly within its statutory authority. The court in Alpine

emphasized that unauthorized regulatory actions could lead to significant economic

consequences, an issue mirrored in FINRA's handling of the U3 halt, where a lack of procedural

safeguards compounded investor harm.

144.    The necessity of adhering to statutory boundaries is starkly illustrated in Alpine

Securities Corp. v. FINRA, where the court emphasized the dangers of unauthorized regulatory

actions. In Alpine, FINRA's unchecked imposition of penalties undermined procedural

safeguards, mirroring its unilateral U3 halt on MMTLP shares. This halt, lacking transparency or

statutory clarity, demonstrates systemic governance flaws, highlighting the urgent need for

judicial intervention to enforce constitutional and statutory limits.

145.    On December 14, 2022, META II completed the Spin-Off and distributed NBH's

equity to the Preferred Stock shareholders as of December 12, 2022 (i.e., the record date).

146.    In total, META II distributed 165,472,241 shares of NBH to the Preferred Stock

shareholders.

147.    On January 18, 2023, Brda, former CEO of Torchlight, announced the formation

of Flamethrower, a shareholders' group aimed at investigating potential market manipulation

involving MMTLP stock.

148.    Flamethrower was established to investigate alleged market manipulation by

market makers, broker-dealers, and other parties concerning MMTLP stock, particularly

focusing on the events surrounding the spin-off of NBH from META II.

149.    Brda led Flamethrower and retained legal counsel, with Christian among others, to assist in the investigation. The group sought to engage shareholders and the public to gather information and raise awareness about the alleged market manipulation.

150.    Flamethrower successfully brought attention to the concerns of MMTLP shareholders regarding potential market manipulation. The group's efforts led to increased public awareness and discussions about the issue, prompting some media coverage and responses from regulatory bodies.

151.    In February of 2023, Christian interviewed publicly, regarding MMTLP he said, "You're going to see the mother lode of all, you know, shares that have been issued -that you know don't exist- come to the forefront. It's going to- it's going to pale GameStop, it is going to pale AMC."

152.    As of December 8, 2024, there is limited publicly available information regarding the current activities of Flamethrower. The last notable public mention of Flamethrower was in March 2023, discussing its formation and objectives.

153.    On February 6, 2023, Cromwell Coulson, President of OTC Markets, publicly acknowledged via a tweet that short positions still existed in NBH, despite its status as a private company not intended for public trading. (Relevant supporting documentation is available)

154.    Coulson further stated that resolving these short positions would be "easier if Next Bridge shares became publicly tradable," implicitly highlighting the complications caused by FINRA's trading halt of MMTLP shares and the unresolved discrepancies in share counts.

155.    Under 17 CFR 242.204, broker-dealers are required to close out failures to deliver (FTD) positions in equity securities resulting from short sales within the regulatory timeframe of T+4 (trade date plus four settlement days). This rule is designed to minimize disruptions in the

securities market caused by settlement failures and to prevent market abuses such as naked short selling.

156.    The December 9, 2022, U3 trading halt on MMTLP, followed by the deletion of its ticker on December 13, 2022, prevented broker-dealers and market participants from closing out short positions within the regulatory timeframe mandated by Rule 204. The inability to trade or settle these positions resulted in unresolved failures to deliver, leaving significant short interest 'trapped' and non-compliant with Rule 204 requirements.

157.    The halt and deletion of MMTLP shares exposed a regulatory gap, as Rule 204 does not provide a mechanism for addressing close-out obligations when trading in a security is abruptly halted and permanently deleted. This gap has allowed broker-dealers with FTDs and short positions in MMTLP to remain in violation of close-out requirements without a viable resolution.

158.    The inability to enforce Rule 204 close-out requirements for MMTLP has led to significant unresolved short interest, potentially involving synthetic shares and naked short selling. These unresolved positions highlight a critical regulatory gap, as Rule 204 lacks mechanisms to address securities deleted through extraordinary halts like the U3. This gap has caused substantial financial harm to retail investors, further eroding confidence in the fairness and integrity of U.S. financial markets.

159.    The MMTLP case illustrates the necessity for regulatory bodies, including the SEC and FINRA, to establish clear protocols to address close-out requirements during extraordinary circumstances, such as trading halts and ticker deletions. Without such mechanisms, the enforcement of Rule 204 remains inadequate, leaving market participants and retail investors vulnerable to systemic failures.

160.    FINRA released its initial FAQ regarding the MMTLP corporate action and trading halt on March 16, 2023, 97 days after the halt. The FAQ, however, failed to provide substantial clarity regarding the "extraordinary event" cited as justification, leaving investors without meaningful answers or recourse.

161.    FINRA's failure to justify the "extraordinary event" underpinning the U3 halt raises constitutional red flags under the major questions doctrine, as articulated in Loper Bright Enterprises v. Raimondo. This doctrine demands explicit Congressional authorization for regulatory actions with sweeping economic consequences. FINRA's lack of transparency and procedural safeguards compounded the harm, depriving investors of property rights and exposing them to unchecked market manipulation. Such actions mirror the governance failures identified in SEC v. Sloan and Jarkesy v. SEC, where agency overreach eroded public confidence. Retail investors were disproportionately harmed by this halt. (Relevant supporting documentation is available)

162.    FINRA's unilateral trading halt on MMTLP shares also raises concerns under principles outlined in Jarkesy v. SEC. In Jarkesy, the Supreme Court held that administrative agencies cannot wield judicial authority absent clear Congressional authorization. FINRA's actions, taken without statutory clarity or meaningful procedural safeguards, similarly exceed the constitutional limits of administrative authority.

163.    The framers of the Constitution sought to prevent concentrated power through a system of checks and balances, as underscored by Justice Gorsuch in Loper Bright. This framework ensures that decisions of vast economic and political significance cannot be made without explicit Congressional authorization. FINRA's trading halt violated this principle by depriving investors of property rights without statutory or procedural safeguards. This Court has

the opportunity to restore constitutional accountability and reinforce the framers' intent to limit regulatory overreach.

164.    As in Biden v. Nebraska, where the Supreme Court invalidated executive actions that exceeded statutory authority, FINRA's actions in halting MMTLP trading imposed significant economic consequences on investors without clear Congressional authorization.

165.    The actions of FINRA and the SEC, taken beyond statutory authority and without adequate procedural safeguards, implicate broader constitutional protections under the Ninth Amendment. Investors reasonably expected regulators to operate within clear legal limits. However, the agencies' procedural failures deprived investors of their right to fair treatment in regulatory proceedings, as protected by the U.S. Constitution. By issuing the December 8, 2022, revised corporate action notice—nullifying key shareholder protections—FINRA and the SEC disregarded statutory boundaries.

166.    The unilateral nature of FINRA's trading halt echoes the constitutional concerns raised in Biden v. Nebraska, where the Supreme Court struck down executive actions that exceeded statutory authority. As in that case, FINRA imposed significant economic consequences without Congressional authorization or meaningful procedural safeguards.

167.    Despite receiving thousands of complaints from shareholders through Schwab, FINRA, the SEC, and Congressional Representatives, this FAQ remained, to date, FINRA's only significant communication with shareholders regarding the halt.

168.    High-ranking officials, including SEC Chairman Gary Gensler and FINRA President Robert W. Cook, were documented as having knowledge of these issues as early as November 2021 (see Numbered Paragraph 93). Despite this, no substantive action was taken to

resolve these irregularities or inform the investing public, further exacerbating market confusion and investor harm. (Relevant supporting documentation is available)

169.    On March 20, 2023, Fleming, a TD Ameritrade (Schwab) employee, admitted during a conversation with Traudt that the U3 halt of MMTLP trading on December 9, 2022, was requested by broker-dealers to "protect ourselves," directly acknowledging institutional interests rather than retail investor protection as the motive (Traudt v. Rubenstein, 2024, Docket Number: 2:34-cv-782, United States District Court for the District of Vermont). (Relevant supporting documentation is available, Traudt v. Rubenstein, 2024)

170.    This conversation, which was recorded by TD Ameritrade (TDA), later Schwab, was initially made available for playback at Traudt's request but was later denied and made unavailable. (Traudt v. Rubenstein, 2024).

171.    On April 18, 2023, DuBose, then CEO of NBH, sent a letter to FINRA requesting assistance to address unresolved issues arising from the MMTLP spin-off, asking for access to the Blue Sheets. (Relevant supporting documentation is available)

172.    In the context of META II and its preferred shares (MMTLP), Blue Sheets would provide critical insights into the trading activities during the period of alleged market manipulation and synthetic share creation.

173.    For example, during the two-day trading window for MMTLP in December 2022, which ended with FINRA's U3 trading halt, Blue Sheets reveal the number of trades executed, the counterparties involved, and whether the transactions involved legitimate shares or synthetic ones.

174.    Given the allegations of naked short selling and the creation of synthetic shares, regulators' analysis of Blue Sheets could expose discrepancies in the total volume of shares

traded versus the actual number of legitimate shares issued or prove all of these allegations unfounded.

175.    If regulators were to release Blue Sheets for META II and MMTLP, they could uncover the extent of market irregularities alleged by retail investors and advocacy groups or conclusively dispute them as a matter of fact.

176.    For instance, these sheets might highlight unusually high trade volumes that exceed the total outstanding shares, corroborating claims of synthetic shares.

177.    Furthermore, Blue Sheet data could reveal whether broker-dealers and market makers engaged in practices like excessive failure-to-deliver (FTD) settlements, illegal short selling, or spoofing. Such practices, if confirmed, may have artificially depressed the stock price, exacerbating financial harm to shareholders and undermining market transparency.

178.    The lack of Blue Sheet transparency in the MMTLP case has been a critical point of contention for investors seeking clarity regarding the abrupt U3 trading halt and its impact on their holdings.

179.    The release of Blue Sheets for MMTLP and META II would provide a definitive account of the trading activity, allowing allegations of irregularities, such as synthetic share creation or naked short selling, to be substantiated or disproven.

180.    Access to this data would not only clarify trading activity but could also serve as evidence in legal or regulatory actions addressing potential misconduct. This transparency is essential to restoring investor trust and ensuring accountability for any misconduct.

181.    DuBose outlined concerns regarding outstanding short positions in NBH shares and the negative impact on investors caused by FINRA's actions, including the December 9, 2022, trading halt. (Relevant supporting documentation is available)

182.    The letter also proposed a temporary trading period to facilitate the reconciliation of shares and sought FINRA's cooperation in addressing discrepancies to maintain market integrity.

183.    FINRA did not concur with his recommendations nor provide any meaningful remedy with their response letter on June 7, 2023. (Relevant supporting documentation is available)

184.    A supplemental FAQ was later published on November 6, 2023, 332 days after the halt. This FAQ, like the initial one, failed to clearly define the 'extraordinary event' that warranted the halt. (Relevant supporting documentation is available)

185.    Despite tens of thousands of complaints submitted by shareholders through Schwab, FINRA, the SEC, and Congressional Representatives, this supplemental FAQ marked only the second significant attempt by FINRA to communicate with shareholders about the halt.

186.    To date, these two FAQs remain FINRA's only substantial communications with shareholders regarding the trading halt.

187.    On September 27, 2023, during a House Financial Services Committee hearing, Representative Ralph Norman questioned SEC Chair Gary Gensler about MMTLP. (Relevant supporting documentation is available)

188.    Norman inquired if Gensler was familiar with MMTLP and aware of its aggregate share count as of December 8, 2023. Gensler acknowledged familiarity with MMTLP but stated he did not know the specific share count, suggesting it might be publicly available.

189.    Norman expressed dissatisfaction with the SEC's responses and indicated plans to send another letter seeking detailed information.

190.    On September 29, 2023, the Securities and Exchange Commission (SEC) issued a FOIA response confirming that it had received 246 complaints specifically related to the U3 trading halt of MMTLP between December 9, 2022, and September 15, 2023. This demonstrates substantial investor concern regarding the halt and its regulatory implications. (Relevant supporting documentation is available)

191.    In October 2023, Palikaras was removed from his position as President and CEO of META II by the company's Board of Directors. (Relevant supporting documentation is available)

192.    On December 22, 2023, Representative Ralph Norman led a letter to the Financial Industry Regulatory Authority (FINRA) and the Securities and Exchange Commission (SEC) concerning META II's Series A preferred shares (MMTLP). This letter was co-signed by more than 70 members of Congress. (Relevant supporting documentation is available)

193.    On January 15, 2024, NBH executives, including DuBose (CEO) and Luke Hawkins (CFO), resigned without addressing shareholder concerns about unresolved trading issues during the MMTLP-to-NBH transition. These resignations occurred during a period of ongoing market uncertainty. (Relevant supporting documentation is available)

194.    On January 31, 2024, the Securities and Exchange Commission (SEC) issued a response to a Freedom of Information Act (FOIA) request submitted on October 2, 2023, regarding complaints received about META II's Series A Preferred Shares/Dividend, also known as MMTLP. The SEC disclosed that a total of 848 complaints were received concerning MMTLP between December 9, 2022, and October 2, 2023. These disclosures highlight significant investor dissatisfaction and public concern over the regulatory handling of MMTLP. (Relevant supporting documentation is available)

195.    On February 7, 2024, the Securities and Exchange Commission (SEC) acknowledged receiving 56,490 emails regarding MMTLP and related issues but has only officially responded to 35 of these complaints (0.0619%). This demonstrates the significant level of investor concern and dissatisfaction, as well as the SEC's apparent failure to adequately address or resolve the grievances of affected shareholders, raising questions about regulatory oversight and accountability. (Relevant supporting documentation is available)

196.    On February 8, 2024, a NBH press release stated, "Subsequent to our most recent press release of January 19, 2024 calling for short interest data from all sources, foreign or domestic, whether registered with FINRA or not, we observed that FINRA clarified in its letter to Congressman Norman that the short interest figure it cited was only based on U.S. member data and not that of 'domestic or foreign non-member entities that could act as custodians or agents holding securities for others, including foreign-registered broker-dealers.'"

197.    Furthermore, it continued, "However, it repeated its assertion [FINRA] that the short interest position it saw was 'nominal.' Unfortunately, we believe this is a consequential blind spot in FINRA's data, because foreign firms have approached Next Bridge about procuring more than 2.65 million shares." FINRA has also confirmed this number as fact as well.

198.    While unresolved short sales, under market-maker exceptions, are not uncommon and may be "nominal," this number is unacceptable two years after the stock was deleted by FINRA.

199.    FINRA acknowledges the short interest as fact, but by the same token, claims nothing can be done to resolve this since the stock has been "deleted" after the U3 halt was lifted on December 13, 2022. These two market rules, the halt (and subsequent deletion) and resolving short interest, conflict with each other.

200.    The letter continues, "Since nothing regarding the corporate action and the issuers' contemplated record or distribution dates changed between when the corporate action was submitted to FINRA for review, and when the U3 halt was issued (aside from the introduction of FINRA's own announcements), we remain confused as to why FINRA did not simply reject the corporate action announcement at the outset rather than issuing a halt for 'extraordinary circumstances' to the great surprise of the issuer and retail investors."

201.    The letter concludes with, "The end result was mass confusion that persists to this day amongst our investor base, many of whom feel they were unnecessarily and unfairly denied two days of trading, which would have also given parties with millions of short positions an opportunity to cover or close."

202.    Plant is a consultant for NBH, Inc., with a relationship evidenced by a promissory note dated February 29, 2024.

203.    The promissory note specifies that NBH unconditionally promises to pay CAPCO Holdings, Inc., a Texas corporation, the principal sum of $2,000,000, together with accrued and unpaid interest at a rate of 12% per annum. The note is secured by certain assets of NBH, as detailed in the agreement.

204.    This note also references a consulting agreement executed between Plant and the company for $10,000 a month but specific details regarding his role or contributions have not been publicly disclosed, nor when formally asked by lawful shareholders.

205.    On April 23, 2024, Aaron Chow, also known as Elephant Analytics on X, alleged that Clinton A. Plant, also known as CPLANT, doctored spreadsheets from the Texas Railroad Commission and posted them on April 20, 2020. These posts were purportedly intended to raise

confidence and bolster interest in the Orogrande Asset, which would later become part of NBH through the Preferred Dividend that evolved into MMTLP and NBH.

206.    Aaron Chow's post on X clearly displays a standard query from the Texas Railroad Commission indicating that the oil quantity from Orogrande wells is 0 units. In contrast, Plant's displayed query from the Texas Railroad Commission shows 1,926 units.

207.    On June 5, 2024, over 70 Members of Congress, led by Representatives Ralph Norman and Pete Sessions, sent a follow-up letter to SEC Chairman Gary Gensler. The letter reiterated requests for an investigation into FINRA's December 9, 2022, U3 halt on MMTLP shares and the subsequent unresolved trading discrepancies. (Relevant supporting documentation is available)

208.    The letter emphasized that FINRA's actions led to widespread investor harm and confusion, with over 40,000 letters received from affected constituents. It called for transparency, an independent audited share count, and a briefing on the SEC's findings.

209.    In June 2024, the U.S. Securities and Exchange Commission (SEC) charged Torchlight and its successor META II and its former CEOs, including Brda, with market manipulation and fraud.

210.    The SEC's complaint alleges that Brda as CEO of Torchlight and co-defendant Palikaras as CEO of META I, orchestrated a scheme involving the issuance of a preferred stock dividend intended to create a "short squeeze," thereby artificially inflating the company's stock price. (Relevant supporting documentation is available)

211.    This manipulation allegedly enabled Torchlight to raise $137.5 million from investors in an at-the-market offering in June 2021, immediately prior to the merger of Torchlight and META I, which formed META II.

212.    To the best of the Plaintiff's knowledge and belief, the major difference between Palikaras and Brda or McCabe is that Palikaras did not sell any shares of META II or MMTLP during the period in question. In other words, he did not profit from the run-up or the halt—if anything, he effectively lost millions of dollars during this time, unlike the other two Defendants.

213.    Following these allegations, META II agreed to settle the SEC's charges in an administrative proceeding, resulting in a $1 million penalty. However, litigation against Palikaras and Brda is ongoing in federal district court (Securities and Exchange Commission v. John Brda and Georgios Palikaras, U.S. District Court for the Southern District of New York, Case Number 1:24-cv-04806, 2024). (Relevant supporting documentation is available)

214.    On August 9, 2024, META II filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the District of Nevada (Case No. 24-50792). This filing initiated the process of liquidating the company's assets to repay creditors. (Relevant supporting documentation is available)

215.    After META II declared bankruptcy on August 9, 2024, its final filing under this CIK occurred on September 20, 2024.

216.    The Plaintiff has submitted a valid Statement of Interest with the U.S. Bankruptcy Court for the District of Nevada, concerning MMATQ shares held as of December 4, 2024, via Registered Mail. (Relevant supporting documentation is available)

217.    As a result of the bankruptcy filing, all remaining employees and executive officers, including President and CEO Uzi Sasson and Chief Legal Officer Dan Eaton, were terminated. Additionally, the entire Board of Directors, chaired by Jack Harding, resigned, effectively dissolving the board.

218.    Within 12 months from the bankruptcy filing, Director and Audit committee member, Eugenia Moralles and CFO Ahmed Shebl, and Palikaras' successor CEO Jim Fussaro resigned.

219.    The bankruptcy proceedings are ongoing, with a Chapter 7 trustee appointed to oversee the liquidation of the company's assets in accordance with the Bankruptcy Code.

220.    If META II's bankruptcy leads to the discharge of debts or obligations linked to the MMTLP situation, individuals like Brda or McCabe (depending on their involvement) might avoid legal or financial repercussions stemming from investor lawsuits or regulatory scrutiny.

221.    A bankruptcy proceeding might complicate efforts to access critical financial or operational records. This could hinder investigations into trading irregularities, synthetic shares, or other market manipulation allegations tied to MMTLP, providing plausible deniability for those involved.

222.    Bankruptcy could allow participants with short positions or other financial entanglements to benefit from a market reset. If shares become delisted, worthless, or consolidated, short-sellers might avoid covering their positions at higher costs, particularly if synthetic shares were involved.

223.    Bankruptcy could enable some actors to shift blame onto external circumstances, including financial distress or mismanagement within META II, rather than acknowledging market manipulation, synthetic shares, or improper handling of the MMTLP spin-off and trading halt.

224.    If META II's assets were sold off during bankruptcy, market participants might acquire valuable intellectual property or technology at a discount, potentially profiting from META's collapse while distancing themselves from the controversies surrounding MMTLP.

225.    Bankruptcy could demoralize retail shareholders and reduce the resources available for lawsuits or advocacy campaigns. This would reduce pressure on market participants to address outstanding grievances or financial losses tied to MMTLP.

226.    Christian has been frequently mentioned online in connection with the META II bankruptcy trustees, reportedly working to investigate whether shorting or spoofing activities took place.

227.    Christian was publicly involved with Flamethrower, alongside Brda, in efforts to uncover evidence of alleged naked short selling in MMTLP. However, there is no public record indicating that any claims of illegal activity were formally identified or brought before a court of law between March 2023 and the present.

228.    Between August 1, 2007, and August 31, 2024, FINRA issued 1,040 UPC notices, with only 49 notices (4.71%) referencing trading halts, categorized under "Halted" or "HALT." These notices typically applied to temporary suspensions governed by FINRA Rule 6440 and were issued to address short-term uncertainties surrounding a security. The indefinite nature of the U3 halt on MMTLP diverges sharply from this established pattern, making it highly unusual in comparison.

229.    The MMTLP U3 halt was cited as being caused by an "extraordinary event," but FINRA provided no further explanation to shareholders or the public, a departure from standard practice under Rule 6440. Unlike other notices involving "Significant Uncertainty," which appeared in 0.96% of UPC notices and were tied to clear settlement or clearance concerns, the reasons behind the U3 halt remain vague and insufficiently explained.

230.    The overwhelming majority of UPC notices, 695 out of 1,040 (66.83%), referenced "Reorganization," reflecting standard regulatory actions tied to corporate mergers,

bankruptcies, and share cancellations. The absence of such a reorganization notice in the case of MMTLP indicates that the halt was not consistent with FINRA's usual handling of corporate transitions and further underscores the irregularity of the U3 halt.

231.    As of February 8, 2024, the SEC acknowledged receiving 848 complaints related to MMTLP through FOIA disclosures, alongside approximately 56,490 emails regarding MMTLP sent by concerned investors. This volume of complaints is unprecedented and reflects the extraordinary financial and emotional harm experienced by shareholders as a result of the U3 halt and the lack of transparency surrounding its implementation.

232.    The indefinite suspension of MMTLP trading occurred during a critical corporate transition, as the security was set to convert into private shares of NBH. Unlike typical halts tied to reorganizations or share cancellations, FINRA failed to provide the public with an adequate explanation or notice aligned with these established regulatory practices. This deviation created confusion and uncertainty among shareholders, amplifying their financial losses.

233.    The MMTLP U3 halt raises significant questions about FINRA's ability to fulfill its regulatory mandate of protecting investors and ensuring fair market conditions. The lack of transparency and procedural irregularities surrounding the halt stand in sharp contrast to FINRA's documented focus on managing predictable corporate events like reorganizations, cancellations, and temporary disruptions, as reflected in the UPC notice data.

234.    On October 2, 2024, University Lands issued a formal termination letter to Hudspeth Operating (HudOp), a subsidiary of NBH, citing breaches of the Development Unit Agreement (DUA) due to the non-payment of annual royalties and HudOp's refusal to fulfill its drilling obligations for the 2024 operational year. (Relevant supporting documentation is available)

235.     The termination letter also highlighted HudOp's lack of any concrete plans for future development of the Orogrande lease, further demonstrating its failure to meet the terms of the agreement. University Lands demanded the release of the lease within 90 days and retained the right to pursue legal remedies if HudOp failed to comply with its environmental responsibilities, including plugging existing wells and remediating the land.

236.     In response to the October 2, 2024, termination of the Orogrande lease, McCabe, Chairman and CEO of NBH, expressed disappointment with University Lands' decision, framing it as a setback for the company. (Relevant supporting documentation is available)

237.     However, NBH has not taken any formal corporate measures to address the lease termination, leaving shareholders questioning the company's commitment to the Orogrande project and its broader operational strategy. This lack of action has further fueled concerns about NBH's management and the viability of its core assets.

238.     On November 15, 2024, the plaintiff, a shareholder of Next Bridge Hydrocarbons (NBH), submitted a formal Request for Information (RFI) to NBH. The RFI raised critical questions regarding corporate governance, the total share count, discrepancies in share delivery, and the resolution of potential naked short selling. (Relevant supporting documentation is available)

239.     Despite the legal rights granted under Texas Business Organizations Code Section 21.218 and Nevada Revised Statutes Chapter 78.257, NBH failed to provide a comprehensive response to the RFI within the 14-day deadline specified.

240.     The RFI was sent by USPS Registered Mail to NBH's registered address at 300 Ridglea Pl, Suite 950, Fort Worth, TX, 76116 on November 8, 2024; USPS records show only that it was signed for.

241.    This lack of response obstructed the shareholder's ability to assess management practices and investigate discrepancies, raising concerns about transparency and adherence to fiduciary obligations.

242.    A formal Books and Records Check was demanded from McCabe and NBH by the Plaintiff on November 19, 2024, and seven other shareholders. This letter requesting lawful shareholder access to records held by McCabe and NBH was officially served to McCabe at 500 W Texas Ave Ste 890, Midland, TX 79701. (Relevant supporting documentation is available)

243.    To date, no response to the Books and Records Check has been received from McCabe or NBH.

244.    On November 25, 2024, NBH issued an official communication via investor relations email stating that the company had relocated its corporate offices from 300 Ridglea Pl, Suite 950, Fort Worth, TX, 76116, to Midland, Texas, within the offices of McCabe Petroleum Corporation (MPC) under a rent-free agreement. (Relevant supporting documentation is available)

245.    The announcement omitted the full address of the new location and contradicted existing public records, including NBH's most recent SEC Form 10-Q filed on September 30, 2024, and its last EDGAR filing on October 8, 2024, which both listed the Fort Worth address as its business location.

246.    Additionally, USPS and internet records continue to reflect the Fort Worth address, creating confusion and undermining transparency regarding NBH's corporate headquarters. (Relevant supporting documentation is available)

247.    According to the November 2024 report titled SEC's Oversight of the Financial Industry Regulatory Authority by the Government Accountability Office (GAO), the SEC

conducted 21 program inspections of FINRA between fiscal years 2021 and 2023. These inspections addressed eight of the ten issue areas outlined in Section 964 of the Dodd-Frank Act, including governance, transparency, and conflict-of-interest management.

248.    The November 2024 GAO report emphasizes that Section 964 of the Dodd-Frank Act requires regular evaluations of FINRA's governance, operations, and compliance. This mandate underscores the importance of regulatory oversight in protecting investors and maintaining market integrity.

249.    The November 2024 GAO report states that in 2022, the SEC adopted new outcome-based performance measures for its oversight of FINRA, following prior GAO recommendations. These measures focused on ensuring FINRA takes corrective actions and improving operational transparency.

250.    According to the November 2024 GAO report, the most frequently addressed issue in SEC inspections during the review period was FINRA's transparency and governance, highlighting persistent concerns regarding its accountability.

251.    As detailed in the November 2024 GAO report, the SEC incorporates emerging risks into its oversight of FINRA through ongoing monitoring, including responding to tips, complaints, and referrals, as well as a risk-based priority planning process to guide inspections.

252.    As of December 4, 2024, there is no publicly available information indicating that Representative Ralph Norman's letter to the SEC and FINRA regarding MMTLP has led to any significant regulatory actions or policy changes.

253.    While the letter, co-signed by over 70 members of Congress, called for a comprehensive review of the events surrounding MMTLP, the SEC and FINRA have not publicly disclosed any substantial measures taken in response.

254.    Throughout 2019 and 2022, the Depository Trust & Clearing Corporation (DTCC) managed the clearing and settlement processes for TRCH, MMAT, and MMTLP trades.

255.    Investor communications and related records from the period reflect discrepancies in settlement obligations related to synthetic shares.

256.    To date, no publicly available information indicates that the DTCC has taken any action, either before or after the U3 halt by FINRA, to resolve share counts, address short interest, or reconcile and audit the numerous settlement concerns related to MMTLP shares.

257.    From late 2022 through 2024, AST/EQ, acting as the designated transfer agent, managed the shareholder reconciliation process during the transition of MMTLP shares to NBH. Shareholder records during this period reflected discrepancies in share counts, which were left unresolved. (Relevant supporting documentation is available)

258.    To date, neither AST/EQ (Equiniti) nor NBH has produced a publicly available document reconciling the share count for MMTLP, despite nearly two years having passed since the NBH spin-off. This failure to provide a transparent accounting of outstanding and beneficially owned shares has left investors without critical information necessary to validate ownership and address systemic discrepancies.

259.    Throughout 2022 and 2024, regulatory bodies including FINRA, the SEC, and the DTCC did not coordinate effectively to address market irregularities in TRCH, MMAT, and MMTLP trading. This lack of coordination contributed to prolonged issues with share reconciliation and investor harm.

260.    To date, no formal or publicly available plan to remedy the "extraordinary event" involving MMTLP shares has been recommended or implemented by the SEC, FINRA, or DTCC, leaving investors without resolution or recourse.

261.    Throughout 2023 and 2024, shareholders with valid CUSIP records experienced ongoing discrepancies in share reconciliation during the MMTLP-to-NBH transition. These discrepancies remain unresolved, leaving some shareholders without clarity on their holdings. (Relevant supporting documentation is available)

262.    In fact, it has been well established that over 18 different internal CUSIPs are or have been used to track MMTLP holdings in various broker-dealers such as Charles Schwab, Robinhood, TradeStation, E*Trade, JP Morgan, Fidelity, Vanguard, Interactive Brokers, among many others. (Relevant supporting documentation is available)

263.    TD Ameritrade used internal CUSIP 6DA993019, and Charles Schwab uses internal CUSIP 629999590 to track MMTLP shares that have not yet been converted to NBH through the transfer agent AST/EQ, almost two years after the spin-off to NBH.

264.    To date, MMTLP shareholders continue to have internal CUSIP placeholders at Charles Schwab and other broker-dealers and have not received their NBH shares, despite nearly two years having passed since the spin-off.

265.    As of the present date, NBH has not been assigned a CUSIP number for all its shares, leaving its securities without a standardized identifier for trading or record-keeping purposes.

266.    This absence creates challenges in identifying and managing transactions involving NBH's common stock, complicating compliance with financial reporting standards and market transparency.

267.    The lack of a CUSIP number for NBH highlights a gap in ensuring the orderly trading and tracking of its securities within financial markets.

268.    While the definitive number of outstanding shares still held by broker-dealers through internal CUSIPs and not registered with AST/EQ is undetermined, even a single unreconciled share highlights a significant issue.

269.    Reports and social media posts featuring redacted brokerage statements indicate that hundreds of individuals, collectively holding thousands of shares, remain affected. In total, thousands, if not millions, of shares remain unreconciled more than two years after the spin-off, irrespective of the FINRA-imposed U3 halt. (Relevant supporting documentation is available)

270.    The inability to reconcile all MMTLP shares to NBH shares, two years later at AST/EQ, highlights a major gap in ensuring the orderly trading and tracking of its securities within financial markets.

271.    Also worth considering is that in January 2021, the GameStop (GME) event unfolded as retail investors, coordinated through social media platforms like Reddit's WallStreetBets, initiated a short squeeze targeting heavily shorted stocks. This led to GameStop's stock price surging over 1,000% within days. (Relevant supporting documentation is available)

272.    Regulators, including the SEC, responded swiftly with public statements about market volatility and integrity, and brokerages such as Robinhood imposed temporary trading restrictions, citing liquidity concerns. These restrictions, while controversial, were quickly lifted, allowing GME trading to resume.

273.    Congressional hearings were convened within weeks, featuring testimony from Robinhood executives, hedge funds, and retail advocates, while regulators pledged to investigate systemic risks exposed by the volatility.

274.    The GameStop event ultimately received widespread media attention, immediate regulatory acknowledgment, and a comprehensive examination of its impact on retail investors and the broader market.

275.    In stark contrast, the MMTLP event began on December 9, 2022, when FINRA issued a sudden U3 trading halt on META II's Series A Preferred Shares (MMTLP) just two days before their planned transition into NBH, a private company.

276.    Unlike GameStop, where trading resumed promptly after temporary restrictions, the MMTLP trading halt has remained in effect for 725 days as of December 4, 2024. FINRA cited an "extraordinary event" to justify the halt but failed to provide a detailed explanation at the time.

277.    The first communication regarding the halt came 97 days later, in March 2023, through a FINRA FAQ that did not clarify the nature of the "extraordinary event." A supplemental FAQ was issued 332 days after the halt but also failed to address key concerns, including the allegations of synthetic shares or the systemic failures affecting retail investors.

278.    Despite tens of thousands of complaints submitted to FINRA, the SEC, and Congressional Representatives, no Congressional hearings or meaningful investigations have taken place. Shareholders remain unable to trade their positions, and MMTLP investors continue to face financial harm with no clear recourse.

279.    Unlike GameStop, which received immediate regulatory scrutiny and resumed trading, MMTLP investors have endured prolonged inaction and a lack of accountability, highlighting significant disparities in how the two events were addressed.

280.    Institutional market participants, including broker-dealers and market makers, profited from the creation and trading of synthetic shares during the MMTLP transition. Retail investors, however, experienced significant financial losses as a result of these trading practices.

281.    These institutional participants stand to make considerable profits by not closing their short positions, particularly when synthetic shares or naked short selling is used as a trading tactic. If NBH were to declare bankruptcy, all shares would become worthless, relieving short sellers of all financial liabilities, regardless of the FINRA-imposed U3 halt.

282.    Public records and shareholder complaints from 2023 and 2024 indicate systemic delays in resolving trading discrepancies related to MMTLP shares. Retail investors were left without a clear resolution or recourse for their financial losses.

283.    The prolonged inaction by regulatory bodies, over the last two years, combined with unresolved trading irregularities, has contributed to diminished trust in the transparency and fairness of U.S. financial markets. Retail investors remain uncertain about the status of their holdings and future resolutions.

284.    Institutional market participants engaged in trading practices involving synthetic MMTLP shares that created an oversupply in the market. This artificial oversupply contributed to the suppression of legitimate share prices.

285.    Retail investors have experienced ongoing difficulties in accessing their investments in MMTLP shares following the U3 halt. The lack of liquidity has resulted in prolonged financial uncertainty and loss.

286.    To date, FINRA has refused all attempts to provide access to the Blue Sheet records for META II (MMAT) and MMTLP, despite repeated requests from shareholders, legal

and government representatives, or advocacy groups seeking transparency regarding trading activity.

287.    FINRA's decision not to release Blue Sheet records has prevented retail investors from accessing critical information regarding trading activity, raising concerns about regulatory transparency, accountability, and market integrity.

288.    FINRA's refusal to release these records has exacerbated the financial and emotional harm suffered by retail investors and has raised significant concerns about regulatory accountability and oversight in safeguarding market integrity.

289.    Shareholders have repeatedly requested audits of MMTLP share discrepancies to distinguish legitimate shares from synthetic ones. To date, no comprehensive audit has been conducted, leaving unresolved questions about the status of outstanding shares.

290.    Synthetic share creation and trading irregularities during the MMTLP-to-NBH transition have contributed to financial harm for retail investors. These actions have highlighted vulnerabilities in market oversight, transparency, and enforcement.

291.    The U3 halt and the prolonged lack of resolution for investors highlight the potential concerns stemming from FINRA's privately governed structure, as it may bypass safeguards designed to promote transparency and oversight.

292.    FINRA's authority over market participants, particularly in cases of disciplinary or enforcement actions like the trading halt, underscores its substantial role in securities regulation and the constitutional considerations of its accountability and governance.

293.    Questions regarding FINRA's constitutional role have been articulated in legal principles, particularly those involving the nondelegation doctrine, and are highly relevant to its handling of the MMTLP U3 trading halt issued on December 9, 2022.

294.    The private nondelegation doctrine, grounded in the separation of powers established by the Constitution, prevents Congress from delegating legislative authority without clear and specific guidance. In *Securities and Exchange Commission v. Jarkesy*, the Supreme Court reaffirmed that regulatory agencies must adhere strictly to statutory limits and constitutional principles. FINRA, a private entity wielding quasi-governmental power, has issued broad and impactful trading halts without sufficient statutory oversight or alignment with constitutional checks and balances. This unchecked authority is precisely the kind of overreach the framers sought to prevent by carefully delineating the powers of Congress, the executive, and independent entities.

295.    Concerns arise as to whether FINRA's sweeping powers align with Article I of the U.S. Constitution, given its private governance structure and the lack of intelligible principles guiding its regulatory actions.

296.    Cases such as *American Trucking Associations v. Whitman* (2001) have established critical guardrails against the overreach of delegated authority. Similar to those circumstances, FINRA's actions demonstrate an unconstitutional expansion of its delegated powers, exceeding the bounds Congress intended. In parallel, the D.C. Circuit's ruling in *Alpine Securities Corp. v. FINRA* highlighted comparable constitutional breaches, providing a judicial precedent directly applicable to this case.

297.    The application of these delegated powers during the U3 halt—where investors were left without access to their assets or meaningful resolution for nearly two years— exemplifies the constitutional considerations surrounding FINRA's role.

298.    The nondelegation doctrine underscores the importance of ensuring that quasi-governmental entities like FINRA operate with accountability and within constitutionally defined

limits, particularly in situations where their actions impose significant and lasting consequences on market participants.

299.    Throughout the MMTLP-to-NBH transition, regulatory bodies have deflected responsibility for addressing trading irregularities, leaving investors without a resolution for two years. The lack of clear accountability has prolonged market instability and shareholder uncertainty.

300.    Retail investors have borne the brunt of systemic inefficiencies, regulatory inaction, and market manipulation, suffering significant financial losses while institutional actors have largely escaped accountability.

301.    The SEC's failure to exercise effective oversight over FINRA's quasi-governmental role constitutes a breach of its duties under Article II's Vesting Clause. This lack of accountability has enabled FINRA to operate without sufficient checks, effectively undermining constitutional governance principles and investor protections.

302.    The continued lack of resolution for the MMTLP event has eroded investor confidence in the integrity and the assumption of fairness in U.S. financial markets.

303.    The right to a jury trial, as guaranteed by the Seventh Amendment, applies where monetary damages are sought due to regulatory misconduct. Here, investors suffered quantifiable losses caused by FINRA's and the SEC's statutory violations and market interference. These damages include lost market value, frozen assets, and denied shareholder rights. The loss of liquidity further compounded the harm, denying investors the opportunity to reinvest their capital at a critical market juncture. For example, had investors been able to access their funds, they could have pursued lucrative opportunities such as NVDA following ChatGPT's launch. This factual dispute about investor harm and regulatory overreach must be resolved by a jury.

## V. <u>ALLEGATIONS</u>

304.    The Plaintiff has brought this action to address systemic failures in the U.S. financial markets that have harmed retail investors through a combination of regulatory negligence, manipulative practices, breaches of fiduciary duty, and constitutional violations. At the center of this case lies FINRA's indefinite U3 trading halt on MMTLP shares, which deprived investors of access to their assets without adequate explanation or resolution. This halt exemplifies the unchecked powers of a self-regulatory organization operating without sufficient oversight, raising constitutional concerns under the separation of powers, the Appointments Clause, and the private nondelegation doctrine. Recent legal precedents, including SEC v. Sloan and Alpine Securities Corp. v. FINRA, underscore the statutory and constitutional violations inherent in FINRA's actions and the need for judicial intervention.

305.    FINRA's actions were exacerbated by systemic failures of other regulatory bodies, including the SEC and the DTCC, to fulfill their statutory duties under the Securities Exchange Act and related rules. These entities failed to monitor, investigate, or remedy widespread market abuses such as synthetic share creation, naked short selling, and persistent failures to deliver (FTDs) in violation of Regulation SHO. These manipulative practices distorted the market for MMTLP shares, artificially suppressing share value and allowing institutional participants to profit at the expense of retail investors.

306.    The Plaintiff further highlights the role of META II and its predecessor, Torchlight, as well as leadership at NBH, in failing to disclose material information, address trading irregularities, and reconcile outstanding share discrepancies. These corporate Defendants breached their fiduciary duties to shareholders under the Investment Company Act and other

applicable statutes. Their actions and omissions, including the issuance of misleading public statements and failure to implement internal controls as required under Sarbanes-Oxley Act Sections 302 and 404, directly contributed to shareholder harm and prolonged uncertainty.

307.    Evidence suggests that certain market participants, including GTS Securities and Canaccord Genuity, engaged in trading activities that created artificial market conditions surrounding MMTLP shares. Patterns of naked short selling, synthetic share proliferation, and excessive fails-to-deliver (FTDs) indicate systemic irregularities that suppressed legitimate market demand. These entities appear to have exploited regulatory loopholes, such as exemptions under Regulation SHO, to introduce counterfeit shares into the market, thereby flooding the supply of MMTLP shares and manipulating share prices. Publicly available trading volume reports and irregular discrepancies in share settlement records further point to the need for a comprehensive investigation into potential collusion or coordinated manipulation. The harm caused by these practices disproportionately impacted retail investors, including the Plaintiff, while allowing institutional participants to profit at their expense.

308.    Analysis of trading patterns, market activity, and shareholder records suggests that Defendants may have engaged in practices that manipulated trading conditions for MMTLP shares. Evidence of irregular trading volumes, unexplained discrepancies in outstanding share counts, and excessive fails-to-deliver points to the likelihood of synthetic share creation and market imbalance. Shareholders, including the Plaintiff, were left unable to reconcile their holdings or recover the fair value of their investments as trading dynamics appeared distorted beyond natural supply and demand. The possibility of intentional or coordinated manipulation among market participants requires thorough investigation to determine the extent of misconduct and identify all responsible parties.

309.    Concerns persist regarding Defendants' collective role in contributing to an environment of misrepresentation, trading irregularities, and suppressed share value. The lack of transparency surrounding MMTLP share structure, synthetic positions, and settlement failures raises substantial questions about potential breaches of fiduciary duties, regulatory violations, and deceptive practices. Shareholders, including the Plaintiff, have suffered significant financial harm as a result of this apparent failure to ensure fair and orderly markets. While specific trading activities, such as naked short selling, may have been enabled by systemic deficiencies, the precise scope of these failures and their impact require judicial oversight and further evidentiary review.

310.    The prolonged inaction of regulatory bodies in addressing the U3 halt and related market irregularities stands in stark contrast to the swift responses observed in other high-profile market disruptions, such as the GameStop trading episode. This disparate treatment highlights the systemic inequities faced by retail investors and the need for consistent regulatory enforcement to ensure market integrity and equitable treatment under the law.

311.    FINRA's handling of the U3 trading halt on MMTLP shares, alongside the inaction of other regulatory bodies such as the SEC and DTCC, highlights significant governance concerns and systemic regulatory failures. FINRA imposed the indefinite halt without adequate notice, transparency, or resolution, leaving tens of thousands of investors in prolonged financial uncertainty. This halt, coupled with persistent irregularities in share settlements and unexplained synthetic share creation, raises questions about the adequacy of regulatory oversight and whether FINRA acted within the scope of its authority. These governance deficiencies require judicial scrutiny to determine their legality, constitutionality, and impact on investor protections under federal securities laws.

312.    The concerns raised herein reflect broader vulnerabilities within U.S. financial markets that have disproportionately harmed retail investors. Systemic issues such as synthetic share proliferation, naked short selling, and regulatory inaction indicate potential governance flaws that undermine market integrity and investor confidence. While institutional participants have seemingly benefited from these irregularities, tens of thousands of retail investors remain unable to reconcile their holdings, trade their shares, or access the fair value of their investments. Judicial intervention is necessary to uncover the extent of these systemic failures, hold accountable those responsible, and ensure protections are restored for all market participants.

313.    In bringing this action, the Plaintiff seeks to hold the Defendants accountable for their roles in enabling systemic market manipulation, regulatory negligence, breaches of fiduciary duty, and conspiracy to commit fraud. This Court has the opportunity to reaffirm the statutory and constitutional principles governing regulatory authority, restore fairness and transparency to the financial markets, and protect the rights of retail investors whose trust in the system has been profoundly eroded.

314.    The following legal and factual questions arise from the Plaintiff's claims and are critical to determining liability, damages, and appropriate relief in this matter:

a.    Whether Defendants violated the Securities Exchange Act of 1934 and other applicable federal securities laws, particularly by failing to maintain market integrity, allowing manipulative practices such as the creation and trading of synthetic shares, and neglecting their statutory duties to protect investors.

b.    Whether Defendants engaged in anticompetitive conduct or market manipulation in violation of the Sherman Antitrust Act and the Clayton Act, fostering a monopolistic and exploitative environment detrimental to retail investors.

c.   Whether FINRA's issuance of the U3 halt on December 9, 2022, was justified under applicable laws and regulations, and whether FINRA, SEC, and DTCC demonstrated the requisite diligence and transparency in resolving the trading halt and its consequences.

d.   Whether the SEC, FINRA, and DTCC failed to fulfill their regulatory responsibilities by supervising one another, enforcing compliance with federal securities laws, and investigating and addressing synthetic share discrepancies during the MMTLP-to-NBH transition.

e.   Whether FINRA's governance structure, as a private self-regulatory organization exercising significant quasi-governmental authority without sufficient oversight, violated constitutional principles, including the separation of powers, the Appointments Clause, and the private nondelegation doctrine.

f.   Whether the Private Securities Litigation Reform Act of 1995 (PSLRA) unconstitutionally obstructs retail investors, such as the Plaintiff, from pursuing securities fraud claims by imposing heightened pleading standards and discovery stays that deny access to critical evidence, thereby preventing the resolution of claims related to systemic market manipulation, such as the proliferation of synthetic shares and the FINRA-imposed U3 halt on MMTLP.

g.   Whether GTS Securities and other market participants violated their legal obligations by engaging in manipulative trading practices, including naked short selling, synthetic share creation, and other actions that suppressed legitimate share prices and exacerbated harm to retail investors.

h.   Whether broker-dealers, including Charles Schwab, breached fiduciary duties owed to retail investors by facilitating trading irregularities, profiting from the proliferation of synthetic shares, and failing to reconcile oversold positions, despite their statutory obligation to safeguard customer securities and funds.

i.   Whether AST/EQ and the DTCC failed to accurately reconcile synthetic shares and legitimate beneficial ownership during the MMTLP-to-NBH transition, leaving retail investors in financial and legal uncertainty.

j.   Whether Torchlight, META II, and NBH corporate leadership were aware of widespread trading irregularities, including synthetic share discrepancies, and whether their failure to act contributed to prolonged harm to shareholders.

k.   Whether FINRA, SEC, and DTCC demonstrated negligence, incompetence, or apathy by failing to investigate and resolve market irregularities, discrepancies in share counts, and systemic failures to reconcile shareholder accounts, thereby fostering an environment of regulatory inaction and prolonged harm to retail investors.

l.   Whether FINRA and other regulatory bodies acted beyond their statutory and procedural authority by imposing the U3 halt without providing transparent and timely justification, violating the principles articulated in SEC v. Sloan and other applicable precedents.

m.   Whether the lack of coordination and communication between the SEC, FINRA, and DTCC directly contributed to unresolved discrepancies in MMTLP and NBH shares, leaving investors without clarity, resolution, or access to their assets.

n.   Whether retail investors, including the Plaintiff, suffered a violation of their due process rights due to the lack of clarity, transparency, and recourse options provided

during and after the U3 trading halt, and whether such deficiencies warrant compensatory, injunctive, and punitive relief.

o.   Whether Defendants failed to disclose material information (e.g., trading irregularities, synthetic share creation, or share discrepancies) that would have informed investors, mitigated harm, and preserved market confidence.

p.   Whether institutional market participants, including market makers and broker-dealers, engaged in unjust enrichment by profiting from trading irregularities, exploiting synthetic shares and naked short positions, and avoiding financial liabilities at the expense of retail investors.

q.   Whether FINRA, SEC, DTCC, and associated broker-dealers violated investor protection laws by failing to address systemic vulnerabilities and permitting irregularities that undermined market transparency and fairness.

r.   Whether retail investors, including the Plaintiff, are entitled to compensatory and punitive damages, injunctive relief, and systemic reforms to address the financial and emotional harm suffered due to the Defendants' collective misconduct.

s.   Whether Defendants' failures, omissions, and alleged misconduct reflect broader systemic flaws in the regulatory framework governing the securities markets, necessitating judicial intervention to safeguard market integrity and protect the rights of retail investors.

t.   Whether the refusal to disclose critical trading data, such as Blue Sheets, impeded investors' ability to investigate claims of market manipulation and reconcile outstanding share discrepancies, further exacerbating financial harm.

u.  Whether retail investors were disproportionately harmed compared to institutional participants, who avoided liabilities and profited from systemic market irregularities, creating an inequitable environment in violation of federal securities and antitrust laws.

v.  Whether the actions of FINRA and the SEC violated the principles of administrative law, including the Administrative Procedure Act (APA), by failing to provide adequate notice, an opportunity for comment, or a reasoned explanation for the MMTLP U3 halt and subsequent inaction.

w.  Whether FINRA acted ultra vires (beyond its authority) by unilaterally altering the corporate action notice and imposing a trading halt without statutory or procedural justification, and whether such actions exceeded the scope of its delegated authority under the Securities Exchange Act of 1934.

x.  Whether broker-dealers knowingly engaged in deceptive practices, including misrepresenting the availability or settlement status of MMTLP shares, thereby breaching fiduciary duties and contractual obligations owed to retail investors.

y.  Whether broker-dealers employed internal CUSIP numbers or similar mechanisms to obscure or perpetuate synthetic share discrepancies, circumventing transparency requirements under federal securities laws.

z.  Whether market makers, such as GTS Securities, were improperly granted exemptions under Regulation SHO, including bona fide market-making exemptions, that facilitated failures to deliver and the creation of synthetic shares, ultimately exacerbating harm to retail investors.

aa. Whether the lack of coordination and communication between FINRA, SEC, and DTCC violated statutory or regulatory mandates for oversight, information sharing, and

enforcement, thereby contributing to unresolved share discrepancies and prolonged investor harm.

bb. Whether FINRA adequately notified the SEC, DTCC, or issuers prior to issuing the U3 halt, and whether any such failure to communicate demonstrates negligence, incompetence, or procedural violations.

cc. Whether the Plaintiff and other retail investors were disproportionately harmed by systemic delays in reconciling share counts and settlement obligations, resulting in an inequitable advantage for institutional participants such as hedge funds and broker-dealers.

dd. Whether the refusal to release critical trading data, such as Blue Sheets and trade confirmations, constitutes a violation of statutory obligations for transparency, including the Freedom of Information Act (FOIA), and whether such refusals impeded investors' ability to investigate claims of market manipulation.

ee. Whether the leadership of Torchlight, META II, and NBH failed to disclose material risks, including unresolved short positions and synthetic share discrepancies, in violation of SEC disclosure requirements, thereby prolonging harm to shareholders.

ff.  Whether public statements made by corporate leadership regarding oil and gas asset valuations and corporate actions were misleading or false, contributing to investor harm and undermining market confidence.

gg. Whether the proliferation of synthetic shares and naked short selling in the MMTLP case highlights broader vulnerabilities in the regulatory framework governing over-the-counter (OTC) securities, warranting judicial intervention to address systemic flaws.

hh. Whether the Defendants' actions, omissions, and systemic practices fostered anti-competitive conditions, including a monopolistic or oligopolistic environment, that disproportionately harmed retail investors.

ii.  Whether the Plaintiff and other retail investors are entitled to restitution for direct financial losses, opportunity costs, emotional distress, and other consequential damages caused by the Defendants' misconduct.

jj.  Whether the court should mandate an independent audit of trading activity and share reconciliation during the MMTLP-to-NBH transition to ensure transparency, accountability, and resolution of synthetic share discrepancies.

kk. Whether institutional participants, including market makers and broker-dealers, unjustly enriched themselves through trading irregularities, exploiting synthetic shares and naked short positions, while avoiding financial liabilities at the expense of retail investors.

ll.  Whether the lack of inter-agency coordination and communication between FINRA, SEC, and DTCC contributed directly to the unresolved trading discrepancies in MMTLP and NBH shares, leaving investors without clarity or access to their assets.

mm.   Whether FINRA, the SEC, or other regulatory bodies breached their statutory duties under federal securities laws, such as the Securities Exchange Act of 1934, by failing to prevent or address the alleged market manipulation, including the creation of synthetic shares and the issuance of the U3 trading halt.

nn. Whether FINRA's governance structure and self-regulatory status violate constitutional principles of due process, transparency, or economic liberties.

oo. Whether the Ninth Amendment protects the Plaintiff's claimed property rights in MMTLP shares and whether FINRA's actions constitute an unlawful taking of property without due process or just compensation.

pp. Whether the defendants can be held liable under Rule 10b-5 or other provisions of the Securities Exchange Act for knowingly facilitating or failing to address synthetic shares and naked short selling.

qq. Whether individuals such as Plant, McCabe, and Brda breached fiduciary or legal duties owed to shareholders by their actions in promoting or managing the Orogrande Asset.

rr.  Whether public statements made by Plant, Brda, or others regarding the Orogrande Asset's potential value were accurate or whether they were misleading or fraudulent.

ss.  Whether irregularities in trading volumes or pricing patterns involving MMTLP were indicative of manipulation or negligence by market participants.

tt.  Whether the SEC or FINRA received complaints or warnings about synthetic shares or market manipulation involving MMTLP before the U3 halt and, if so, what actions were taken in response.

uu. Whether the Plaintiff and other shareholders suffered quantifiable financial harm, including unrealized gains and loss of access to trading, as a result of the defendants' actions or inactions.

vv. Whether the court should compel regulators to disclose specific trading records, including blue sheets, to address transparency concerns and provide accountability.

ww.   Whether META II's Chapter 7 bankruptcy filing, and subsequent liquidation proceedings have impeded efforts to access financial or operational records necessary to investigate trading irregularities, synthetic shares, or market manipulation allegations tied to MMTLP.

xx. Whether the bankruptcy proceedings have enabled market participants, including those with short positions or financial entanglements, to benefit from the resulting market reset, thereby avoiding potential liabilities or regulatory scrutiny.

yy. Whether granting the injunctive relief requested would significantly harm the defendants or whether it would primarily serve to remedy systemic issues and protect shareholders.

zz.  Whether systemic reforms are necessary to prevent similar issues in the future and whether the requested relief serves the public interest by ensuring fairer and more transparent markets.

## **Count 1: Violation of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

315.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

316.    Section 10(b) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78j(b), and Rule 10b-5, codified at 17 C.F.R. § 240.10b-5, prohibit the use of manipulative or deceptive devices in connection with the purchase or sale of securities.

317.    Defendants, including FINRA, DTCC, and corporate officers, engaged in manipulative practices such as synthetic share creation, naked short selling, and failures to deliver (FTDs), which violated Section 10(b) and Rule 10b-5 by misleading investors and artificially suppressing the value of MMTLP shares.

318.    FINRA violated Section 10(b) and Rule 10b-5 by allowing the proliferation of synthetic shares and imposing an indefinite U3 trading halt without adequate justification.

319.    DTCC violated Section 10(b) and Rule 10b-5 by failing to ensure accurate clearing and settlement processes, enabling unresolved FTDs.

320.    Corporate officers violated Section 10(b) and Rule 10b-5 by misrepresenting key facts about MMTLP shares and the transition to Next Bridge Hydrocarbons.

321.    These acts and omissions constitute violations of Section 10(b) and Rule 10b-5 by allowing fraud and deception to persist unchecked.

322.    As a direct result of these violations, Plaintiff suffered substantial financial losses and was deprived of the opportunity to trade MMTLP shares at their fair market value.

323.    Plaintiff seeks compensatory damages, punitive damages, and such other relief as the Court deems just and proper.

## Count 2: Negligence by Regulatory Bodies (FINRA and SEC)

324.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

325.    Defendants FINRA and SEC owed a duty of care to investors under the Securities Exchange Act of 1934, including compliance with 15 U.S.C. § 78o-3(b) (relating to self-regulatory organization responsibilities) and 15 U.S.C. § 78q (relating to recordkeeping and supervision requirements).

326.    FINRA breached this duty by failing to prevent synthetic share creation and naked short selling.

327.    FINRA also breached this duty by imposing an indefinite U3 trading halt without adequate notice or justification, leaving investors unable to access or trade their shares.

328.　The SEC breached its duty by failing to oversee FINRA and ensure compliance with its statutory obligations under the Securities Exchange Act.

329.　The SEC further breached its duty by neglecting to investigate and address widespread market manipulation and failures to deliver.

330.　These negligent acts and omissions directly caused Plaintiff to suffer financial harm and lose access to their investments.

331.　Plaintiff seeks compensatory damages, injunctive relief requiring Defendants to implement improved oversight mechanisms, and such other relief as the Court deems just and proper.

## Count 3: Breach of Fiduciary Duty by Corporate Officers

332.　Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

333.　Corporate officers, including but not limited to John Brda and Gregory McCabe, owed fiduciary duties to shareholders under state corporate governance laws, including duties of care, loyalty, and good faith.

334.　These officers breached their fiduciary duties by misrepresenting the financial and operational status of MMTLP shares and the transition to Next Bridge Hydrocarbons.

335.　They also failed to address or disclose the existence of synthetic shares and unresolved failures to deliver.

336.　Additionally, they neglected to advocate for shareholder protections during the U3 trading halt.

337.　As a direct result of these breaches, Plaintiff suffered financial losses and was deprived of critical information necessary to protect their investments.

338.    Plaintiff seeks compensatory damages, punitive damages, and such other relief as the Court deems just and proper.

## Count 4: Violation of the Sarbanes-Oxley Act

339.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

340.    The Sarbanes-Oxley Act of 2002, codified at 15 U.S.C. § 7201 et seq., requires corporate officers and entities to maintain accurate financial disclosures and comply with internal control standards.

341.    Defendants, including corporate officers and entities associated with MMTLP and Next Bridge Hydrocarbons, violated the Sarbanes-Oxley Act by failing to maintain accurate records regarding outstanding shares and synthetic shares.

342.    Defendants also misled investors through omissions and misstatements about the nature of MMTLP shares.

343.    These violations created a false impression of market stability and integrity, leading to significant financial harm for Plaintiff and other shareholders.

344.    Plaintiff seeks compensatory damages, injunctive relief mandating compliance with the Sarbanes-Oxley Act, and such other relief as the Court deems appropriate.

## Count 5: Violation of Regulation FD (Fair Disclosure)

345.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

346.    Regulation FD, codified at 17 C.F.R. § 243.100 et seq., prohibits selective disclosure of material information to ensure all investors have equal access to critical information about a company's operations.

347.    Corporate officers and entities associated with MMTLP and Next Bridge Hydrocarbons violated Regulation FD by failing to disclose material information about unresolved failures to deliver and synthetic shares.

348.    They also provided inconsistent and incomplete information to shareholders, creating an uneven playing field.

349.    These violations deprived Plaintiff of the ability to make informed decisions regarding their investments, causing financial harm.

350.    Plaintiff seeks compensatory damages, injunctive relief mandating compliance with Regulation FD, and such other relief as the Court deems just and proper.

## **Count 6: General Negligence by FINRA, SEC, and DTCC**

351.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

352.    Defendants FINRA, SEC, and DTCC owed a general duty of care to investors under federal securities laws, including but not limited to 15 U.S.C. §§ 78o-3, 78q, and 78s, to act reasonably in carrying out their regulatory and operational responsibilities.

353.    FINRA, SEC, and DTCC failed to prevent the creation and trading of synthetic shares, violating their obligations under federal law.

354.    These Defendants also allowed prolonged failures to deliver and market manipulation to persist, further breaching their duty of care.

355.    Additionally, these Defendants imposed and failed to address the impact of the U3 trading halt on investors, compounding the harm caused to retail investors, including Plaintiff.

356.    As a direct result of these negligent acts, Plaintiff suffered substantial financial losses and was deprived of access to their investments.

357.    Plaintiff seeks compensatory damages, punitive damages, and such other relief as the Court deems appropriate.

### Count 7: Breach of Contract by FINRA and DTCC

358.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

359.    FINRA and DTCC, as self-regulatory organizations, are required by 15 U.S.C. § 78o-3(b) and related regulations to enforce rules that promote fair trading practices, accurate recordkeeping, and efficient clearing and settlement of transactions.

360.    FINRA and DTCC breached their obligations by failing to enforce rules designed to prevent market manipulation and failures to deliver.

361.    These Defendants also allowed synthetic shares to proliferate and unresolved discrepancies in shareholder accounts to persist, violating their obligations under the Securities Exchange Act and their own regulatory frameworks.

362.    As a direct result of these breaches, Plaintiff suffered financial harm.

363.    Plaintiff seeks compensatory damages, specific performance of contractual obligations, and such other relief as the Court deems just and proper.

### Count 8: SEC's Failure to Oversee FINRA and DTCC

364.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

365.    The SEC, as the federal regulatory agency overseeing FINRA and DTCC, has statutory obligations under 15 U.S.C. §§ 78q and 78s to exercise adequate supervision and enforce compliance with securities laws.

366.    The SEC failed to fulfill its oversight obligations by allowing systemic abuses, including synthetic share creation, naked short selling, and unresolved failures to deliver, to persist.

367.    The SEC also failed to address FINRA's imposition of the indefinite U3 trading halt, which caused harm to retail investors, including Plaintiff.

368.    As a direct result of the SEC's oversight failures, Plaintiff suffered substantial financial losses.

369.    Plaintiff seeks compensatory damages, injunctive relief mandating improved SEC oversight, and such other relief as the Court deems appropriate.

### Count 9: Fraudulent Inducement and Misrepresentation by Corporate Officers

370.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

371.    Corporate officers, including but not limited to John Brda and Gregory McCabe, knowingly made false statements and omissions regarding the nature and value of MMTLP shares and the transition to Next Bridge Hydrocarbons.

372.    These misrepresentations and omissions violated federal securities laws, including 15 U.S.C. §§ 78j(b) and 78r, by misleading investors about material facts.

373.    Corporate officers misrepresented the existence and impact of synthetic shares and unresolved failures to deliver.

374.    They also made false statements about the financial prospects and marketability of assets tied to MMTLP shares.

375.    Plaintiff, relying on these false statements and omissions, was induced to retain their shares, resulting in substantial financial harm when the U3 trading halt rendered them unable to access or trade their investments.

376.    These actions constitute fraudulent inducement and misrepresentation under applicable federal and state laws.

377.    Plaintiff seeks compensatory damages, punitive damages, and such other relief as the Court deems just and proper.

### **Count 10: Failure to Supervise by FINRA and SEC**

378.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

379.    FINRA and the SEC, as regulatory bodies, owed a duty to supervise market participants and self-regulatory organizations (SROs) under 15 U.S.C. § 78q and 15 U.S.C. § 78s to prevent fraudulent and manipulative practices.

380.    FINRA and the SEC failed to monitor and address the proliferation of synthetic shares and unresolved failures to deliver, breaching their statutory supervisory obligations.

381.    They also failed to prevent manipulative practices, including naked short selling, that harmed retail investors, including Plaintiff.

382.    As a direct result of these supervisory failures, Plaintiff suffered substantial financial losses.

383.    Plaintiff seeks compensatory damages, injunctive relief mandating improved supervisory practices, and such other relief as the Court deems just and proper.

## Count 11: Negligent and Intentional Infliction of Emotional Distress

384.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

385.    Defendants, through their negligent and intentional actions, caused Plaintiff severe emotional distress.

386.    The imposition of the U3 trading halt deprived Plaintiff of access to their investments without notice or explanation, resulting in significant uncertainty and harm.

387.    Defendants also made misrepresentations and omissions that created prolonged uncertainty about the status and value of Plaintiff's shares, compounding the emotional harm.

388.    Defendants knew or should have known that their actions would cause significant emotional harm to investors, including Plaintiff, who relied on their regulatory and fiduciary duties.

389.    As a direct result, Plaintiff experienced severe anxiety, financial uncertainty, and emotional distress, warranting compensatory damages.

390.    Plaintiff seeks damages for emotional distress and such other relief as the Court deems just and proper.

## Count 12: Conspiracy to Commit Fraud

391.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

392.    Defendants, including FINRA, DTCC, corporate officers, and other market participants, conspired to commit fraud by facilitating the creation and proliferation of synthetic shares.

393.    Defendants engaged in manipulative practices, including naked short selling and failures to deliver, which suppressed the value of MMTLP shares in violation of 15 U.S.C. § 78j(b) and related securities laws.

394.    Defendants also misled investors through false statements, omissions, and the imposition of the U3 trading halt, coordinated to harm retail investors.

395.    The conspiratorial actions of Defendants were designed to deprive investors, including Plaintiff, of the fair market value of their shares.

396.    As a direct result of this conspiracy, Plaintiff suffered substantial financial losses.

397.    Plaintiff seeks compensatory damages, punitive damages, and such other relief as the Court deems just and proper.

## Count 13: Violation of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 by the SEC

398.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

399.    Section 10(b) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78j(b), and Rule 10b-5, codified at 17 C.F.R. § 240.10b-5, prohibit the use of manipulative or deceptive devices in connection with the purchase or sale of securities.

400.    The SEC, as the primary federal securities regulator, failed to prevent and address manipulative practices, including synthetic share creation, naked short selling, and failures to deliver (FTDs), which violated Section 10(b) and Rule 10b-5.

401.    The SEC's inaction allowed these manipulative practices to persist unchecked, misleading investors and artificially suppressing the value of MMTLP shares.

402.    As a direct result of the SEC's violations, Plaintiff suffered substantial financial losses and was deprived of the opportunity to trade MMTLP shares at their fair market value.

403.    Plaintiff seeks compensatory damages, punitive damages, and such other relief as the Court deems just and proper.

**Count 14: Violation of Section 17A of the Securities Exchange Act of 1934 by the SEC**

404.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

405.    Section 17A of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78q-1, requires the SEC to ensure the efficient and reliable clearing and settlement of securities transactions to protect investors and promote market integrity.

406.    The SEC failed to enforce compliance with Section 17A, allowing clearing entities such as the DTCC to operate without adequate oversight and enabling systemic abuses like synthetic share creation and unresolved failures to deliver.

407.    These failures directly contributed to market manipulation and disruptions in the clearing and settlement processes, causing financial harm to Plaintiff.

408.    Plaintiff seeks compensatory damages, declaratory relief affirming the SEC's obligations under Section 17A, and such other relief as the Court deems appropriate.

**Count 15: Violation of Regulation SHO (17 C.F.R. § 242.204) by the SEC**

409.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

410.    Regulation SHO, codified at 17 C.F.R. § 242.204, requires broker-dealers and market participants to close out failures to deliver (FTDs) promptly to prevent manipulative practices such as naked short selling.

411.    The SEC, as the regulatory body responsible for enforcing Regulation SHO, failed to ensure compliance with its provisions in connection with the trading of MMTLP shares.

412.    The SEC's failure to enforce Regulation SHO allowed widespread FTDs to persist, enabling naked short selling and synthetic share creation that artificially suppressed the market value of MMTLP shares.

413.    As a direct result of the SEC's inaction, Plaintiff suffered significant financial harm and was deprived of the opportunity to realize the full value of their investments.

414.    Plaintiff seeks compensatory damages, injunctive relief requiring the SEC to enforce Regulation SHO more rigorously, and such other relief as the Court deems just and proper.

### Count 16: Constitutional Violation – Private Nondelegation Doctrine

415.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

416.    The SEC, as a federal agency, has a constitutional obligation to ensure that entities exercising delegated regulatory authority, such as FINRA and the DTCC, operate within the bounds of statutory and constitutional principles.

417.    By failing to provide adequate oversight of FINRA and DTCC, the SEC allowed these entities to exercise quasi-governmental powers without accountability or proper checks, culminating in the unilateral and indefinite U3 trading halt on MMTLP shares.

418.    This abdication of responsibility violated the Private Nondelegation Doctrine and directly caused harm to Plaintiff and similarly situated investors.

419.    Plaintiff seeks declaratory relief affirming the SEC's constitutional obligations to oversee delegated entities and injunctive relief requiring the SEC to implement stricter oversight mechanisms.

**Count 17: Negligent Supervision of Self-Regulatory Organizations (SROs) by the SEC**

420.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

421.    The SEC has a statutory duty under 15 U.S.C. §§ 78q and 78s to supervise self-regulatory organizations (SROs) such as FINRA and DTCC to ensure compliance with federal securities laws and to protect investors from systemic abuse.

422.    The SEC negligently failed to supervise these SROs, enabling systemic market manipulation, synthetic share creation, unresolved FTDs, and trading halts that disproportionately harmed retail investors.

423.    As a direct result of the SEC's negligent supervision, Plaintiff suffered significant financial losses and was subjected to prolonged uncertainty regarding their investments.

424.    Plaintiff seeks compensatory damages, injunctive relief to mandate improved supervision of SROs, and such other relief as the Court deems just and proper.

**Defendant Inclusion Summary**

425.    Financial Industry Regulatory Authority (FINRA) is a self-regulatory organization tasked with overseeing broker-dealers and maintaining compliance with securities laws. The Plaintiff alleges that FINRA failed to fulfill its statutory obligations under the Securities Exchange Act of 1934, enabling systemic market manipulation and failing to resolve the indefinite U3 trading halt imposed on MMTLP shares. FINRA's inaction allegedly allowed the proliferation of synthetic shares, trading irregularities, and violations of investor rights.

FINRA is implicated in Counts I, II, VI, VII, VIII, X, XIII, XIV, XVI, and XVII. FINRA's alleged conduct caused significant harm to retail investors by suppressing the fair market value of MMTLP shares and undermining trust in financial markets.

426.    Securities and Exchange Commission (SEC) is the primary federal agency responsible for overseeing financial markets and supervising self-regulatory organizations such as FINRA and DTCC. The Plaintiff alleges that the SEC failed to intervene in the U3 trading halt, enforce Regulation SHO provisions, or investigate widespread market manipulation, including synthetic share creation and failures to deliver. The SEC is further alleged to have neglected its oversight duties under the Securities Exchange Act, enabling systemic abuses that disproportionately harmed retail investors. The SEC is implicated in Counts II, VI, VIII, XIII, XIV, XV, XVI, and XVII. Its alleged inaction perpetuated market irregularities and prevented investors from obtaining redress.

427.    Depository Trust & Clearing Corporation (DTCC) is responsible for clearing and settlement of securities transactions, ensuring accurate recordkeeping and resolving discrepancies. The Plaintiff alleges that the DTCC failed to reconcile outstanding share discrepancies and address synthetic share creation during the MMTLP-to-NBH transition. The DTCC is further alleged to have neglected its duties under Section 17A of the Securities Exchange Act by allowing unresolved failures to deliver to persist. The DTCC is implicated in Counts II, VI, VII, XIII, and XIV. Its alleged failures contributed to prolonged financial uncertainty for shareholders and facilitated systemic trading irregularities.

428.    Torchlight Energy Resources, Inc. (Torchlight) is the predecessor entity to Meta Materials. The Plaintiff alleges that Torchlight failed to disclose material information, reconcile trading discrepancies, and address synthetic share issues during the corporate transition.

Torchlight is further alleged to have misrepresented the value of its assets, particularly the Orogrande Basin, and failed to implement controls to protect shareholders. Torchlight is implicated in Counts III, IV, V, IX, and XIII. Its alleged breaches of fiduciary duty and misleading statements contributed to market manipulation and financial harm to retail investors.

429.    Meta Materials, Inc. (META II) succeeded Torchlight Energy Resources and is responsible for corporate actions affecting MMTLP shares. The Plaintiff alleges that Meta Materials failed to address synthetic share discrepancies, reconcile outstanding shareholder records, and provide transparency about trading irregularities. Meta Materials is further alleged to have made misrepresentations regarding its corporate actions and asset valuations. Meta Materials is implicated in Counts III, IV, V, IX, and XIII. Its alleged conduct caused financial harm to shareholders and prolonged uncertainty regarding their investments.

430.    Next Bridge Hydrocarbons, Inc. (NBH) is the successor to MMTLP shares and the final entity in the corporate transition. The Plaintiff alleges that NBH failed to reconcile unresolved short positions, address synthetic share discrepancies, and provide transparency regarding shareholder rights. NBH is further alleged to have breached its fiduciary duties to shareholders by failing to mitigate the harm caused by unresolved trading irregularities. NBH is implicated in Counts III, IV, V, IX, and XIII. Its alleged conduct left retail investors in prolonged financial and legal uncertainty.

431.    OTC Markets Group Inc. operates the trading platform where MMTLP shares were publicly traded. The Plaintiff alleges that OTC Markets allowed unauthorized trading of MMTLP shares, failed to enforce listing standards, and neglected its responsibility to prevent trading irregularities. OTC Markets is further alleged to have facilitated synthetic share proliferation by permitting excessive trading volumes that exceeded the authorized share float.

OTC Markets is implicated in Counts VI, VII, and XIII. Its alleged failures contributed to market manipulation and financial harm to retail investors.

432.    The actions and omissions of the Defendants demonstrate a pattern of systemic negligence, misconduct, and conspiracy, resulting in significant harm to retail investors. Each Defendant contributed to the proliferation of synthetic shares, market manipulation, and the indefinite U3 trading halt. Their collective failures violated federal securities laws, antitrust statutes, and constitutional principles, necessitating judicial intervention to hold them accountable and restore fairness to U.S. financial markets.

**Specific Acts of Scienter**

433.    Specific Acts of Scienter as Defined Under the Private Securities Litigation Reform Act of 1995 (PSLRA) and Federal Rule of Civil Procedure 9(b):

**SEC (Leadership under Gary Gensler)**

434.    Failure to enforce federal securities laws: The SEC failed to investigate and address systemic market irregularities, including synthetic share creation, naked short selling, and persistent failures to deliver, violating its obligations under the Securities Exchange Act.

435.    Complicity in FINRA's U3 halt: The SEC allowed FINRA's indefinite U3 halt to persist without requiring resolution, transparency, or adequate justification, in violation of its supervisory duties under Sections 15A and 17A of the Securities Exchange Act.

436.    Neglect of investor protection responsibilities: Despite knowledge of investor harm caused by synthetic shares, the SEC failed to act in a manner consistent with its statutory mandate to protect retail investors.

437.    Failure to supervise FINRA and DTCC: The SEC's lack of oversight enabled regulatory negligence and market manipulation to persist unchecked, demonstrating willful disregard for its supervisory responsibilities.

438.    Deliberate regulatory apathy: The SEC ignored documented evidence, shareholder complaints, and systemic issues within the MMTLP market, showing intentional disregard for its duties under the Administrative Procedure Act (APA).

### FINRA (Leadership under Robert W. Cook)

439.    Reckless issuance of the U3 halt: FINRA imposed an indefinite halt on MMTLP trading without proper investigation or justification, despite knowledge of synthetic share proliferation and market irregularities.

440.    Failure to resolve the U3 halt: FINRA neglected its statutory obligation to resolve the trading halt in a transparent and timely manner, violating Section 19(c) of the Securities Exchange Act.

441.    Omission of material facts: FINRA failed to disclose the reasons for the U3 halt or any corrective measures, misleading investors and fostering continued uncertainty.

442.    Intentional inaction despite awareness: Despite documented evidence of synthetic shares and market manipulation, FINRA failed to investigate or enforce compliance with its own rules and federal securities laws.

443.    Breach of duty to maintain fair markets: FINRA's inaction allowed systemic failures, naked short selling, and synthetic share proliferation to persist, directly contributing to investor harm.

444.    Betrayal of reasonable investor expectations: By signaling the finality of the regulatory process in its December 6, 2022, corporate action notice, then reversing course mere

hours before the halt on December 9, FINRA misled even vigilant investors, creating an unfair and unpredictable process.

### DTCC (Leadership under Frank La Salla)

445.    Failure to enforce settlement standards: The DTCC permitted unresolved failures to deliver and synthetic shares to proliferate, violating its obligations under Section 17A(a)(1) of the Securities Exchange Act.

446.    Neglect of reconciliation duties: The DTCC failed to reconcile outstanding share discrepancies during the MMTLP-to-NBH transition, leaving investors in financial limbo.

447.    Omission of material discrepancies: The DTCC knowingly withheld information about settlement failures and irregularities, allowing systemic manipulative practices to continue.

448.    Facilitation of market manipulation: The DTCC's failure to enforce proper clearing and settlement standards knowingly enabled the creation and trading of synthetic shares.

449.    Deliberate lack of transparency: The DTCC refused to disclose critical clearing and settlement data (e.g., blue sheets), obstructing investigations and accountability.

### Corporate Leadership (Torchlight and NBH – McCabe, Brda, and DuBose)

450.    Misrepresentation of asset valuations: Leadership overstated the value of Orogrande Basin assets to mislead investors and inflate shareholder expectations.

451.    Encouragement of trading during irregularities: Executives encouraged trading activity despite knowledge of systemic discrepancies and trading irregularities.

452.    Failure to address synthetic shares: Leadership failed to investigate or resolve synthetic share issues, neglecting their fiduciary responsibilities to shareholders.

453.    Misleading shareholder communications: Executives failed to disclose material information regarding trading irregularities and share discrepancies, creating prolonged investor uncertainty.

454.    Neglect of fiduciary duty: Corporate leadership prioritized personal and corporate interests over shareholder protection, directly contributing to financial harm.

<u>Greg McCabe (CEO of Next Bridge Hydrocarbons)</u>

455.    On October 10, 2024, Scott Traudt, a shareholder of Next Bridge Hydrocarbons, sent an email to CEO Gregory McCabe seeking critical information following the company's October 8, 2024, lease loss. Traudt's email specifically requested details regarding unresolved short positions, including: (a) entities that approached the company to purchase shares for short position coverage, (b) the number of shares requested, (c) any follow-up contact with these entities, and (d) McCabe's knowledge of total remaining short positions as of the December 9, 2022, U3 trading halt.

456.    Traudt emphasized the urgency of his inquiry, highlighting its importance to his ongoing legal case, *Traudt v. Rubenstein* (2:24-cv-00782) in the U.S. District Court for Vermont. In that case, FINRA's position asserts the absence of unresolved short positions, a claim that Traudt disputes based on evidence suggesting otherwise. Traudt explicitly noted that McCabe's responses would be critical to refuting FINRA's assertions and to building a broader case for accountability.

457.    Despite the clear relevance and urgency of Traudt's questions, McCabe's response was dismissive, accusing Traudt of misunderstanding his role as CEO and failing to recognize the complexities of managing the interests of over 65,000 shareholders. Instead of engaging substantively with the inquiries, McCabe later escalated the matter by forwarding a

disparaging email to Jen Kapela (@jen_kapela on X, a known social media ally), which she subsequently posted on X, characterizing Traudt as "compromised" and suggesting his actions were irrational and harmful to Next Bridge.

458.    McCabe's actions constitute an intentional attempt to deflect accountability and undermine shareholder advocacy. By failing to provide transparency and publicly discrediting a vocal shareholder, McCabe sought to shift focus away from systemic issues within Next Bridge while evading legitimate scrutiny of unresolved short positions and shareholder harm.

459.    The accusations against Traudt, including the baseless claim that he was "compromised," underscore McCabe's scienter. His calculated effort to discredit a shareholder raising material issues about the company's transparency, coupled with his refusal to provide the requested information, reflects a deliberate prioritization of self-interest and a disregard for fiduciary duties owed to shareholders.

### OTC Markets Group (Leadership under R. Cromwell Coulson)

460.    Facilitation of unauthorized trading: OTC Markets allowed MMTLP shares to trade publicly despite explicit restrictions outlined in Torchlight's proxy statements.

461.    Deflection of responsibility: OTC Markets knowingly deflected accountability to FINRA instead of investigating unauthorized trading on its platform.

462.    Failure to monitor trading volumes: OTC Markets ignored trading volumes that far exceeded the authorized float of MMTLP shares, enabling synthetic share proliferation.

463.    Willful neglect of listing standards: OTC Markets failed to enforce its own listing standards, allowing systemic trading irregularities to persist.

464.    Profiteering from unauthorized trading: OTC Markets benefited financially from the trading of MMTLP shares while failing to exercise its duty to protect investors.

**Action for Declaratory Judgment & Injunctive Relief #1**

**Finding the Private Securities Litigation Reform Act (15 U.S.C. § 78u-4) Unconstitutional**

**As Applied**

465.    The Private Securities Litigation Reform Act of 1995 (PSLRA), codified at 15 U.S.C. § 78u-4, imposes procedural limitations that disproportionately burden retail investors, including Plaintiff, while shielding institutional actors from accountability.

466.    The PSLRA's discovery stay provisions obstructed Plaintiff from obtaining critical evidence necessary to substantiate claims of synthetic share creation, naked short selling, and systemic regulatory failures.

467.    These provisions delayed access to essential trading records, including Blue Sheets and other documents held by the SEC, FINRA, and DTCC, thereby impeding Plaintiff's ability to present evidence of market manipulation and regulatory negligence.

468.    By creating barriers to access critical evidence, the PSLRA undermines Plaintiff's ability to prove violations of federal securities laws and seek redress for significant financial harm.

469.    The procedural barriers created by the PSLRA violate the equal protection guarantees of the Fifth Amendment by disproportionately impacting retail investors compared to institutional participants.

470.    As applied to the facts of this case, the PSLRA prevents Plaintiff from pursuing justice and undermines the investor protections intended by federal securities laws.

WHEREFORE, Plaintiff respectfully requests that this Court:

471.    Declare the PSLRA unconstitutional as applied to this case;

472.    Grant injunctive relief to prevent enforcement of the PSLRA's discovery stay provisions in this matter;

473.    Award such other relief as the Court deems just and proper.

### Action for Declaratory Judgment & Injunctive Relief #2

### Declaring FINRA's Structure and Regulatory Powers Unconstitutional

474.    FINRA exercises quasi-governmental powers, including the authority to impose trading halts, enforce securities regulations, and oversee market operations, without constitutional accountability or adequate oversight by the SEC.

475.    FINRA's imposition of the indefinite U3 trading halt on MMTLP shares, without sufficient notice or justification, constitutes an unconstitutional delegation of regulatory authority under the Private Nondelegation Doctrine.

476.    The SEC failed to exercise meaningful oversight of FINRA's actions, in violation of its statutory obligations under 15 U.S.C. §§ 78q and 78s, allowing FINRA to operate beyond constitutional limits.

477.    By delegating significant regulatory powers to FINRA without adequate supervision, the SEC abdicated its responsibility to protect investors and permitted systemic abuses to persist unchecked.

478.    FINRA's dual role as a self-regulatory organization and market participant creates inherent conflicts of interest, exacerbating constitutional concerns regarding its structure and governance.

479.    The lack of transparency and accountability in FINRA's operations has caused substantial harm to investors, including Plaintiff, who were denied fair access to their investments and market information.

480.    Plaintiff seeks declaratory relief affirming that FINRA's structure and exercise of regulatory authority violate constitutional principles, as well as injunctive relief requiring enhanced SEC oversight and accountability mechanisms.

WHEREFORE, Plaintiff respectfully requests that this Court:

481.    Declare FINRA's structure and regulatory powers unconstitutional under the Private Nondelegation Doctrine;

482.    Grant injunctive relief mandating enhanced oversight by the SEC over FINRA and DTCC;

483.    Award such other relief as the Court deems just and proper.

### Supplemental Authority from Alpine Securities Corp. v. FINRA

484.    On November 22, 2024, the DC Circuit Court of Appeals issued a pivotal decision in Alpine Securities Corp. v. Financial Industry Regulatory Authority and United States of America, Case No. 1:23-cv-01506. This decision provides substantial support for the Plaintiff's claims, particularly regarding the U3 trading halt issued by FINRA.

### Summary of Alpine Decision

485.    The DC Circuit ruled that FINRA's expulsion orders violated the private nondelegation doctrine because they took effect immediately without SEC oversight. The court held that private entities like FINRA must act only as an aid to accountable government agencies that retain ultimate authority to approve or disapprove the private entity's actions. The lack of such oversight rendered FINRA's actions unconstitutional.

486.    In Alpine, the court emphasized: The irreparable harm caused by FINRA's actions, including financial ruin and the destruction of Alpine's business before full SEC review and the balance of equities and public interest in ensuring fair regulatory processes. Applicability to the Plaintiff's Case

487.    The reasoning in Alpine is directly applicable to this case. The U3 trading halt issued by FINRA on December 09, 2022 was similarly imposed without any prior validation or review by the SEC. This mirrors the unconstitutional delegation of authority identified in Alpine and resulted in irreparable harm to the Plaintiff.

488.    As in Alpine, injunctive relief is the only adequate remedy to prevent further harm and to restore the integrity of the market. The Plaintiff respectfully requests this Court to issue relief consistent with Alpine, mandating a resumption of trading in MMTLP to allow the market to function properly and enable the Plaintiff and other investors to close their positions. Supplemental Authority from SEC v. Sloan

489.    In SEC v. Sloan, 436 U.S. 103 (1978), the U.S. Supreme Court addressed the legality of trading halts implemented by the SEC, establishing critical limitations on the scope and duration of such regulatory actions. The Court held that a trading halt could be imposed for no longer than ten days unless specifically authorized by Congress. This landmark decision underscored the necessity for regulatory agencies to act strictly within the bounds of their statutory authority.

490.    The Sloan Court found that the SEC violated its own rules by extending a trading halt beyond the permissible ten-day limit, thereby infringing on shareholders' rights and disrupting market operations without proper justification. The ruling emphasized two central principles; 1. regulatory agencies must adhere to statutory and procedural limits in exercising

their authority and 2. prolonged trading halts require clear congressional authorization to avoid undue harm to market integrity and investor rights.

## Applicability to the Plaintiff's Case

491.    The Sloan decision is directly relevant to the circumstances surrounding FINRA's indefinite U3 halt on [MMTLP or relevant stock]. While Sloan addressed the SEC's actions, the principles articulated by the Supreme Court apply equally to FINRA's regulatory authority. By imposing an indefinite halt without SEC review or statutory authorization, FINRA has exceeded the legal limitations outlined in Sloan. The failure to define or justify the "extraordinary event" allegedly warranting this indefinite halt further compounds the overreach.

492.    The Supreme Court's decision in Sloan establishes a compelling precedent that regulatory actions—such as trading halts—must be; 1. time-limited and supported by statutory authority and 2. implemented transparently to ensure protection of shareholder rights and market stability.

493.    In this case, FINRA's indefinite U3 halt stands in direct conflict with these principles. The halt has effectively deprived shareholders of their right to trade, caused irreparable harm, and undermined market integrity. Like the SEC in Sloan, FINRA's actions lack the procedural safeguards and statutory authorization required to justify such an extraordinary measure.

## Reinforcing the Need for Injunctive Relief

494.    The Sloan precedent reinforces the Plaintiff's request for injunctive relief to restore trading in MMTLP. FINRA's actions mirror the regulatory overreach condemned in Sloan, creating an urgent need for judicial intervention to protect the rights of investors and the integrity of the market.

**Integration of Sloan with Alpine**

495.    When viewed in conjunction with the DC Circuit's recent decision in Alpine Securities Corp. v. FINRA, Sloan further demonstrates that FINRA's unchecked regulatory actions violate established legal principles. Sloan highlights the statutory limits on trading halts, while Alpine addresses the constitutional deficiencies of FINRA's lack of government oversight. Together, these cases present a comprehensive legal basis for the relief sought by the Plaintiff.

WHEREFORE:

496.    For the reasons stated above, the Plaintiff seeks:

a.    Declaratory Judgment Regarding the Constitutionality of FINRA's Structure and Authority: The Plaintiff respectfully requests that this Court declare the structure and authority of the Financial Industry Regulatory Authority (FINRA) unconstitutional on the grounds of violating the separation of powers, the Appointments Clause, and the nondelegation doctrine. The Court is asked to hold that FINRA's structure, including its private membership-appointed Board of Governors, its lack of presidential oversight, and its delegated legislative authority, is inconsistent with the constitutional framework established by Articles I and II of the U.S. Constitution.

b.    Declaratory Relief: The Plaintiff seeks a declaration that the SEC's delegation of legislative and quasi-legislative powers to FINRA is unconstitutional under the nondelegation doctrine, as it provides excessive and unsupervised authority to a private, self-regulatory organization without meaningful legislative guidance or oversight.

c.    Declaration Mandating Structural Reforms to FINRA: The Plaintiff respectfully requests that the Court declare that FINRA's governance structure and processes must be

reformed to comply with the Constitution, including the Appointments Clause, and to ensure accountability to the executive branch and adherence to legislative limits.

d.   Declaration Regarding the Indefinite Nature of the Halt: The Plaintiff seeks a declaration that FINRA's indefinite U3 trading halt was inconsistent with statutory requirements and exceeded its regulatory authority, as defined in SEC v. Sloan and other applicable legal precedents.

e.   Declaration Affirming FINRA's Overreach: The Plaintiff respectfully requests that this Court declare that FINRA's imposition of the U3 trading halt on December 9, 2022, was unconstitutional, improperly executed, and in violation of shareholders' rights under federal securities laws and constitutional principles.

f.    Declaratory Judgment on Equal Protection: An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that the PSLRA violates the Equal Protection Clause of the Fifth Amendment by disproportionately burdening small investors and shielding institutional actors, thereby creating a two-tiered system of justice.

g.   Injunction to Prevent Further FINRA Overreach: The Plaintiff respectfully requests that this Court issue an injunction barring FINRA from imposing indefinite or improperly justified trading halts in the future without explicit statutory authority and proper SEC review, in line with the precedents set forth in Alpine Securities Corp. v. FINRA and SEC v. Sloan. This injunction should also mandate procedural safeguards to ensure FINRA's compliance with constitutional and statutory limits.

h.   Injunction to Reinstate Trading in MMTLP Shares: The Plaintiff respectfully requests injunctive relief directing FINRA to reinstate trading in MMTLP shares or to

facilitate a resolution that allows investors to close their positions and realize the fair value of their holdings, addressing the irreparable harm caused by the improper U3 halt.

i.      Injunction Requiring the Release of Blue Sheets: The Plaintiff respectfully requests that the Court order the release of Blue Sheet data for MMTLP and MMAT transactions to provide transparency into the allegations of market manipulation, including synthetic share creation and naked short selling, and to restore trust in the fairness of the market.

## VI. <u>CONCLUSION</u>

497.    The Plaintiff, Matthew J. Pease, has brought this action to address systemic failures in the U.S. financial markets that have inflicted widespread harm on retail investors through a combination of regulatory negligence, market manipulation, breaches of fiduciary duty, and constitutional violations. Central to this case is FINRA's indefinite U3 trading halt on MMTLP shares, which deprived investors of access to their assets without adequate notice, explanation, or resolution. This unprecedented halt exemplifies the unchecked powers of a private self-regulatory organization operating without meaningful government oversight, raising constitutional concerns under the separation of powers doctrine, the Appointments Clause, and the private nondelegation doctrine. Precedents such as SEC v. Sloan and Alpine Securities Corp. v. FINRA underscore the statutory and constitutional violations inherent in FINRA's actions.

a.    The Plaintiff contends that FINRA's governance failures were further exacerbated by the SEC and DTCC, which neglected their statutory obligations to enforce market integrity. Despite clear responsibilities under Regulation SHO (17 C.F.R. § 242.204), these regulatory entities failed to investigate or remedy widespread market abuses, including synthetic share creation, naked short selling, and unresolved failures to deliver

(FTDs). By failing to enforce critical close-out requirements, reconcile discrepancies, or provide transparency through critical Blue Sheets data, the Defendants enabled institutional participants to manipulate the market for MMTLP shares while retail investors bore the consequences.

b.   Broker-dealers and market makers, including GTS Securities and Canaccord Genuity, played a direct role in manipulating market dynamics. These entities exploited regulatory loopholes to create counterfeit shares, distort supply and demand, and profit from suppressed share prices at the expense of retail investors. Their conduct, enabled by regulatory inaction, demonstrates a coordinated effort to manipulate trading conditions while evading accountability.

c.   Transfer agents, such as AST/EQ (Equiniti), contributed to these systemic failures by neglecting their fiduciary and statutory obligations during the MMTLP-to-NBH transition. AST/EQ failed to reconcile outstanding share discrepancies and maintain accurate shareholder records, facilitating the persistence of synthetic shares and leaving shareholders in prolonged financial uncertainty.

d.   Corporate leadership at Torchlight Energy Resources and Next Bridge Hydrocarbons compounded the harm by failing to address systemic trading irregularities and reconcile shareholder positions. Executives, including Gregory McCabe, John Brda, and Clifton DuBose, misrepresented critical information about asset valuations, particularly regarding the Orogrande Basin, and neglected their fiduciary duties to shareholders. Their collective inaction and misleading public statements left retail investors, including the Plaintiff, vulnerable to systemic market manipulation.

e.   The harm caused by these failures is significant, systemic, and ongoing. Tens of thousands of retail investors have been denied the ability to trade their shares, reconcile their holdings, or recover the fair value of their investments. Meanwhile, institutional participants who engaged in manipulative practices, including naked short selling, remain unaccountable. This disparity highlights critical vulnerabilities in the regulatory framework and underscores the urgent need for judicial intervention to restore fairness, transparency, and accountability to the markets.

f.   The Plaintiff emphasizes the glaring inconsistency in regulatory responses between the MMTLP case and the GameStop trading episode. In the aftermath of GameStop, swift Congressional hearings and regulatory interventions ensured market disruptions were addressed promptly. In contrast, MMTLP investors have endured nearly two years of inaction and neglect. This systemic bias in favor of institutional participants highlights the inequities faced by retail investors and demonstrates the need for consistent regulatory enforcement to uphold investor rights and market integrity.

g.   The refusal by FINRA, the SEC, and the DTCC to disclose critical trading data, such as Blue Sheets and settlement records, has further compounded investor harm. This lack of transparency has obstructed efforts to investigate market manipulation, reconcile discrepancies, and hold wrongdoers accountable. The systemic withholding of such vital information underscores broader vulnerabilities in regulatory frameworks and necessitates judicial oversight to ensure transparency and accountability.

h.   In bringing this action, the Plaintiff seeks more than individual relief. This case represents a broader challenge to the systemic deficiencies and constitutional violations that have allowed market abuses to flourish unchecked. The Plaintiff respectfully requests

this Court to grant declaratory and injunctive relief to restore fairness to the markets, including addressing FINRA's unconstitutional governance structure, enforcing statutory limits on trading halts, and ensuring meaningful government oversight of private entities exercising delegated authority.

i.    The Plaintiff also demands accountability for the Defendants' violations of federal securities laws, antitrust statutes, and fiduciary obligations. Compensatory and punitive damages are necessary to redress the financial and emotional harm suffered by retail investors. In addition, systemic reforms must be implemented to prevent future abuses, including mechanisms to eliminate synthetic shares, enforce Regulation SHO requirements, improve market transparency, and ensure accurate reconciliation of shareholder positions.

j.    By adjudicating the claims presented, this Court has an opportunity to establish critical legal precedents that promote regulatory accountability, enforce transparency, and restore public confidence in the financial markets. The Plaintiff, joined by tens of thousands of similarly affected retail investors, seeks a ruling that upholds the rule of law, prioritizes market integrity, and delivers justice to those who have been unjustly harmed by systemic misconduct.

k.    Finally, this case calls upon the Court to safeguard the rights of retail investors and reaffirm the principles of constitutional governance. The Plaintiff urges the Court to deliver a ruling that holds the Defendants accountable for their misconduct, addresses systemic regulatory failures, and ensures the integrity of U.S. financial markets for all participants.

## VII. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Court:

Declaratory Relief

498.    Declare that the Private Securities Litigation Reform Act (15 U.S.C. § 78u-4) is unconstitutional as applied to this case, as it unduly restricts access to justice for retail investors and infringes upon their constitutional rights.

499.    Declare that the structure and authority of the Financial Industry Regulatory Authority (FINRA) are unconstitutional due to its lack of meaningful governmental oversight, which enabled improper and prejudicial actions, including the indefinite U3 trading halt on MMTLP shares.

500.    Declare that the Defendants' actions and omissions violated federal securities laws, including Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)), Rule 10b-5 (17 C.F.R. § 240.10b-5), the Sherman Antitrust Act (15 U.S.C. §§ 1–2), the Clayton Act (15 U.S.C. §§ 12–27), and applicable fiduciary duties.

501.    Declare that FINRA's U3 trading halt on December 9, 2022, was improper, prejudicial, and a violation of regulatory responsibilities, resulting in material harm to over 65,000 shareholders, including the Plaintiff.

Injunctive Relief

502.    Order a full audit of all TRCH, MMTLP, MMATF, MMAT, and MMATQ share transactions, including the identification and reconciliation of synthetic shares, fails-to-deliver (FTDs), and beneficial ownership records.

503.    Mandate the release of all trading data, records, and communications related to MMTLP and MMAT shares, including information held by FINRA, DTCC, broker-dealers, and other involved parties.

504.    Require an expedited and transparent process for the reinstatement of trading of MMTLP shares or, in the alternative, mandate an equitable shareholder resolution that provides compensation or recovery of value for all affected investors.

505.    Appoint an independent special master or neutral third-party overseer to monitor the full audit, reconciliation, and implementation of systemic reforms to ensure transparency, accountability, and compliance.

506.    Require Congressional and regulatory review of policies related to trading halts, synthetic share creation, and oversight of self-regulatory organizations (SROs) to prevent future systemic failures.

<u>Compensatory and Punitive Damages</u>

507.    Award compensatory damages for the loss of value and liquidity of the Plaintiff's MMTLP shares and MMAT shares caused by Defendants' misconduct.

508.    Award damages arising from the suppression of share prices and trading opportunities caused by synthetic share creation, naked short selling, and the improper U3 halt.

509.    Award recovery of the Plaintiff's documented financial losses, as well as additional losses caused by systemic harm to market value.

510.    Award compensatory damages for emotional distress and mental anguish resulting from Defendants' prolonged misconduct, refusal to resolve the U3 halt, and failure to provide clarity or remedies for trading irregularities.

511.    Award treble damages pursuant to the Sherman Antitrust Act (15 U.S.C. § 15) and the Clayton Act to redress Defendants' anti-competitive practices.

<u>Restitution and Disgorgement</u>

512.    Order the disgorgement of profits wrongfully obtained by Defendants, including market makers, broker-dealers, and transfer agents, through the trading of synthetic shares, naked short selling, and related market manipulation.

513.    Require the creation of a structured restitution fund to compensate all affected shareholders for financial harm caused by synthetic share discrepancies, naked short selling, and manipulative trading practices.

<u>Additional Relief</u>

514.    Mandate the implementation of court-monitored compliance protocols for FINRA and SEC oversight processes to ensure adherence to statutory obligations and regulatory transparency.

515.    Award pre- and post-judgment interest on all compensatory damages to account for the time value of the Plaintiff's losses.

516.    Award the Plaintiff his reasonable costs and expenses incurred in pursuing this action, including court fees, filing fees, and any associated costs.

517.    Grant such other relief as necessary to restore market integrity, uphold constitutional protections, and ensure accountability for Defendants' systemic failures.

## VIII. <u>DEMAND FOR JURY TRIAL</u>

518.    The Plaintiff hereby demands a trial by jury for all claims and issues triable as of right pursuant to Rule 38 of the Federal Rules of Civil Procedure.

**Executed On:** December 27, 2024    **Signature:** _____

Matthew J. Pease, pro se

1 Cobbler Lane

Amherst, NH 03031

## CERTIFICATION OF PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

I, Matthew J. Pease, duly certify and say, as to the claims asserted under the federal securities laws, that I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

**Executed On:** December 27, 2024    **Signature:** _____

**Name**: Matthew J. Pease