**FILED**

February 26, 2025

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____
J. Barker
DEPUTY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WESTERN TEXAS**

| | |
|---|---|
| MATTHEW J. PEASE, | Case No.:   7:24-CV-00322-DC |
| Plaintiff, | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | JURY TRIAL DEMANDED |
| SECURITIES & EXCHANGE COMMISSION, FINANCIAL INDUSTRY REGULATORY AUTHORITY, JOHN BRDA, GREGORY MCCABE, NEXT BRIDGE HYDROCARBONS, INC. | SECOND AMENDED COMPLAINT |
| Defendants. | |

# I. <u>TABLE OF CONTENTS</u>

| | | |
|---|---|---|
| **II.** | **Jurisdiction and Venue** | **3** |
| **III.** | **Introduction** | **5** |
| **IV.** | **Parties** | **9** |
| **V.** | **Factual Background** | **11** |
| | Pre-Merger Activities | 11 |
| | Merger and Spin-Off | 15 |
| | Premature Inclusion in Schwab Total Stock Market Index Fund (SWTSX) | 22 |
| | Unauthorized Trading of MMTLP Shares | 23 |
| | Negligence by Transfer Agents | 25 |
| | Regulatory Awareness of Unauthorized Trading | 26 |
| | Systemic Trading Irregularities | 28 |
| | Misleading Public Statements and Social Media Influence | 32 |
| | Role of Software in Systemic Failures | 33 |

Failure to Audit Software Systems 34
U3 Trading Halt 35
Post-Halt Inaction 35
Systemic Bias in Regulatory Responses 36
Congressional Concerns Over Regulatory Failures 37
Ongoing Harm to Retail Investors 38

**VI.    Constitutional Challenges                                          38**
Appointments Clause Violations (Article II) 38
Nondelegation Doctrine Violations 42

**VII.   Market Manipulation and Regulatory Failures            45**
Synthetic Share Creation and Naked Short Selling 45
Failures to Deliver (FTDs) 47
Obstruction Through Lack of Transparency 49
Lack of Regulatory Oversight 51

**VIII.  Legal Framework and Precedents                            53**
Statutory Violations 53
Regulation SHO 54
Constitutional Claims 55
Appointments Clause 55
Nondelegation Doctrine 56

**IX.    Claims for Relief                                                    60**
Due Process Violations (SEC and FINRA) 60
Nondelegation Doctrine Violations 62
Appointments Clause Violations 62
Market Manipulation (DTCC and OTC Markets) 63
Breach of Fiduciary Duties (McCabe and Brda) 63
Negligence (SEC, FINRA, DTCC) 64
Breach of Contractual Obligations 64

**X.     Specific Acts of Scienter                                         65**

**XI.    Counts                                                                 70**

**XII.   Prayer for Relief                                                    82**

**XIII.  Evidence and Supporting Documentation                  84**

**XIV.   Conclusion                                                           87**

**XV.    Demand for Jury Trial                                           91**

**XVI.   Certification of Plaintiff Pursuant to Federal Securities Laws    92**

## II. **Jurisdiction and Venue**

1.    Jurisdiction is proper under 28 U.S.C. § 1331, as this action arises under federal law, including the Securities Exchange Act of 1934 (15 U.S.C. § 78), the Sherman Antitrust Act (15 U.S.C. §§ 1–2), the Clayton Act (15 U.S.C. §§ 12–27), and the United States Constitution, including claims under the Appointments Clause, Nondelegation Doctrine, and the Due Process Clause of the Fifth Amendment.

2.    Supplemental jurisdiction over related state law claims is proper under 28 U.S.C. § 1367.

3.    Jurisdiction is also proper under 28 U.S.C. § 1332(a), as the amount in controversy exceeds $75,000, exclusive of interest and costs, and complete diversity exists between the Plaintiff, a resident of New Hampshire, and the Defendants, who are based in states including Texas, New York, and Washington, D.C.

4.    Venue is appropriate in the United States District Court for the Western District of Texas, Midland Division, under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred within this jurisdiction.

5.    Next Bridge Hydrocarbons, Inc. ("NBH"), a key defendant, is headquartered in Midland, Texas, and its operations are central to the events at issue. NBH maintains its principal place of business at 500 W. Texas Avenue, Suite 1020, Midland, Texas, 79701. The corporate actions at issue, including the spin-off of MMTLP shares and the transition to NBH, were orchestrated and managed from this location.

6.    Gregory McCabe, a key individual defendant, resides and conducts business in Midland, Texas, and serves as the CEO and Chairman of NBH. His significant ties to this district further support venue here. McCabe's actions, including his role in the valuation and

management of NBH's assets, particularly the Orogrande Basin, occurred within this jurisdiction.

7. John Brda, a key individual defendant and the former CEO of Torchlight Energy Resources, which was integral to the creation of NBH, has historical connections to Texas through Torchlight's operations. Torchlight's last known address was in Plano, Texas, and its legacy is tied to this district. Brda's actions, including his role in structuring the merger between Torchlight and Meta Materials, Inc., and the subsequent creation of MMTLP shares, are central to the claims in this case.

8. The Orogrande Basin, a key asset tied to NBH, is located in Texas, and its valuation and management are central to the claims. The operations and decisions related to this asset occurred within this jurisdiction. The alleged misrepresentations about the value and potential of the Orogrande Basin, which form a core part of the Plaintiff's claims, were made and relied upon in Texas.

9. The Securities and Exchange Commission ("SEC"), and the Financial Industry Regulatory Authority ("FINRA"), key defendants, operate across the United States and are not tied to any specific jurisdiction. These defendants' actions, including their failure to enforce federal securities laws, prevent market manipulation, and reconcile share discrepancies, directly contributed to the harm suffered by the Plaintiff and other investors in this district. Venue is proper for these defendants under 28 U.S.C. § 1391(b)(3), as they may be sued in any judicial district where they are subject to personal jurisdiction.

10. The Western District of Texas, Midland Division, is uniquely positioned to adjudicate this case due to its familiarity with the local defendants, the regional economic impact of the claims, and the centrality of Texas-based events to the case. This district has a strong

interest in resolving disputes involving local entities and ensuring accountability for actions that directly affect its residents and economy.

11.     For the foregoing reasons, venue is proper in the United States District Court for the Western District of Texas, Midland Division, under 28 U.S.C. § 1391(b). This court is the most appropriate forum to adjudicate the Plaintiff's claims and provide meaningful relief to the affected investors.

### III. <u>Introduction</u>

12.     This case arises from systemic market manipulation, regulatory negligence, breaches of fiduciary duty, and constitutional violations that have eroded the integrity of U.S. financial markets. The Plaintiff, Matthew J. Pease, a retail investor and Information Technology professional, seeks to hold accountable quasi-governmental regulatory bodies, including the Financial Industry Regulatory Authority ("FINRA") and the Securities and Exchange Commission ("SEC"), whose combined failures allowed systemic fraud to persist unchecked.

13.     Regulatory communications, including FOIA-obtained emails, confirm that officials at both agencies were aware of extensive trading irregularities in MMTLP for over a year before the December 9, 2022, U3 halt but deliberately failed to intervene. These records reveal discussions about synthetic shares, excessive trading volume, and failures to deliver (FTDs), yet no corrective action was taken.

14.     By fostering an unregulated environment where broker-dealers and market makers exploited regulatory loopholes, the Defendants enabled the unchecked proliferation of synthetic shares and naked short selling. For instance, the Office of the Comptroller of the Currency (OCC) issued a letter that allowed market makers additional time to close out fails-to-deliver, creating an opportunity for exploitation. This systemic failure, exacerbated by regulatory

loopholes such as the market maker exemption, defrauded tens of thousands of investors, leaving

them in financial limbo with no recourse.

15.     FINRA's imposition of an indefinite U3 trading halt—without transparency or an

audit of outstanding share discrepancies—exacerbated the damage, violating due process and

investor protections. The actions and inactions of FINRA and the SEC reflect not regulatory

diligence, but scienter—intentional misconduct or reckless disregard for investor harm.

16.     Central to this case are the Non-Voting Series A Preferred Shares of Meta

Materials, Inc. ("MMTLP"), which were issued as part of a corporate spin-off intended to

provide private ownership in Next Bridge Hydrocarbons, Inc. ("NBH"). Instead of facilitating an

orderly transition to private ownership, market participants, including broker-dealers, market

makers, and transfer agents, engaged in manipulative practices such as synthetic share creation

and naked short selling. These actions flooded the market with counterfeit shares, suppressed

legitimate share prices, and deprived shareholders, including the Plaintiff, of the fair value of

their investments.

17.     A defining moment occurred on December 9, 2022, when FINRA issued an

extraordinarily rare U3 trading halt on MMTLP shares, citing an undefined "extraordinary

event." This unilateral and indefinite halt froze all trading activity, leaving tens of thousands of

investors, including the Plaintiff, unable to access their assets, reconcile their positions, or trade

their shares. However, FOIA-released emails from November 29, 2021, show that FINRA and

the SEC had been aware of trading irregularities in MMTLP for over a year before the halt but

failed to take corrective action.

18.     These internal emails confirm that regulatory officials discussed concerns about

synthetic shares, excessive trading volume, and failures to deliver (FTDs) in MMTLP. Yet,

despite this knowledge, FINRA took no action until the last possible moment, allowing market manipulation to persist unchecked before abruptly halting trading.

19.    The U3 halt raises serious constitutional concerns about the unchecked powers of private self-regulatory organizations. By allowing known market manipulation to continue while withholding critical information from investors, FINRA and the SEC crossed the line from negligence to complicity. Their conduct reflects not diligence, but scienter—intentional misconduct or reckless disregard for investor harm.

20.    As highlighted in key legal precedents, including *SEC v. Sloan* and *Alpine Securities Corp. v. FINRA*, private entities exercising quasi-governmental authority must operate within statutory and constitutional constraints. FINRA's indefinite halt violated the separation of powers doctrine, the Appointments Clause, and the private nondelegation doctrine, as there was no meaningful government oversight or statutory authority to justify its actions.

21.    Beyond FINRA's governance flaws, other regulatory bodies exacerbated the systemic failures in this case. The Securities and Exchange Commission ("SEC"), tasked with overseeing FINRA and ensuring market integrity, neglected its statutory duties by allowing the U3 halt to persist and failing to investigate widespread irregularities. The Depository Trust & Clearing Corporation ("DTCC"), responsible for clearing and settlement, permitted unresolved failures to deliver ("FTDs") and synthetic shares to proliferate, violating Section 17A of the Securities Exchange Act. Furthermore, the DTCC failed to maintain accurate records and reconcile share discrepancies, contributing to the proliferation of synthetic shares and hindering efforts to uncover the true extent of market manipulation. Together, these regulatory failures enabled institutional participants to manipulate the market and profit at the expense of retail investors, including the Plaintiff.

22.     Corporate leadership at Torchlight Energy Resources and Next Bridge Hydrocarbons also played a significant role in enabling these systemic failures. Executives, including Gregory McCabe, John Brda, and Clifton DuBose, failed to address share discrepancies, trading irregularities, and systemic market manipulation. Instead, they misrepresented the financial prospects of key assets, such as the Orogrande Basin, and neglected their fiduciary duties to shareholders, including the Plaintiff.

23.     Nearly two years have passed since the U3 halt, and the Defendants have taken no meaningful steps to resolve these systemic failures or mitigate the harm caused to retail investors. Shareholders, including the Plaintiff, remain in financial and legal limbo, unable to trade their positions, reconcile their holdings, or recover the fair value of their investments. This prolonged inaction underscores critical vulnerabilities in the existing regulatory framework and highlights the urgent need for judicial intervention.

24.     The disparity between the regulatory response to the MMTLP case and other market disruptions, such as the GameStop trading episode, illustrates the inequities faced by retail investors. While GameStop shareholders benefited from swift regulatory and Congressional action, MMTLP investors have endured prolonged neglect. This inconsistency underscores systemic bias in favor of institutional participants and the urgent need for equitable treatment of all market participants under the law.

25.     Through this action, the Plaintiff seeks to hold the Defendants accountable for their roles in perpetuating systemic misconduct, breaches of fiduciary duty, and constitutional violations. The Plaintiff requests compensatory and punitive damages to redress the financial and emotional harm he has suffered.

26.     Equally important, this case seeks to challenge the structural and constitutional flaws within FINRA's governance and advocate for systemic reforms. These reforms include enforcing greater transparency, requiring accountability for regulatory bodies, and implementing mechanisms to prevent future abuses, such as synthetic share creation, prolonged trading halts, and failures to deliver.

27.     By addressing the systemic deficiencies and constitutional violations described herein, this Court has the opportunity to restore fairness, integrity, and transparency to U.S. financial markets. The Plaintiff urges the Court to hold the Defendants accountable for their actions, reaffirm the principles of constitutional governance, and protect the rights of retail investors whose trust in the financial system has been eroded.

## IV. <u>PARTIES</u>

28.     Matthew J. Pease (hereinafter referred to as "Plaintiff") is a resident of Amherst, New Hampshire, and a professional in the field of Information Technology. The Plaintiff is a retail investor who purchased shares of Meta Materials, Inc. (MMTLP) and Next Bridge Hydrocarbons, Inc. (NBH) and was harmed by systemic market manipulation, regulatory negligence, and breaches of fiduciary duty by the Defendants. Through this action, the Plaintiff seeks accountability for the Defendants' misconduct and redress for the financial and emotional harm he has suffered.

Defendants

29.     The Securities and Exchange Commission (hereinafter "SEC") is the federal agency responsible for enforcing federal securities laws, regulating the securities industry, and ensuring market integrity. The SEC is headquartered at 100 F Street NE, Washington, D.C., 20549. The SEC is tasked with overseeing self-regulatory organizations (SROs), including the

Financial Industry Regulatory Authority (FINRA), and ensuring compliance with federal securities laws. In this case, the SEC's actions and inactions are central to the systemic market manipulation and regulatory failures that harmed the Plaintiff and other retail investors.

30.     The Financial Industry Regulatory Authority (hereinafter "FINRA") is a private, self-regulatory organization authorized by the SEC to oversee broker-dealers and ensure compliance with federal securities laws. FINRA is headquartered at 1735 K Street NW, Washington, D.C., 20006. FINRA operates under delegated authority from the SEC and is responsible for enforcing compliance with its own rules, investigating misconduct, and imposing disciplinary actions. Despite its mandate, FINRA failed to properly audit and oversee the trading of MMTLP, allowing unauthorized transactions to persist without regulatory intervention. FINRA also failed to enforce trade settlement regulations, exacerbating systemic failures that resulted in millions of unsettled trades. Ultimately, FINRA imposed an indefinite U3 trading halt without reconciling market discrepancies, leaving retail investors trapped and unable to liquidate their holdings.

31.     Next Bridge Hydrocarbons, Inc. (hereinafter "NBH") is a private oil and gas exploration company incorporated in Nevada and headquartered in Midland, Texas. NBH was formed as part of the corporate spin-off of Torchlight Energy Resources' oil and gas assets, with shareholders receiving preferred shares designated as MMTLP. In this case, NBH's role in the transition of MMTLP shares and its management of key assets, including the Orogrande Basin, are central to the harm suffered by the Plaintiff and other retail investors.

32.     Gregory McCabe (hereinafter "McCabe") is the Chief Executive Officer and Chairman of Next Bridge Hydrocarbons, Inc. (NBH) and the President of McCabe Petroleum Corporation, located at 500 W. Texas Avenue, Suite 1020, Midland, Texas, 79701. McCabe

played a central role in the corporate actions that led to the creation of NBH, including the spin-off of Torchlight Energy Resources' oil and gas assets. In this case, McCabe's actions and representations regarding NBH's assets and the transition of MMTLP shares are central to the harm suffered by the Plaintiff and other retail investors.

33.    John Brda (hereinafter "Brda") is the former Chief Executive Officer of Torchlight Energy Resources, Inc. (Torchlight), a Texas-based oil and gas exploration company. Brda played a central role in structuring the merger between Torchlight and Meta Materials, Inc. (META I), which led to the creation of META II and the issuance of MMTLP shares. Following the merger, Brda transitioned into an executive consulting role with META II. In this case, Brda's actions and representations regarding the merger, spin-off, and transition of MMTLP shares are central to the harm suffered by the Plaintiff and other retail investors.

## V. FACTUAL BACKGROUND

### Pre-Merger Activities

34.    In the years leading up to the merger, Torchlight Energy Resources, Inc. ("Torchlight") was in severe financial distress, struggling with mounting debt, declining investor confidence, and operational challenges. To prevent bankruptcy, Torchlight's leadership, including Defendant John Brda, orchestrated a reverse merger with Meta Materials, Inc. ("META I"), a Canadian smart materials company. As part of this transaction, Torchlight's oil and gas assets were spun off into a newly created private entity, Next Bridge Hydrocarbons, Inc. ("NBH"). Shareholders were issued Non-Voting Series A Preferred Shares, designated as MMTLP, which were intended to represent private ownership in NBH. This structure was

marketed to investors as a strategic pivot to preserve value while transitioning from energy exploration to advanced materials technology.

35.    Based on Brda and McCabe's stated 'probable reserve' of 3.678 billion barrels of oil at the Orogrande site and the 2019 average price of West Texas Intermediate (WTI) crude oil at $56.99 per barrel, the perceived above-ground value of the asset was approximately $209.51 billion. Using industry-standard valuations of 10–20% of the market price for oil in the ground, the below-ground value ranged from approximately $20.96 billion to $41.92 billion, reflecting the potential fair market value prior to extraction. These statements, from NBH corporate officers and social media influencers regarding the probable reserve, inferred great expectations regarding NBH's financial prospects and were referenced consistently in shareholder discussions leading up to the MMTLP transition. The Orogrande Project was identified as the flagship asset, comprising over 134,000 acres with a substantial recoverable resource potential estimated at 3.7 billion barrels of oil equivalent in the median case. The presentation underscored the project's potential to attract major industry players for acquisitions or partnerships due to its size and resource estimates. While acknowledging market risks, the company highlighted its belief in the presence of oil, framing the central question as not whether oil exists but determining the exact quantity recoverable.

36.    Despite assurances that the spin-off would be handled properly, significant unresolved issues plagued the process. For example, Torchlight initially issued the MMTLP shares as restricted securities, which are typically not eligible for public trading without either SEC registration or an applicable exemption (e.g., Rule 144 or Section 3(a)(10)). However, these shares began trading publicly on OTC Markets on October 6, 2021—months before any formal authorization or compliance with regulatory requirements. Adding to the complexity, another

ticker symbol, MMATF, emerged around the fourth quarter of 2020, representing a duplicate of META I already trading on the Canadian Securities Exchange (CSE). This premature trading, along with the existence of the MMATF ticker, raises serious questions about whether corporate officers, including Defendant Brda, intentionally structured the issuance to allow unauthorized trading and create investor confusion, despite public assurances to the contrary.

37.     Further complicating matters, Torchlight experienced unprecedented trading volumes in the months leading up to the merger, raising concerns about unusual trading activity. From January 1, 2021, to June 25, 2021, Torchlight traded approximately 3.6 billion shares—a staggering increase compared to its cumulative trading volume of 745 million shares over the prior decade. This extreme trading activity far exceeded Torchlight's authorized float of 165 million shares, raising red flags about potential synthetic share creation, naked short selling, and other manipulative practices. Notably, this surge in trading volume occurred even before the merger and spin-off, suggesting that potential naked short selling and synthetic share creation were already at play, further setting the stage for the subsequent market manipulation surrounding MMTLP shares. Yet, no steps were taken to investigate or reconcile these discrepancies before issuing MMTLP shares, creating a foundation for systemic market manipulation.

38.     Additionally, internal communications suggest that Torchlight's leadership may have been aware of these irregularities but failed to disclose them to retail investors. For instance, emails and memos obtained through FOIA requests reveal discussions among executives about unresolved share discrepancies and the risks posed by excessive trading volumes. These communications highlight a pattern of selective disclosure, where material information was shared with certain institutional players while being withheld from retail

investors in violation of Regulation FD (17 C.F.R. § 243.100 et seq.). This unequal treatment created an uneven playing field, leaving retail investors vulnerable to systemic abuses.

39.    The lack of transparency extended to the valuation of Torchlight's assets, particularly the Orogrande Basin. Executives repeatedly misrepresented the basin's value, claiming it contained "proven reserves" of approximately 3.7 billion barrels of recoverable oil. However, these claims lacked independent verification, as no third-party certified reserve report was ever produced. By promoting exaggerated valuations while failing to address systemic risks, Torchlight's leadership induced investors to retain their MMTLP shares under false pretenses, further exacerbating the harm caused by the eventual U3 trading halt.

40.    Torchlight's financial instability posed substantial risks to shareholders, but company executives, including Defendant John Brda, failed to disclose key material information about these risks. In its public filings, Torchlight acknowledged significant debt, liquidity problems, and operational challenges but failed to fully inform retail investors of the potential consequences. For example, internal communications reveal that Torchlight's leadership was aware of unresolved share discrepancies, synthetic shares, and excessive trading volumes that far exceeded the authorized float. These issues were not disclosed to investors, leaving them unaware of the systemic risks affecting their investments. Additionally, Torchlight misrepresented the value of its flagship asset, the Orogrande Basin, claiming it contained "proven reserves" of approximately 3.7 billion barrels of recoverable oil. However, these claims lacked independent verification, as no third-party certified reserve report was ever produced. By promoting exaggerated valuations while failing to address systemic risks, Torchlight induced investors, including the Plaintiff, to retain their MMTLP shares under false pretenses. This

selective disclosure and lack of transparency directly contributed to the financial harm suffered by retail investors.

41.    Internally, Torchlight's leadership knew that the company was reliant on the merger with META I to avoid collapse. Instead of transparently disclosing these risks, Brda and other executives selectively released information to certain institutional players while withholding it from retail investors. This created an unequal playing field in direct violation of Regulation FD (17 C.F.R. § 243.100 et seq.), which prohibits selective disclosure of material nonpublic information.

42.    Additionally, Torchlight shareholders were repeatedly assured that the MMTLP spin-off would be handled properly and that share discrepancies would be resolved before the transition to NBH. However, no such reconciliation occurred, and unresolved failures to deliver ("FTDs") persisted throughout the merger and spin-off process.

<u>Merger and Spin-Off</u>

43.    On June 28, 2021, Torchlight completed a reverse merger with META I, forming Meta Materials, Inc. ("META II"). As part of this corporate action, Torchlight's oil and gas assets were spun off into a newly created private entity, Next Bridge Hydrocarbons, Inc. ("NBH"), and shareholders were issued Non-Voting Series A Preferred Shares ("MMTLP") to represent their ownership interest in NBH.

44.    However, the merger and spin-off were executed with serious material omissions. The proxy statement for the merger failed to address unresolved share discrepancies, including synthetic shares and naked short selling activity that had flooded the market prior to the merger. At the time of the merger, the actual number of MMTLP shares in circulation was unknown, as Torchlight had experienced record-high trading volumes of over 3.6 billion shares in early

2021—far exceeding its authorized float of 165 million shares. Internal discussions among Torchlight executives reveal that corporate officers may have intentionally structured the issuance of MMTLP shares to allow unauthorized trading, despite public assurances to the contrary. This timeline of events highlights the lack of transparency and intent to mislead investors.

45.     Torchlight's own proxy filings explicitly stated that MMTLP shares would not be publicly traded. Despite these clear corporate disclosures, OTC Markets improperly listed MMTLP for trading, enabling broker-dealers and market makers to execute transactions beginning on October 6, 2021, without any formal authorization from META II or its executives.

46.     This unauthorized trading activity occurred without SEC oversight, and neither FINRA nor the SEC took action to prevent or investigate these irregularities, despite their clear regulatory obligations. As a result, millions of retail investors unknowingly purchased an unregistered security, leaving them exposed to financial losses when regulatory failures later culminated in the U3 trading halt.

47.     As part of the merger, Torchlight's oil and gas assets were spun off into a separate private company, Next Bridge Hydrocarbons, Inc. ("NBH"), and existing shareholders received Non-Voting Series A Preferred Shares ("MMTLP") to reflect their ownership interest in NBH. These shares were explicitly designated as a "placeholder" for NBH equity and were never intended to be publicly traded.

48.     However, significant unresolved issues and discrepancies existed at the time of the spin-off. Despite repeated public assurances from corporate leadership and regulatory bodies, no formal audit or reconciliation of MMTLP shares was ever conducted. Shareholders were

never provided with a verified count of the total number of MMTLP shares in circulation, despite the fact that trading activity had long exceeded the legally authorized float of 165 million shares.

49.    Broker-dealers, clearinghouses, and regulators ignored red flags about synthetic share proliferation, failures to deliver ("FTDs"), and discrepancies in shareholder records. Internal communications, later revealed through FOIA requests and congressional inquiries, indicate that regulatory agencies were aware of these anomalies but failed to take corrective action.

50.    The lack of oversight resulted in retail investors being left with highly uncertain and potentially fraudulent securities, creating substantial financial harm and legal ambiguity.

51.    Defendant John Brda, who transitioned into an executive consulting role with Meta Materials, Inc. ("META II"), and Defendant Gregory McCabe, CEO of Next Bridge Hydrocarbons, Inc. ("NBH"), made repeated public statements that misrepresented the value, viability, and investment potential of NBH's assets, particularly the Orogrande Basin.

52.    In investor calls, public filings, and social media posts, Brda and McCabe consistently portrayed the Orogrande Basin as a high-value oil asset, claiming it contained "proven reserves" of approximately 3.7 billion barrels of recoverable oil. However, these assertions lacked independent verification, as no third-party certified reserve report was ever produced.

53.    Furthermore, both executives failed to disclose significant risks affecting the Orogrande asset, including infrastructure deficiencies, extraction challenges, regulatory barriers, and lease expirations that could render the project unviable. By withholding material information while promoting exaggerated valuations, Brda and McCabe induced investors, including Plaintiff, to retain their MMTLP shares under false pretenses.

54.     Throughout 2021 and 2022, Defendants Brda and McCabe repeatedly made misleading statements regarding the Orogrande Basin, claiming it contained "proven reserves" of approximately 3.7 billion barrels of recoverable oil. However, these statements were based on speculative internal assessments rather than any independently verified third-party audit.

55.     Despite lacking proper certification, Brda and McCabe aggressively promoted these claims across multiple platforms, including investor calls, SEC filings, social media posts, and shareholder meetings. Their statements gave the false impression that the Orogrande Basin was a fully developed and high-value asset, rather than an unproven speculative venture with significant operational challenges.

56.     As a result of these misleading representations, investors, including Plaintiff, were led to believe that their MMTLP shares represented ownership in a high-value energy asset with near-certain profitability. These exaggerated claims contributed to artificial market demand and price inflation for MMTLP shares, distorting investor expectations and decision-making.

57.     Brda and McCabe actively misrepresented the Orogrande Basin as a proven, high-value oil asset, creating false expectations about the worth of MMTLP shares. Their public statements and investor communications consistently suggested that the Orogrande reserves were confirmed, extraction-ready, and positioned for profitability. However, these representations concealed key facts that undermined the true viability of the asset, including:

a.     Unproven extraction feasibility – No commercial-scale drilling had ever been conducted, and no independent third-party reserve certification existed, making valuation claims speculative.

b.     Severe infrastructure limitations – The region lacked essential pipelines, refining capacity, and transportation infrastructure, making oil extraction costly and impractical.

18

c.    Regulatory and legal uncertainties – Leases were nearing expiration, environmental compliance concerns remained unresolved, and no clear legal framework ensured long-term production viability. These misrepresentations, including public claims that the Orogrande Basin contained 3.7 billion barrels of recoverable oil, induced shareholders, including Plaintiff, to retain their MMTLP shares under false pretenses.

58.    By misleading investors into believing Orogrande was a fully developed, highly valuable asset, Brda and McCabe induced Plaintiff and others to retain MMTLP shares under false pretenses.

59.    Beyond the misrepresentations about Orogrande's value, Brda and McCabe also failed to address systemic trading risks that directly impacted the marketability and legitimacy of MMTLP shares. These risks included:

a.    The unresolved issue of synthetic shares and failures to deliver ("FTDs") – Trading volumes consistently exceeded the legally authorized float of 165 million shares, indicating the presence of counterfeit shares and naked short selling. Persistent FTDs confirmed the inability of broker-dealers to deliver actual shares to investors.

b.    The lack of a CUSIP number for NBH shares – This omission made the shares non-tradeable after the transition, stranding investors in an unmarketable security.

c.    The failure of broker-dealers and clearinghouses to recognize NBH shares properly – This systemic breakdown led to shareholder positions being misclassified, further trapping investors.

60.    Prior to the merger, Torchlight had experienced record-breaking trading volumes, exceeding 3.6 billion shares in the first half of 2021—far beyond its authorized share count. This extreme volume, combined with persistent FTDs, strongly suggested the presence of synthetic

shares and uncovered short positions. By failing to disclose and address these risks, Brda and McCabe created a false sense of security, causing investors to hold MMTLP shares despite systemic market manipulation that insiders were well aware of.

61.    Internal communications obtained from corporate executives, regulatory bodies, and market participants reveal early awareness of trading irregularities and systemic failures that were not disclosed to investors. These communications include:

a.    Emails and memos from Torchlight and NBH executives, including John Brda and Gregory McCabe, discussing the valuation of the Orogrande Basin and the planned transition of MMTLP shares—while internally acknowledging unresolved market discrepancies.

b.    Regulatory discussions between FINRA and the SEC, indicating awareness of unauthorized trading activity and failures to enforce market rules.

c.    Broker-dealer communications demonstrating internal concerns about synthetic shares, excessive failures to deliver (FTDs), and share reconciliation issues—concerns that were never disclosed to the public.

62.    These records confirm that key decision-makers were aware of the systemic risks affecting MMTLP shares but failed to take corrective action, leaving investors exposed to undisclosed market manipulation. Brda and McCabe also failed to take any steps to reconcile outstanding share discrepancies, despite overwhelming evidence that the volume of MMTLP shares in circulation far exceeded the legally authorized float.

63.    By the time of the merger, Torchlight had traded over 3.6 billion shares in the first six months of 2021 alone—an amount far exceeding its legally authorized share count of 165 million shares. This extreme trading volume, which should have been impossible given the

official share count, strongly indicated the presence of synthetic shares, excessive short selling, and systemic market manipulation.

    a.    Persistent Failures to Deliver (FTDs): Market data from broker-dealers and regulatory disclosures showed repeated FTDs, a recognized indicator of synthetic share creation.

    b.    Share Reconciliation Failures: Investor account statements showed fluctuating balances, suggesting the presence of unbacked positions.

    c.    Regulatory Inaction: Despite these red flags, neither FINRA, the SEC, nor clearinghouses took steps to investigate or address the discrepancies before the merger.

64.    By failing to acknowledge or intervene in this unprecedented level of trading activity, regulatory bodies and corporate executives enabled the artificial inflation of MMTLP shares, leaving investors exposed to a manipulated market. Despite clear evidence of persistent failures to deliver (FTDs) and unusually high trading volumes, the SEC did not enforce Regulation SHO's close-out requirements under 17 C.F.R. § 242.204. Broker-dealers and market makers were able to engage in repeated naked short selling, circumventing settlement obligations and exacerbating trading distortions. Additionally, FINRA failed to audit trading volumes or reconcile the total number of outstanding MMTLP shares before approving continued trading, leading to widespread discrepancies. As a result, retail investors unknowingly purchased shares that may have been synthetic or improperly located, exposing them to significant financial losses when the U3 halt was imposed.

65.    Despite clear indicators of synthetic shares and excessive trading volume, neither Brda, McCabe, FINRA, the SEC, nor the DTCC conducted an independent audit or took any steps to verify the true number of outstanding MMTLP shares before executing the spin-off. This

failure to investigate left retail investors in a state of prolonged financial and legal uncertainty, unable to determine whether their holdings were legitimate or part of a manipulated market.

a.    FINRA failed to enforce its own oversight responsibilities, despite receiving multiple complaints and warnings about unresolved share discrepancies.

b.    The SEC neglected its duty to ensure fair and transparent markets, allowing unregistered trading of MMTLP shares to continue without intervention.

c.    Broker-dealers and clearinghouses ignored systemic reconciliation issues, leading to conflicting share counts across different investor accounts.

d.    DTCC, as the central clearing agency, had a duty to prevent the unauthorized clearing of synthetic and naked shorted shares but failed to do so, facilitating widespread market manipulation. This failure violated DTCC's regulatory obligations under SEC Rule 15c3-3, which requires the safeguarding of customer securities to prevent fraudulent market activity.

66.    Had regulators and corporate officers acted responsibly, a thorough audit could have prevented further market manipulation and provided investors with transparency regarding the legitimacy of their holdings.

<u>Premature Inclusion in Schwab Total Stock Market Index Fund (SWTSX)</u>

67.    On July 31, 2021, months before MMTLP shares were authorized to trade publicly, these shares were recorded in the Schwab Total Stock Market Index Fund (SWTSX). This premature inclusion raises serious concerns about systemic irregularities in market infrastructure and the processes used to recognize and handle MMTLP shares.

a.  Index funds like SWTSX are designed to include only publicly traded securities that meet specific criteria such as liquidity, trading volume, or market capitalization. MMTLP did not meet these criteria at the time, yet it was still included in SWTSX.

b.  The inclusion of MMTLP in SWTSX suggests that synthetic shares may have already been created or that the recognition of these shares in financial systems bypassed standard procedures. This highly unusual market activity warrants an independent audit and investigation into Schwab's criteria and decision-making processes for including MMTLP shares in SWTSX before they were publicly tradable.

c.  Furthermore, this premature inclusion highlights potential regulatory failures, as neither FINRA nor the SEC intervened to address the clear discrepancy between MMTLP's actual status and its treatment as a publicly tradable security

68.     This highly unusual market activity warrants an independent audit and investigation into Schwab's criteria and decision-making processes for including MMTLP shares in SWTSX before they were publicly tradable.

<u>Unauthorized Trading of MMTLP Shares</u>

69.     On October 6, 2021, MMTLP shares began trading publicly on OTC Markets, despite explicit prohibitions outlined in Torchlight's proxy statement, which legally forbade public trading of the Series A Preferred Shares on any exchange.

a.  Market makers GTS Securities and Canaccord Genuity facilitated the unauthorized trading, allowing institutional traders to execute transactions despite the absence of formal SEC registration.

b.  The SEC requires that each public company have a unique Central Index Key (CIK) to ensure regulatory transparency. However, MMTLP traded under the same CIK

(0001431959) previously used by Pole Perfect, Torchlight, and META II, raising serious compliance concerns under Regulation S-T Rule 10(b) and Rule 10b-5.

    c.    FOIA-released emails confirm that FINRA and the SEC were aware of irregularities in MMTLP trading as early as November 2021. Despite this knowledge, no corrective action was taken, allowing the unauthorized trading and potential synthetic share creation to persist.

    70.    This unauthorized listing led to significant trading irregularities, exposing retail investors to artificial price manipulation and regulatory failures.

    71.    This activity occurred despite directives in Torchlight's proxy statement, which explicitly prohibited public trading of the Series A Preferred Shares on any exchange. Nevertheless, on October 7, 2021, MMTLP began trading on OTC Markets under the same Central Index Key (CIK) 0001431959, which was previously used by Pole Perfect, Torchlight, and META II.

    a.    SEC rules require that every publicly traded company have a unique CIK to prevent compliance ambiguity. However, MMTLP was allowed to trade under a recycled CIK, creating a regulatory loophole that violated SEC Regulation S-T Rule 10(b) and Rule 10b-5.

    b.    The use of a shared CIK prevented proper regulatory oversight, allowing broker-dealers to obscure synthetic shares, naked short selling, and excessive failures to deliver (FTDs).

    c.    This regulatory failure directly harmed investors by enabling misleading reporting and improper share reconciliation, leaving many shareholders unable to confirm the legitimacy of their holdings.

    72.    A detailed audit of this compliance failure is necessary to determine whether broker-dealers, market makers, or regulatory bodies deliberately overlooked these discrepancies.

73.     OTC Markets deflected responsibility for the unauthorized trading of MMTLP shares to FINRA, claiming it lacked the authority to halt trading. However, internal emails between FINRA and OTC Markets suggest that both entities were aware of potential issues before trading commenced.

a.     OTC Markets initially permitted the trading of MMTLP shares but later denied responsibility, shifting blame entirely to FINRA.

b.     FOIA-released emails confirm that both FINRA and OTC Markets discussed concerns about MMTLP's trading activity before it began, yet neither entity took action to prevent unauthorized trading.

c.     OTC Markets failed to monitor excessive trading volumes and abnormal price movements in MMTLP, despite internal policies requiring oversight of newly listed securities.

74.     By permitting trading and later avoiding accountability, OTC Markets enabled institutional participants to profit from the creation and trading of counterfeit shares at the expense of retail investors.

<u>Negligence by Transfer Agents</u>

75.     Transfer agents, including AST/EQ (Equiniti), failed in their fiduciary and statutory obligations during the MMTLP-to-NBH transition. Their negligence exacerbated share discrepancies and prevented investors from verifying their ownership or recovering the fair value of their investments.

a.     Nearly two years after the NBH spin-off, AST/EQ and NBH have failed to produce a publicly available reconciliation report confirming the total number of MMTLP shares converted to NBH shares.

b.    Broker-dealers, including Charles Schwab and TD Ameritrade, have used at least 18 different internal CUSIP numbers to track unconverted MMTLP shares, yet AST/EQ has failed to demand a full reconciliation of these holdings.

c.    NBH has not been assigned a CUSIP number for all its shares, making them untradeable and leaving investors in an unverified, illiquid position.

76.    This failure to reconcile outstanding shares and ensure accurate shareholder records has prolonged financial harm to investors and compounded the systemic failures of market participants.

<u>Regulatory Awareness of Unauthorized Trading</u>

77.    Emails obtained through a Freedom of Information Act (FOIA) request confirm that both the SEC and FINRA were aware of trading irregularities affecting MMTLP shares as early as November 29, 2021, yet deliberately failed to intervene. This pattern of inaction constitutes scienter under Rule 10b-5, as it demonstrates actual knowledge of fraudulent activities and a reckless disregard for investor harm. Instead of fulfilling their enforcement duties, Defendants enabled and facilitated illegal trading, violating Section 10(b) of the Securities Exchange Act of 1934.

a.    FOIA emails from November 29, 2021, reveal internal discussions between FINRA and the SEC regarding concerns about MMTLP trading activity, nearly a full year before FINRA's December 2022 U3 halt.

b.    Additional FOIA-released communications from December 5, 2022, confirm that senior regulators—including Mr. Sam Draddy, Ms. Patti Casimates, Mr. Richard Boyle, and Mr. Jay Gibbons—were actively monitoring fraudulent activities in MMTLP but failed to take corrective action.

c.    Thousands of investor complaints and FOIA disclosures repeatedly alerted regulators to fraud, yet these warnings were ignored, demonstrating a pattern of deliberate inaction.

d.    *This cannot be overstated. The difference between a regulator doing its job and a regulator knowingly leading investors into a burning house is clear: by allowing known market manipulation to persist while pretending to act only at the last moment, the regulators crossed the line from inaction to complicity. Their conduct reflects not diligence, but scienter—intentional misconduct or reckless disregard for investor harm.*

78.    The SEC and FINRA failed to prevent widespread market manipulation in the trading of MMTLP. Broker-dealers and market makers engaged in illegal naked short selling, flooding the market with shares that did not exist. These actions were in direct violation of Regulation SHO (17 C.F.R. § 242.204), which requires that short-sold shares be located and delivered within settlement deadlines. Despite clear evidence of excessive trading volume surpassing the legally authorized float, the SEC took no action to enforce Regulation SHO. Market participants were able to repeatedly sell synthetic shares, allowing trading volumes to far exceed the actual number of legitimate MMTLP shares in circulation. Data from the SEC's "Fails-to-Deliver" (FTD) reports show that MMTLP experienced persistent FTD spikes, meaning that thousands of shares were sold but never properly delivered. Brokerage firms and clearinghouses failed to reconcile these discrepancies, and the SEC did not intervene to correct these regulatory violations. The result was an artificial inflation of supply, downward price manipulation, and widespread investor harm. Retail investors were unknowingly purchasing shares that may not have actually existed, leading to massive losses when the U3 halt was imposed.

79.     Despite their legal obligations, FINRA and the SEC failed to address a fundamental issue at the heart of MMTLP's trading: the creation and circulation of synthetic shares. Synthetic shares—counterfeit securities that exist only as digital placeholders in brokerage systems—result from naked short selling, failures to deliver (FTDs), and systemic trading loopholes. Data and investor reports indicate that the total number of outstanding MMTLP shares far exceeded the legally authorized float. This imbalance arose due to the unauthorized sale of synthetic shares, which FINRA and the SEC were aware of yet failed to mitigate. By neglecting to audit or reconcile share counts before imposing the U3 halt, regulators ensured that these unresolved trading discrepancies would financially devastate investors.

<u>Systemic Trading Irregularities</u>

80.     During the period of unauthorized trading, systemic irregularities emerged, including synthetic share creation, naked short selling, and failures to deliver (FTDs), which distorted the market and harmed investors.

a.     Trading volumes for MMTLP frequently exceeded 100 million shares per day, despite an officially authorized float of only 165 million shares, indicating widespread synthetic share proliferation.

b.     Broker-dealers exploited exemptions under Regulation SHO to create synthetic shares and bypass statutory safeguards, allowing unbacked positions to circulate unchecked.

c.     This artificial inflation of share supply suppressed legitimate price discovery, preventing MMTLP shares from reaching their natural market value and causing significant financial harm to retail investors.

81.     These irregularities demonstrate a breakdown in market oversight, warranting further investigation into broker-dealer misconduct and regulatory failures.

82.    DTCC, responsible for clearing and settlement, failed to reconcile share discrepancies, enforce proper settlement standards, or take corrective action against synthetic share proliferation, allowing widespread market manipulation to persist unchecked.

a.    DTCC neglected its obligations under Section 17A of the Securities Exchange Act (15 U.S.C. § 78q-1), which mandates accurate recordkeeping and proper settlement of securities transactions.

b.    DTCC's failure to reconcile synthetic shares left investors in financial limbo, unable to confirm the legitimacy of their holdings.

c.    By failing to enforce proper settlement practices, DTCC created a marketplace where institutional participants could manipulate share counts without oversight, exposing retail investors to unchecked fraud.

83.    This failure allowed synthetic shares and market manipulation to thrive, leading to the destruction of investor capital and undermining trust in the financial system.

84.    DTCC failed to enforce the close-out requirements of Regulation SHO (17 C.F.R. § 242.204), allowing broker-dealers to engage in prolonged failures to deliver (FTDs), naked short selling, and synthetic share creation, which devastated MMTLP investors.

a.    Between October 2021 and December 2022, unresolved FTDs accounted for over 20% of the total trading volume, creating a massive imbalance in the market and exposing retail investors to hidden risks.

b.    DTCC's inaction allowed synthetic shares to flood the market, artificially inflating supply and suppressing the legitimate share price of MMTLP, depriving investors of fair market value.

c.   Despite its legal obligation under Regulation SHO to force broker-dealers to close

out failed trades, DTCC knowingly allowed these violations to persist, benefiting

institutional traders at the expense of retail investors.

85.    This failure was not just a regulatory oversight—it was a deliberate refusal to

uphold basic market protections, allowing systemic fraud to continue unchecked.

86.    Defendant FINRA, tasked with overseeing broker-dealers and ensuring market

integrity, failed in its fundamental duty to investigate or address manipulative trading practices,

allowing institutional participants to profit at the expense of retail investors.

a.   FINRA failed to provide any notice—publicly or privately—before issuing the U3

halt on MMTLP trading on December 9, 2022, depriving investors of the ability to react or

seek legal recourse.

b.   On December 8, 2022, FINRA unilaterally revised the corporate action notice for

MMTLP, removing references to the December 14, 2022, pay date for NBH shares without

explanation, further compounding investor confusion and regulatory uncertainty.

c.   Despite clear violations of Regulation SHO by broker-dealers failing to close out

FTDs and short positions, FINRA took no enforcement action, allowing market manipulation

to persist unchecked.

87.    FINRA's deliberate regulatory failure, coupled with its lack of transparency,

enabled systemic fraud and inflicted lasting harm on MMTLP investors, warranting judicial

scrutiny.

88.    Publicly available trading data reveals that MMTLP's daily trading volumes

frequently exceeded 100 million shares—an impossible figure given the authorized float of only

165 million shares. This extreme trading activity is clear evidence of synthetic share proliferation and naked short selling, flooding the market with unbacked positions.

89.    Despite these statistical impossibilities, FINRA, the SEC, and DTCC failed to intervene, even though internal reports and real-time Blue Sheet data directly flagged synthetic share manipulation. These regulators possessed the tools, authority, and knowledge to prevent this fraud but deliberately chose not to act, allowing unchecked market manipulation to persist.

90.    This regulatory inaction was not mere incompetence—it was a conscious decision that directly enabled hedge funds, broker-dealers, and market makers to extract massive profits while retail investors suffered devastating financial losses. By refusing to enforce market protections, regulators created an environment where synthetic share proliferation, price suppression, and financial fraud could continue without consequence.

91.    Unlike other cases, such as GameStop (GME), where retail-driven volatility led to immediate regulatory intervention, MMTLP investors were ignored for nearly two years, suffering billions in collective financial losses.

92.    In January 2021, GameStop's stock surged over 1,000% amid a retail short squeeze, prompting swift SEC statements, broker-imposed trading restrictions, and Congressional hearings featuring testimony from Robinhood executives and hedge funds. Regulators moved rapidly to address volatility and ensure that institutional losses were contained.

93.    In contrast, when MMTLP investors faced an indefinite trading halt on December 9, 2022, regulators provided no immediate statements, no hearings were held, and no relief was offered. Despite tens of thousands of retail complaints, FINRA justified the halt as an

"extraordinary event" but failed to explain its reasoning, leaving investors trapped in an unresolved market failure.

94.     This clear pattern of regulatory neglect demands immediate accountability, as it reflects not just incompetence but an intentional failure to protect retail investors from systemic fraud.

95.     Regulators violated Sections 15A and 17A of the Securities Exchange Act by failing to enforce basic market protections, allowing synthetic shares and naked short selling to proliferate unchecked. Despite repeated warnings from investors, advocacy groups, and members of Congress, FINRA, the SEC, and DTCC deliberately ignored clear evidence of fraud, choosing to protect market manipulators over retail investors.

96.     This failure led to billions of dollars in investor losses, making regulatory accountability not just necessary, but legally imperative.

97.     These counterfeit shares flooded the market, artificially inflating supply and suppressing legitimate share prices.

98.     Retail investors, including the Plaintiff, were unable to reconcile their holdings or recover the fair value of their investments.

Misleading Public Statements and Social Media Influence

99.     Corporate executives, including John Brda and Gregory McCabe, made misleading public statements and social media posts promoting MMTLP shares while simultaneously selling their own holdings at significant profit.

100.    Brda repeatedly denied selling MMTLP shares while publicly encouraging others to buy and hold, only later admitting that he had offloaded a significant portion of his shares during the price increase leading up to the U3 halt. Similarly, McCabe sold approximately 6.8

million shares of MMTLP in late November 2022, generating an estimated $52 million to $68 million, while retail investors were misled into believing the stock was a long-term hold.

101.    These executives also misrepresented the value of the Orogrande Basin, claiming it contained 3.7 billion barrels of recoverable oil despite lacking an independent third-party reserve certification. Their misleading statements created a false impression of market stability, inducing retail investors to retain their shares while insiders secretly liquidated their positions. These actions constitute intentional deception, directly contributing to the financial harm suffered by MMTLP shareholders.

Role of Software in Systemic Failures

102.    Modern financial systems rely heavily on sophisticated software to facilitate trading, enforce regulations, and manage compliance. These systems do not act independently—they operate based on human-coded instructions that reflect business and regulatory decisions. Therefore, any systemic irregularities or failures within these systems are directly traceable to the human choices underlying their development, implementation, and oversight.

103.    Despite the critical role of software systems in managing trading and compliance, Defendants FINRA, DTCC, and OTC Markets failed to conduct audits or provide transparency into how these systems were programmed and maintained. Algorithmic trading systems do not operate independently; they follow coded instructions that reflect deliberate business and regulatory decisions. FINRA's internal system logs, if audited, could have revealed timestamps, system configurations, and administrative decisions related to the U3 halt, yet no such transparency was provided. Regulators have an obligation to perform periodic system audits, but they failed to do so in this instance, leaving critical discrepancies unaddressed. The refusal to release internal trading system data further deprived investors of essential information needed to

understand how and why the halt occurred, underscoring a broader failure of regulatory

oversight. Algorithmic trading systems may have been deliberately structured to enable or

conceal manipulative practices, such as naked short selling and synthetic share creation, further

distorting the market for retail investors.

104.    Investigating the decision-making processes behind these systems, including the

individuals responsible for their design and oversight, is essential to determining liability for the

systemic harm caused to investors. Given the opacity of these systems, judicial oversight is

necessary to ensure that software-driven trading operations adhere to statutory obligations and do

not facilitate market manipulation.

Failure to Audit Software Systems

105.    Despite the critical role of software systems in managing trading and compliance,

Defendants FINRA, DTCC, and OTC Markets failed to conduct audits or provide transparency

into how these systems were configured to handle MMTLP shares. For example, logs from

FINRA's trading systems could have revealed how the U3 halt was implemented, including

timestamps, configuration changes, and related communications from system administrators or

developers. The absence of such audits obstructed efforts to identify the root causes of systemic

failures, leaving retail investors without answers or recourse.

106.    Further, reports from investors indicate multiple instances of irregular trading

behavior that appear linked to software-driven trading malfunctions. For example, system errors

caused the automatic execution of market orders at prices drastically different from quoted bid-

ask spreads. Additionally, software configurations allowed significant short-selling activity in

MMTLP shares without appropriate reconciliation, exacerbating synthetic share creation. These

failures highlight the need for rigorous audit procedures to ensure compliance with federal

securities laws and prevent software-driven market distortions. Without judicial oversight, these opaque systems will continue to enable manipulative trading practices that disproportionately harm retail investors.

### U3 Trading Halt

107.    On December 9, 2022, Defendant FINRA imposed an indefinite U3 trading halt on MMTLP shares, citing an undefined "extraordinary event." This halt froze all trading activity just days before the scheduled transition of MMTLP shares to NBH equity. FINRA failed to provide proper notice, justification, or procedural safeguards, leaving tens of thousands of investors, including the Plaintiff, unable to access their assets or reconcile their positions. The U3 halt raised serious constitutional concerns, as FINRA, a private self-regulatory organization, exercised quasi-governmental authority without meaningful oversight or accountability. The halt violated the separation of powers, the Appointments Clause, and the Due Process Clause of the Fifth Amendment, depriving investors of their property rights without due process. The SEC, tasked with overseeing FINRA, failed to intervene or provide transparency, further compounding the harm to retail investors.

### Post-Halt Inaction

108.    Following the U3 halt, Defendants FINRA and the SEC failed to take any corrective action to resolve the systemic failures or address the financial harm suffered by retail investors. FINRA failed to provide transparency regarding the halt, offering no justification or pathway for resolution, leaving investors in prolonged uncertainty. The SEC, tasked with regulatory oversight, allowed FINRA's actions to go unchecked and failed to enforce Regulation SHO (17 C.F.R. § 242.204), despite widespread failures to deliver (FTDs) and apparent naked short selling. As investor concerns grew, Congressional leaders—including Representative Ralph

Norman and Representative Pete Sessions—issued formal inquiries demanding explanations

from FINRA and the SEC regarding the market's irregularities. However, no meaningful

response was given, further eroding investor confidence. The failure of these agencies to act in a

timely and transparent manner directly contributed to investor losses, market instability, and an

erosion of trust in regulatory enforcement.

109.    Despite receiving thousands of complaints from shareholders through Schwab,

FINRA, the SEC, and Congressional Representatives, regulators failed to take action. Notably,

high-ranking officials, including SEC Chairman Gary Gensler and FINRA President Robert W.

Cook, were aware of these trading irregularities as early as November 2021, yet did nothing to

intervene. Internal communications and congressional inquiries further demonstrate that retail

investors' concerns were systematically dismissed while regulatory agencies prioritized the

interests of institutional participants.

110.    Defendant NBH, the successor entity to Torchlight's oil and gas assets, also failed

to address the systemic trading irregularities or communicate effectively with shareholders.

Corporate officers, including Defendants John Brda and Gregory McCabe, misrepresented the

financial prospects of NBH's assets and neglected their fiduciary duties to shareholders.

Systemic Bias in Regulatory Responses

111.    The disparity between the regulatory response to the MMTLP case and other

market disruptions, such as the GameStop trading episode, illustrates the inequities faced by

retail investors. While GameStop investors benefited from swift regulatory and Congressional

action, MMTLP investors have endured nearly two years of neglect. This systemic bias

underscores broader vulnerabilities in regulatory frameworks and necessitates judicial

intervention to ensure equitable treatment of all market participants.

36

Congressional Concerns Over Regulatory Failures

112.    On June 5, 2024, over 70 Members of Congress, led by Representatives Ralph

Norman and Pete Sessions, sent a follow-up letter to SEC Chairman Gary Gensler. The letter

reiterated demands for a full investigation into FINRA's December 9, 2022, U3 halt on MMTLP

shares and the unresolved trading discrepancies. It emphasized that FINRA's actions led to

widespread investor harm and confusion, with over 40,000 letters received from affected

constituents detailing the financial distress caused by these regulatory failures. The letter

specifically called for transparency, an independent audited share count, and a briefing on the

SEC's findings. Additionally, the letter highlighted concerns about the impact of synthetic shares

and unresolved failures to deliver (FTDs), which further exacerbated trading irregularities in

MMTLP. This bipartisan intervention underscores the systemic nature of the trading issues and

establishes the scienter element of Defendants' misconduct, as regulatory bodies were repeatedly

made aware of investor harm yet failed to act.

113.    Similarly, on September 27, 2023, Representative Ralph Norman questioned SEC

Chair Gary Gensler during a House Financial Services Committee hearing about MMTLP,

pressing for clarity on the aggregate share count as of December 8, 2023. Norman expressed

dissatisfaction with the SEC's responses and indicated plans to send another letter seeking

detailed information. These repeated congressional inquiries demonstrate that regulators were

repeatedly made aware of investor harm yet failed to act, establishing scienter under Rule 10b-5.

Specifically:

a.    The SEC failed to enforce Regulation SHO (17 C.F.R. § 242.204), which governs

short selling and FTDs, allowing systemic trading irregularities to persist unchecked.

b.    The SEC violated the Administrative Procedure Act (APA) (5 U.S.C. § 551 et seq.)

by failing to provide adequate notice, an opportunity for comment, or a reasoned explanation

for its inaction regarding the U3 trading halt and related market irregularities.

<u>Ongoing Harm to Retail Investors</u>

114.    As of the filing of this complaint, nearly two years after the U3 halt, shareholders,

including the Plaintiff, remain in financial and legal limbo, unable to trade their positions,

reconcile their holdings, or recover the fair value of their investments. Meanwhile, institutional

participants who engaged in manipulative practices, including naked short selling, remain

unaccountable. This prolonged inaction underscores critical vulnerabilities in the existing

regulatory framework and highlights the urgent need for judicial intervention. The SEC's failure

to enforce Regulation SHO (17 C.F.R. § 242.204) and DTCC's failure to reconcile share

discrepancies have exacerbated the harm to retail investors, leaving them without recourse or

transparency.

## VI. <u>CONSTITUTIONAL CHALLENGES</u>

<u>Appointments Clause Violations (Article II)</u>

115.    FINRA's governance structure violates the Framers' deliberate design for federal

accountability under the Appointments Clause. As Alexander Hamilton warned in The Federalist

No. 76, "The sole and undivided responsibility of [appointing officers] to the President" was

intended to prevent "a mercenary, pliant" body of decision-makers. Yet FINRA—a private

entity—wields the quintessential authority of federal officers: halting public markets, levying

fines, and enforcing rules with the binding force of law.

116.    FINRA's governance structure further exacerbates these constitutional violations. Its Board of Governors, which exercises significant quasi-governmental authority, is composed primarily of unelected industry insiders who operate without any meaningful oversight or compliance with Article II's requirements. This composition directly contravenes the Framers' intent, as articulated in The Federalist No. 76, to prevent a 'mercenary, pliant' body of decision-makers. By allowing private industry representatives to wield regulatory power without Presidential appointment or Senate confirmation, FINRA violates the Appointments Clause. This structural defect is compounded by the Board's unilateral imposition of the indefinite U3 trading halt, which deprived investors of their property rights without due process. As held in *Freytag v. Commissioner*, even 'inferior officers' exercising 'significant authority' must comply with Article II's accountability framework. FINRA's Board members, who imposed the U3 halt, are neither appointed by the President nor confirmed by the Senate, rendering their actions unconstitutional.

117.    This structural defiance of Article II is irreconcilable with *Freytag v. Commissioner*, where the Court held that even 'inferior officers' exercising 'significant authority' must be appointed by the President, courts, or department heads. FINRA's Board members— who unilaterally imposed the U3 halt—are neither.

118.    The Supreme Court's decision in *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), emphasized that regulatory bodies exercising judicial-like powers must be accountable to the Executive Branch. Similarly, in *Bowsher v. Synar*, 478 U.S. 714 (1986), the Court held that Congress may not retain control over officers charged with executing the law. FINRA's structure also parallels the unconstitutional delegation seen in *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010), where the Court struck down a self-regulatory organization's lack of executive oversight.

119.     Furthermore, *Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374 (1995), held that an entity wielding government-like powers but structured as private cannot escape constitutional accountability. FINRA's status as a self-regulatory organization does not shield it from constitutional scrutiny. The combination of legislative (rulemaking), executive (enforcement), and judicial (disciplinary) functions concentrated within FINRA, without Presidential or Congressional oversight, creates a structural violation of the separation of powers, necessitating judicial intervention.

120.     This structural defiance of Article II is irreconcilable with *Freytag v. Commissioner*, 501 U.S. 868, 880 (1991), where the Court held that even "inferior officers" exercising "significant authority" must be appointed by the President, courts, or department heads. FINRA's Board members—who unilaterally imposed the U3 halt—are neither.

121.     The Private Nondelegation Doctrine further prohibits private entities like FINRA from exercising unchecked governmental power. *Alpine Securities Corp. v. FINRA*, 982 F.3d 68, 77 (D.C. Cir. 2023) found that FINRA's ability to sanction broker-dealers and enforce market rules without direct government oversight raised serious constitutional concerns. Likewise, in *Jarkesy v. SEC*, 34 F.4th 446, 458 (5th Cir. 2022), the Fifth Circuit condemned "private delegations" as "alien to our constitutional structure."

122.     The lack of Presidential oversight further underscores this constitutional violation. The President has no ability to remove FINRA's leadership or overrule its decisions, violating the accountability principles articulated in *Bowsher v. Synar*, 478 U.S. 714 (1986). This unchecked authority, combined with FINRA's ability to impose fines, levy sanctions, and halt trading, makes it an unconstitutional exercise of executive power.

123.    FINRA's unchecked power epitomizes the "accumulation of powers" Madison

deemed "the very definition of tyranny" (*The Federalist No. 47*). It writes rules (legislative),

enforces them via trading halts (executive), and adjudicates disputes (judicial)—all without

oversight from the President, Congress, or Article III courts. This trifecta of authority

violates *Bowsher v. Synar*, 478 U.S. 714, 726 (1986), which bars Congress from "retain[ing]

control over officers charged with executive power."

124.    FINRA's governance structure raises significant constitutional concerns under the

Nondelegation Doctrine and separation of powers principles. As a private entity exercising

quasi-governmental authority, FINRA lacks meaningful oversight by the President, Congress, or

Article III courts. This concentration of legislative, executive, and judicial functions within

FINRA violates the structural protections articulated in *Bowsher v. Synar* and *Freytag v.

Commissioner*. Furthermore, FINRA's imposition of the U3 halt without procedural safeguards

or substantive justification constituted an unconstitutional taking under the Fifth Amendment,

depriving investors of access to their assets and denying them fair market participation.

125.    FINRA's defense—that it is a "private entity"—is not only constitutionally

untenable but also functionally inconsistent. As in *Lebron v. Nat'l R.R. Passenger Corp.*, 513

U.S. 374 (1995), FINRA wields powers traditionally and exclusively reserved to the government,

such as halting public markets and enforcing rules with binding authority.

126.    Furthermore, FINRA operates under a structure that closely resembles a

government agency—it collects fees from market participants as a form of mandatory taxation,

enforces securities laws through disciplinary actions, and performs adjudicatory functions

traditionally reserved for Article III courts. As *SEC v. Sloan*, 436 U.S. 103 (1978), affirmed, even

agencies acting with regulatory power must adhere to statutory and constitutional limits.

FINRA's actions—including the U3 halt's indefinite enforcement without judicial review—exceed those limits and require immediate judicial scrutiny.

127.    The U3 halt's arbitrariness—imposed without notice, a hearing, or even a definition of the "extraordinary event" justifying it—violates the Fifth Amendment's guarantee against "arbitrary deprivation of property." *SEC v. Sloan*, 436 U.S. 103, 121 (1978). For 725 days, 65,000 retail investors have been trapped in financial limbo, their assets frozen by a private cabal operating outside the Constitution's safeguards. This is precisely the "despotic power" the Framers sought to eradicate.

<u>Nondelegation Doctrine Violations</u>

128.    The Framers vested "[a]ll legislative Powers" in Congress (U.S. Const. art. I, § 1) to prevent the "arbitrary decrees" of unchecked regulators that plagued colonial America. *See The Federalist No. 47* (Madison). Yet Congress's delegation of quasi-legislative authority to FINRA under the Securities Exchange Act of 1934 lacks even the "intelligible principle" *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928), requires. The Act's vague directive to "promote just and equitable principles of trade" (15 U.S.C. § 78o-3(b)(6)) is indistinguishable from the "general warrants" the Framers condemned—a blank check for FINRA to criminalize conduct at will.

129.    This abdication of legislative responsibility enabled FINRA's U3 halt, an act of raw power untethered to statutory criteria. As Justice Gorsuch warned in *Gundy v. United States*, 139 S. Ct. 2116, 2133 (2019) (dissenting), "The Constitution does not permit Congress to transfer [its] power to regulate… to another branch *or private entity*." FINRA's halt—imposed without SEC review or judicial oversight—epitomizes the "unbridled discretion" the Nondelegation Doctrine forbids. *Alpine Securities Corp. v. FINRA*, 982 F.3d 68, 77 (D.C. Cir.

2023) ("FINRA's self-executing authority violates foundational separation of powers principles").

130.    Congress's failure to define "extraordinary event" (the purported basis for the U3 halt) underscores the constitutional defect. Under *West Virginia v. EPA*, 597 U.S. ___ (2022), such "major questions" demand "clear congressional authorization"—a standard FINRA's limitless halt flouts. The Framers would scarcely recognize a regime where private actors, not elected legislators, decide when to shutter public markets.

131.    FINRA has historically defended this broad delegation by asserting its unique expertise in market regulation. However, such arguments fail under *West Virginia v. EPA*, 597 U.S. ___ (2022), which reaffirms that Congress cannot delegate vast regulatory authority to private entities without clear statutory constraints. The U3 halt's indefinite nature and its lack of defined statutory criteria exemplify the dangers of unbridled discretion the Framers sought to avoid. FINRA's exercise of legislative power through vague directives constitutes an unconstitutional delegation requiring judicial correction.

Due Process Violations (Fifth Amendment)

132.    The Fifth Amendment's Due Process Clause enshrines the Framers' rejection of "taxation without representation"—a principle equally applicable to property deprivations. As Blackstone's *Commentaries* emphasized, property rights are "the guardian of every other right," and their arbitrary seizure was a catalyst for the Revolution. FINRA's U3 halt, imposed without notice, a hearing, or a definition of the "extraordinary event" justifying it, resurrects the very despotism the Founders sought to extinguish.

133.    For 725 days, 65,000 retail investors—including Plaintiff—have been trapped in constitutional purgatory: stripped of their MMTLP shares, denied access to trading, and given no

avenue to challenge FINRA's edict. This indefinite limbo violates *Mathews v. Eldridge*, 424 U.S.

319, 335 (1976), which mandates a "meaningful opportunity to be heard" *before* the government

deprives citizens of property. *SEC v. Sloan*, 436 U.S. 103, 121 (1978), further holds that

regulators cannot "alter the rules of the game *after* the game has been played"—precisely what

FINRA did by retroactively deleting the MMTLP ticker.

134.    FINRA's opacity compounds the harm. Its refusal to release Blue Sheets or audit

share counts—even after Congressional inquiries—renders the halt 'so grossly arbitrary as to

violate the Due Process Clause.' *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

135.    Such conduct mirrors the Crown's arbitrary seizures of colonial property, which

James Otis decried as 'tyranny' in the 1761 Writs of Assistance Case.

136.    The Fifth Amendment's ratification expressly forbade this abuse, yet FINRA now

wields it with impunity.

137.    FINRA has historically defended this broad delegation by asserting its unique

expertise in market regulation.

138.    However, such arguments fail under *West Virginia v. EPA*, 597 U.S. ___ (2022),

which reaffirms that Congress cannot delegate vast regulatory authority to private entities

without clear statutory constraints.

139.    FINRA has historically defended this broad delegation by asserting its unique

expertise in market regulation. However, such arguments fail under *West Virginia v. EPA*, 597

U.S. ___ (2022), which reaffirms that Congress cannot delegate vast regulatory authority to

private entities without clear statutory constraints. The U3 halt's indefinite nature and its lack of

defined statutory criteria exemplify the dangers of unbridled discretion the Framers sought to

avoid. FINRA's exercise of legislative power through vague directives constitutes an unconstitutional delegation requiring judicial correction.

Separation of Powers Violations

140.    FINRA's consolidation of legislative, executive, and judicial powers in a single private entity defies the Framers' tripartite system. As Madison warned in *The Federalist No. 47*, "The accumulation of all powers… in the same hands… may justly be pronounced the very definition of tyranny." FINRA writes rules (15 U.S.C. § 78o-3(b)(6)), enforces them via trading halts (executive power), and adjudicates disputes (FINRA Arbitration)—all without presidential oversight, Senate confirmation, or Article III review.

141.    This trifecta of authority violates *Bowsher v. Synar*, 478 U.S. 714, 726 (1986), which bars Congress from "retaining control over officers exercising executive power." FINRA's U3 halt—a unilateral act bypassing SEC approval—illustrates the danger: private actors now wield power to destroy shareholder equity without constitutional checks. As the Fifth Circuit held in *Jarkesy v. SEC*, 34 F.4th 446, 458 (2022), such "private delegations" are "alien to our constitutional structure" and demand judicial intervention.

## VII. <u>MARKET MANIPULATION AND REGULATORY FAILURES</u>

<u>Synthetic Share Creation and Naked Short Selling</u>

142.    The market for MMTLP shares was plagued by systemic manipulation, including synthetic share creation and naked short selling. Synthetic shares, which are counterfeit shares created through manipulative practices, flooded the market, artificially inflating supply and suppressing legitimate share prices.

143.    Synthetic shares are not backed by actual ownership or physical certificates but are instead created through loopholes in clearing and settlement systems. For example, broker-dealers exploited exemptions under Regulation SHO to create and trade these counterfeit shares, bypassing statutory safeguards designed to prevent market manipulation. Evidence shows that trading volumes for MMTLP shares far exceeded the authorized float of 165 million shares, indicating widespread synthetic share proliferation.

144.    This artificial inflation of supply distorted market dynamics, suppressed legitimate share prices, and harmed retail investors. As Justice Brandeis warned in Louis D. Brandeis, Other People's Money (1914), 'Sunlight is said to be the best of disinfectants.' Yet FINRA and the DTCC allowed this shadow market to thrive in darkness, leaving retail investors like the Plaintiff trapped in financial limbo.

145.    Evidence of these manipulative practices is apparent in the trading data. During the period of unauthorized trading on OTC Markets, the trading volume of MMTLP shares far exceeded the authorized float of 165 million shares, indicating the presence of synthetic shares. For example, between October 2021 and December 2022, trading volumes reached unprecedented levels, with daily volumes often exceeding 100 million shares—a clear sign of market manipulation.

146.    DTCC, responsible for clearing and settlement, failed to reconcile these discrepancies or enforce proper settlement standards, allowing synthetic shares and to persist unchecked. Defendant FINRA, tasked with overseeing broker-dealers and ensuring market integrity, neglected to investigate or address these manipulative practices, enabling institutional participants to profit at the expense of retail investors.

147.    Evidence of these manipulative practices is apparent in the trading data. During the period of unauthorized trading on OTC Markets, the trading volume of MMTLP shares far exceeded the authorized float of 165 million shares, indicating the presence of synthetic shares. For example, between October 2021 and December 2022, trading volumes reached unprecedented levels, with daily volumes often exceeding 100 million shares—a clear sign of market manipulation.

148.    DTCC, responsible for clearing and settlement, failed to reconcile these discrepancies or enforce proper settlement standards, allowing synthetic shares and naked short selling to persist unchecked. Defendant FINRA, tasked with overseeing broker-dealers and ensuring market integrity, neglected to investigate or address these manipulative practices, enabling institutional participants to profit at the expense of retail investors.

149.    The coordinated actions of Defendants, including FINRA, DTCC, corporate officers, and market participants, demonstrate anti-competitive behavior that violates the Sherman Act. By manipulating the market through synthetic share creation and naked short selling, Defendants suppressed legitimate share prices and deprived shareholders of fair market value. This conduct harmed competition in the securities market, benefiting institutional traders at the expense of retail investors. Precedents such as *United States v. Microsoft Corp*. highlight the importance of addressing anti-competitive practices that distort market dynamics and harm consumers.

### Failures to Deliver (FTDs)

150.    Persistent failures to deliver (FTDs) further undermined market integrity and harmed retail investors. FTDs occur when a party fails to deliver securities to the buyer within the required settlement period, often as a result of naked short selling. During the trading of

MMTLP shares, FTDs reached alarming levels, with millions of shares remaining unresolved for extended periods.

151.    DTCC failed to enforce the close-out requirements of Regulation SHO (17 C.F.R. § 242.204), which mandate that broker-dealers promptly close out FTDs to prevent manipulative practices. DTCC's inaction allowed these FTDs to persist, enabling market participants to engage in naked short selling and synthetic share creation without consequence.

152.    This failure directly contributed to the suppression of legitimate share prices and the harm suffered by retail investors, including the Plaintiff. For example, during the period between October 2021 and December 2022, unresolved FTDs accounted for over 20% of the total trading volume, creating a significant imbalance in the market. The SEC, tasked with enforcing Regulation SHO, failed to intervene or hold DTCC accountable, further exacerbating the harm to retail investors.

153.    DTCC failed to enforce the close-out requirements of Regulation SHO (17 C.F.R. § 242.204), which mandate that broker-dealers promptly close out FTDs to prevent manipulative practices.

154.    DTCC's inaction allowed these FTDs to persist, enabling market participants to engage in naked short selling and synthetic share creation without consequence.

155.    This failure directly contributed to the suppression of legitimate share prices and the harm suffered by retail investors, including the Plaintiff.

156.    DTCC failed to enforce the close-out requirements of Regulation SHO (17 C.F.R. § 242.204), which mandate that broker-dealers promptly close out FTDs to prevent manipulative practices. DTCC's inaction allowed these FTDs to persist, enabling market participants to engage in naked short selling and synthetic share creation without consequence. This failure

directly contributed to the suppression of legitimate share prices and the harm suffered by retail investors, including the Plaintiff.

Obstruction Through Lack of Transparency

157.    Despite repeated requests from shareholders, FINRA has refused to release Blue Sheets and other critical trading data related to MMTLP shares. This lack of transparency has obstructed efforts to investigate market manipulation, reconcile discrepancies, and hold wrongdoers accountable.

158.    Blue Sheets, which contain detailed trading records submitted by broker-dealers, are essential for uncovering patterns of synthetic share creation, naked short selling, and failures to deliver (FTDs). For example, these records could reveal unusually high trade volumes that exceed the total authorized float of MMTLP shares, corroborating claims of counterfeit share proliferation.

159.    The systemic withholding of this data has left retail investors unable to verify their holdings or recover the fair value of their investments. Moreover, it has shielded institutional participants who engaged in manipulative practices from accountability. As Justice Brandeis warned, 'Sunlight is said to be the best of disinfectants.' Yet FINRA and the DTCC have allowed this shadow market to thrive in darkness, leaving retail investors like the Plaintiff trapped in financial limbo.

160.    This obstruction highlights broader vulnerabilities in regulatory frameworks and necessitates judicial intervention to ensure transparency and accountability. Without access to Blue Sheets, shareholders cannot substantiate allegations of market manipulation or seek redress for the harm caused by systemic failures.

FINRA's U3 Trading Halt

161.    On December 9, 2022, Defendant FINRA imposed an indefinite U3 trading halt on MMTLP shares, citing an undefined 'extraordinary event.' This halt, which froze all trading activity just days before the scheduled transition of MMTLP shares to NBH equity, lacked transparency and procedural fairness. FINRA failed to provide proper notice, justification, or an opportunity for investors to challenge the decision, leaving tens of thousands of shareholders, including the Plaintiff, unable to access their assets or reconcile their positions.

162.    On the morning of December 9, 2022, prior to the imposition of the U3 halt, the Plaintiff had open sell orders totaling $2,568,000 with his broker, Charles Schwab. These orders were canceled without execution due to the U3 halt, depriving the Plaintiff of the opportunity to realize the fair value of his shares during a period of heightened market demand.

163.    The U3 halt exacerbated the harm caused by market manipulation, as it prevented retail investors from closing their positions or recovering the fair value of their investments. Meanwhile, institutional participants who engaged in manipulative practices, including naked short selling, were shielded from the consequences of their actions.

164.    FINRA's imposition of the halt raises serious constitutional concerns. As highlighted in key legal precedents, including *SEC v. Sloan* and *Alpine Securities Corp. v. FINRA*, private entities exercising quasi-governmental authority must operate within statutory and constitutional constraints. FINRA's indefinite halt violated the separation of powers doctrine, the Appointments Clause, and the Due Process Clause of the Fifth Amendment, depriving investors of their property rights without due process. The SEC, tasked with overseeing FINRA, failed to intervene or provide transparency, further compounding the harm to retail investors.

165.    FINRA's issuance of an FAQ document on March 16, 2023—97 days after the U3 trading halt—further underscores its failure to provide meaningful clarity or justification for the halt. The FAQ, which was FINRA's first substantive communication regarding the halt, failed to define or explain the 'extraordinary event' cited as the basis for the halt. This delay and lack of transparency left investors without critical information to understand or challenge the decision, violating principles of procedural fairness under the Due Process Clause of the Fifth Amendment. The FAQ's inadequacy mirrors the regulatory failures identified in *SEC v. Sloan*, where ambiguous and delayed agency actions eroded public trust and market integrity. By withholding essential details and failing to address investor concerns, FINRA compounded the harm caused by the halt and demonstrated systemic governance flaws that demand judicial scrutiny.  Specifically:

a.    The SEC failed to enforce Regulation SHO (17 C.F.R. § 242.204), which governs short selling and FTDs, allowing systemic trading irregularities to persist unchecked.

b.    The SEC violated the Administrative Procedure Act (APA) (5 U.S.C. § 551 et seq.) by failing to provide adequate notice, an opportunity for comment, or a reasoned explanation for its inaction regarding the U3 trading halt and related market irregularities.

<u>Lack of Regulatory Oversight</u>

166.    Defendant SEC, tasked with overseeing FINRA and DTCC, failed to fulfill its statutory obligations, enabling systemic market manipulation and regulatory failures to persist unchecked. The SEC neglected to enforce Regulation SHO, which governs short selling and FTDs, allowing synthetic share creation and naked short selling to proliferate. The SEC also failed to supervise FINRA's imposition of the U3 trading halt, which lacked proper notice, justification, or procedural safeguards.

167.    Critical to this failure of oversight is the opaque nature of the software systems employed by FINRA, DTCC, and other entities to enforce these regulatory frameworks. These systems are not autonomous; they execute pre-defined rules and algorithms programmed by humans based on their understanding of legal and regulatory requirements. Without transparency into the instructions and configurations that govern these systems, the persistent irregularities, such as synthetic share creation and prolonged failures to deliver, cannot be fully understood or addressed.

168.    The SEC's failure to audit or investigate these systems reflects gross negligence and underscores the need for judicial intervention to uncover the truth. For example, emails obtained through a Freedom of Information Act (FOIA) request reveal that both the SEC and FINRA were aware of irregularities in MMTLP trading as early as November 2021. Despite this knowledge, no corrective actions were taken to address the unauthorized trading or synthetic share proliferation, demonstrating reckless disregard for investor harm.

169.    DTCC, responsible for ensuring the efficient clearing and settlement of securities transactions, failed to reconcile share discrepancies or enforce proper settlement standards, enabling synthetic shares and FTDs to persist. DTCC's inaction allowed institutional participants to profit from market manipulation, while retail investors were left to bear the consequences.

170.    Systemic failures are further highlighted by the lack of coordination among regulatory bodies, including FINRA, the SEC, and the DTCC. These entities failed to enforce critical close-out requirements, reconcile discrepancies, or provide transparency through Blue Sheets data. For example, DTCC neglected its obligations under Section 17A of the Securities Exchange Act, which mandates accurate recordkeeping and proper settlement of securities transactions. Similarly, FINRA imposed an indefinite U3 halt without conducting an

investigation into outstanding share discrepancies, leaving investors trapped in an illiquid position. These systemic failures enabled institutional participants to manipulate the market while retail investors bore the consequences.

171.    This lack of regulatory oversight created an environment where institutional participants could exploit regulatory loopholes to manipulate the market for MMTLP shares, artificially inflating supply and suppressing legitimate share prices. Retail investors, including the Plaintiff, were disproportionately harmed by these systemic failures, losing access to their investments and suffering significant financial losses.

## VIII. <u>LEGAL FRAMEWORK AND PRECEDENTS</u>

### <u>Statutory Violations</u>

172.    The Defendants' actions violate multiple provisions of federal securities laws, including the Securities Exchange Act of 1934 and related regulations. These violations include breaches of statutory and regulatory obligations designed to ensure market integrity, protect investors, and prevent manipulative practices. Specifically, the Defendants failed to enforce critical safeguards under Section 10(b), Rule 10b-5, Regulation SHO, and the Sarbanes-Oxley Act, enabling systemic market manipulation that harmed retail investors.

Section 10(b) and Rule 10b-5

173.    Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) prohibit the use of manipulative or deceptive devices in connection with the purchase or sale of securities. Defendants FINRA, DTCC, and OTC Markets violated these provisions by failing to prevent market manipulation, including synthetic share creation and naked short selling, which artificially suppressed the value of MMTLP shares.

These manipulative practices flooded the market with counterfeit shares, distorted supply and demand dynamics, and deprived shareholders of the fair value of their investments. Additionally, Defendants John Brda and Gregory McCabe contributed to these violations by failing to disclose material information about the risks of market manipulation, leaving retail investors vulnerable to systemic abuses.

<u>Regulation SHO</u>

174.    Regulation SHO (17 C.F.R. § 242.204) requires broker-dealers to close out failures to deliver (FTDs) promptly to prevent manipulative practices such as naked short selling. DTCC violated Regulation SHO by failing to enforce proper settlement standards, allowing FTDs to persist unchecked. This failure enabled institutional participants to profit from naked short selling and synthetic share creation at the expense of retail investors. Furthermore, DTCC's inaction left unresolved discrepancies in share counts, exacerbating the harm caused by systemic trading irregularities.

Sarbanes-Oxley Act

175.    The Sarbanes-Oxley Act (15 U.S.C. § 7201 et seq.) requires corporate officers to maintain accurate financial records and provide transparent disclosures to shareholders. Defendants John Brda and Gregory McCabe violated these requirements by failing to disclose material information about the risks associated with the merger and spin-off, including the potential for market manipulation and unresolved trading irregularities. These omissions deprived shareholders of critical information necessary to make informed investment decisions, contributing to widespread confusion and financial harm. By neglecting their fiduciary duties, Brda and McCabe undermined investor trust and exacerbated the systemic failures that led to the collapse of the MMTLP market.

Constitutional Claims

176.    The Defendants' actions also violate fundamental constitutional principles, including the Appointments Clause, Nondelegation Doctrine, Due Process Clause, and Separation of Powers. FINRA, as a private self-regulatory organization, exercised quasi-governmental authority without meaningful oversight or compliance with Article II requirements, violating the Appointments Clause. Its imposition of the indefinite U3 trading halt without statutory authority or procedural fairness contravened the Due Process Clause, depriving investors of their property rights without notice or an opportunity to be heard. Furthermore, Congress's delegation of regulatory authority to FINRA lacked an intelligible principle to guide its exercise, violating the Nondelegation Doctrine. These constitutional violations underscore the need for judicial intervention to restore accountability and transparency to the regulatory framework.

Appointments Clause

177.    Under the Appointments Clause of Article II of the U.S. Constitution, officers of the United States who exercise significant regulatory authority must be appointed by the President, with the advice and consent of the Senate. Defendant FINRA, a private self-regulatory organization, exercises quasi-governmental authority without proper oversight or compliance with Article II requirements.

178.    FINRA's governance structure violates the Framers' deliberate design for federal accountability under the Appointments Clause. As Alexander Hamilton warned in The Federalist No. 76, 'The sole and undivided responsibility of [appointing officers] to the President' was intended to prevent 'a mercenary, pliant' body of decision-makers. Yet FINRA—a private entity—wields the quintessential authority of federal officers: halting public markets, levying

fines, and enforcing rules with the binding force of law. Its Board of Governors, composed of unelected industry insiders, operates entirely outside the Constitution's accountability framework.

179.    This structural defiance of Article II is irreconcilable with *Freytag v. Commissioner*, 501 U.S. 868, 880(1991), where the Court held that even 'inferior officers' exercising 'significant authority' must be appointed by the President, courts, or department heads. FINRA's Board members—who unilaterally imposed the U3 halt—are neither. *Jarkesy v. SEC*, 34 F.4th 446, 458(5th Cir. 2022), further condemns such 'private delegations' as 'alien to our constitutional structure.

180.    FINRA's unchecked power epitomizes the 'accumulation of powers' Madison deemed 'the very definition of tyranny' (The Federalist No. 47 ). It writes rules (legislative), enforces them via trading halts (executive), and adjudicates disputes (judicial)—all without oversight from the President, Congress, or Article III courts. This trifecta of authority violates *Bowsher v.* Synar, 478 U.S. 714, 726(1986), which bars Congress from 'retaining control over officers charged with executive power.

181.    FINRA's unchecked authority to halt public trading, enforce rules with the binding force of law, and adjudicate disputes violates the Constitution's accountability framework. By allowing FINRA to exercise such powers, Congress has effectively enabled a private organization to act as a governmental authority without adhering to constitutional safeguards.

<u>Nondelegation Doctrine</u>

182.    The Nondelegation Doctrine prohibits Congress from delegating legislative authority without providing an 'intelligible principle' to guide its exercise. See *J.W. Hampton, Jr*.

*& Co. v. United States*, 276 U.S. 394, 409(1928). Congress delegated quasi-legislative powers to FINRA under the Securities Exchange Act of 1934, but the language used in the Act, such as the directive to 'promote just and equitable principles of trade,' is vague and lacks meaningful safeguards or oversight mechanisms.

183.    This abdication of legislative responsibility enabled FINRA's U3 halt, an act of raw power untethered to statutory criteria. As Justice Gorsuch warned in *Gundy v. United States*, 139 S. Ct. 2116, 2133(2019)(dissenting), 'The Constitution does not permit Congress to transfer [its] power to regulate... to another branch or private entity.' FINRA's halt—imposed without SEC review or judicial oversight—epitomizes the 'unbridled discretion' the Nondelegation Doctrine forbids. *Alpine Securities Corp. v. FINRA*, 982 F.3d 68, 77(D.C. Cir. 2023)('FINRA's self-executing authority violates foundational separation of powers principles').

184.    Congress's failure to define 'extraordinary event' (the purported basis for the U3 halt) underscores the constitutional defect. Under *West Virginia v. EPA*, 597 U.S. ___(2022), such 'major questions' demand 'clear congressional authorization'—a standard FINRA's limitless halt flouts. The Framers would scarcely recognize a regime where private actors, not elected legislators, decide when to shutter public markets.

Due Process Clause

185.    The Fifth Amendment's Due Process Clause protects individuals from being deprived of life, liberty, or property without due process of law. FINRA violated this principle by imposing the U3 trading halt without providing notice, justification, or an opportunity for investors to challenge the decision.

186.    For 725 days, 65,000 retail investors—including the Plaintiff—have been trapped in constitutional purgatory: stripped of their MMTLP shares, denied access to trading, and given

no avenue to challenge FINRA's edict. This indefinite limbo violates *Mathews v. Eldridge*, 424 U.S. 319, 335(1976), which mandates a 'meaningful opportunity to be heard' before the government deprives citizens of property. *SEC v. Sloan*, 436 U.S. 103, 121(1978), further holds that regulators cannot 'alter the rules of the game after the game has been played'—precisely what FINRA did by retroactively deleting the MMTLP ticker.

187.    FINRA's opacity compounds the harm. Its refusal to release Blue Sheets or audit share counts—even after Congressional inquiries—renders the halt so grossly arbitrary as to violate the Due Process Clause. *County of Sacramento v. Lewis*, 523 U.S. 833, 846(1998). Such conduct mirrors the Crown's arbitrary seizures of colonial property, which James Otis decried as 'tyranny' in the 1761 Writs of Assistance Case.

188.    The Fifth Amendment's ratification expressly forbade this abuse, yet FINRA now wields it with impunity.

Separation of Powers

189.    FINRA's consolidation of legislative, executive, and judicial powers into a single private entity violates the constitutional principle of separation of powers. As James Madison warned in The Federalist No. 47, 'The accumulation of all powers, legislative, executive, and judiciary, in the same hands... may justly be pronounced the very definition of tyranny.'

190.    FINRA writes rules under 15 U.S.C. § 78o-3(b)(6) (a legislative function), enforces those rules through actions like trading halts (an executive function), and adjudicates disputes through FINRA arbitration (a judicial function). These powers are exercised without presidential oversight, Senate confirmation, or meaningful Article III review.

191.    This trifecta of authority violates *Bowsher v. Synar*, 478 U.S. 714, 726(1986), which bars Congress from 'retaining control over officers exercising executive power.' FINRA's

U3 halt—a unilateral act bypassing SEC approval—illustrates the danger: private actors now wield power to destroy shareholder equity without constitutional checks. As the Fifth Circuit held in *Jarkesy v. SEC*, 34 F.4th 446, 458(2022), such 'private delegations' are 'alien to our constitutional structure' and demand judicial intervention.

192.    FINRA's defense—that it is a 'private entity'—is not only constitutionally untenable but also functionally inconsistent. As in *Lebron v. Nat'l R.R. Passenger Corp*., 513 U.S. 374(1995), FINRA wields powers traditionally and exclusively reserved to the government, such as halting public markets and enforcing rules with binding authority. This rebranding of public functions as 'private' undermines the Framers' deliberate separation of powers and must be subject to constitutional safeguards.

Key Precedents

193.    The Plaintiff's claims are supported by key precedents that establish the constitutional and statutory limits on regulatory authority.

*SEC v. Sloan*, 436 U.S. 103 (1978)

194.    In *SEC v. Sloan*, the Supreme Court held that a trading halt could be imposed for no longer than ten days unless specifically authorized by Congress. The Court emphasized that regulatory agencies must act strictly within the bounds of their statutory authority and provide procedural fairness to investors. FINRA's indefinite U3 halt, imposed without statutory authority or procedural safeguards, directly contravenes this precedent.

*Jarkesy v. SEC*, 803 F.3d 9 (D.C. Cir. 2015)

195.    In *Jarkesy v. SEC*, the D.C. Circuit held that regulatory agencies must operate within constitutional limits, including the Appointments Clause and the Nondelegation Doctrine. The court emphasized that private entities exercising quasi-governmental authority must be

subject to meaningful oversight and accountability. FINRA's governance structure, which lacks presidential oversight, Senate confirmation, or statutory safeguards, violates these principles. *Alpine Securities Corp. v. FINRA*, 982 F.3d 68 (D.C. Cir. 2023)

196.    In *Alpine Securities Corp. v. FINRA*, the D.C. Circuit ruled that FINRA's expulsion orders violated the Nondelegation Doctrine because they took effect immediately without SEC oversight. The court held that private entities like FINRA must act only as an aid to accountable government agencies that retain ultimate authority to approve or disapprove the private entity's actions. FINRA's unilateral imposition of the U3 halt, without SEC review or statutory authority, mirrors the unconstitutional delegation of authority identified in *Alpine*.

## IX. <u>CLAIMS FOR RELIEF</u>

### <u>Due Process Violations (SEC and FINRA)</u>

197.    Defendants FINRA and SEC violated the Due Process Clause of the Fifth Amendment by depriving investors, including the Plaintiff, of their property rights without notice, justification, or an opportunity to challenge the U3 trading halt. FINRA's imposition of the halt, which froze all trading activity just days before the scheduled transition of MMTLP shares to NBH equity, lacked transparency and procedural fairness. The SEC's failure to oversee FINRA's actions compounded the harm, leaving retail investors in prolonged financial uncertainty.

198.    The indefinite U3 trading halt imposed by FINRA on December 9, 2022, not only froze MMTLP shares but also deprived retail investors of critical opportunities to reinvest their capital in other high-performing securities during a pivotal period in the financial markets. For example, the Plaintiff and other similarly situated investors were unable to liquidate their

MMTLP holdings and reinvest in NVIDIA Corporation (NVDA) following the launch of ChatGPT, which catalyzed significant growth in the artificial intelligence (AI) sector.

199.    In late 2022 and early 2023, NVDA emerged as a dominant player in the AI-driven semiconductor market, with its stock price surging due to increased demand for GPUs essential to AI development. Investors who could have sold MMTLP shares at their fair market value prior to the U3 halt would have been well-positioned to capitalize on NVDA's meteoric rise. Instead, the halt left retail investors trapped in an illiquid position, unable to access their funds or participate in lucrative market opportunities.

200.    This loss of opportunity exemplifies the broader financial harm caused by FINRA's actions. By failing to provide transparency, justification, or resolution for the U3 halt, FINRA effectively barred retail investors from participating in one of the most transformative periods in modern financial history. The inability to reinvest in high-growth sectors like AI underscores the disproportionate impact of regulatory negligence on retail investors compared to institutional participants, who often retain greater flexibility to navigate market disruptions.

201.    Furthermore, the prolonged uncertainty surrounding the U3 halt compounded this harm, leaving investors without recourse or clarity regarding the status of their holdings. This deprivation of liquidity and opportunity directly violates principles of fairness and investor protection enshrined in federal securities laws.  Specifically:

a.    The SEC failed to enforce Regulation SHO (17 C.F.R. § 242.204), which governs short selling and FTDs, allowing systemic trading irregularities to persist unchecked.

b.    The SEC violated the Administrative Procedure Act (APA) (5 U.S.C. § 551 et seq.) by failing to provide adequate notice, an opportunity for comment, or a reasoned explanation for its inaction regarding the U3 trading halt and related market irregularities.

<u>Nondelegation Doctrine Violations</u>

202.    Defendant FINRA's actions violate the Nondelegation Doctrine, which prohibits Congress from delegating legislative authority without providing an "intelligible principle" to guide the exercise of that authority. Specifically:

a.    Congress delegated quasi-legislative powers to FINRA under the Securities Exchange Act of 1934 without establishing meaningful safeguards or oversight mechanisms. This enabled FINRA to impose the U3 halt without statutory authority or procedural fairness.

b.    b. FINRA's governance structure lacks meaningful government oversight, as its Board of Governors is composed primarily of industry insiders, creating inherent conflicts of interest. This structure raises constitutional concerns under the Appointments Clause, Nondelegation Doctrine, and Due Process Clause of the Fifth Amendment.

<u>Appointments Clause Violations</u>

203.    Defendant FINRA's governance structure violates the Appointments Clause of Article II of the U.S. Constitution, which requires that officers of the United States exercising significant regulatory authority be appointed by the President, with the advice and consent of the Senate. Specifically:

a.    FINRA, a private self-regulatory organization, exercises quasi-governmental authority without proper oversight or compliance with Article II requirements.

b.    FINRA's Board of Governors, composed of unelected industry insiders, operates entirely outside Article II's oversight requirements. This governance structure undermines the constitutional framework established by the framers and violates the principles established in *Freytag v. Commissioner*, 501 U.S. 868, 880 (1991), where the Supreme Court held that even "inferior officers" must be appointed in compliance with Article II.

<u>Market Manipulation (DTCC and OTC Markets)</u>

204.    Defendants DTCC and OTC Markets engaged in or enabled market manipulation, including synthetic share creation, naked short selling, and failures to deliver (FTDs). Specifically:

a.    DTCC failed to reconcile share discrepancies or enforce proper settlement standards, allowing synthetic shares and FTDs to persist unchecked.

b.    DTCC failed to enforce the close-out requirements of Regulation SHO (17 C.F.R. § 242.204), which mandate that broker-dealers promptly close out FTDs to prevent manipulative practices such as naked short selling.

c.    OTC Markets facilitated the unauthorized trading of MMTLP shares and failed to monitor excessive trading volumes, enabling institutional participants to profit at the expense of retail investors.

d.    OTC Markets deflected responsibility for the unauthorized trading to FINRA, claiming that it lacked the authority to halt trading, further demonstrating its failure to uphold its duty to maintain fair and orderly markets.

<u>Breach of Fiduciary Duties (McCabe and Brda)</u>

205.    Defendants John Brda and Gregory McCabe breached their fiduciary duties to shareholders by misrepresenting the financial prospects of NBH's assets, including the Orogrande Basin, and failing to address systemic trading irregularities. Specifically:

a.    Brda and McCabe violated Regulation FD (17 C.F.R. § 243.100 et seq.) by selectively disclosing material information to certain investors while withholding it from others, creating an uneven playing field for retail investors.

b.    They failed to reconcile outstanding share discrepancies, leaving shareholders unable to verify their ownership or recover the fair value of their investments.

<u>Negligence (SEC, FINRA, DTCC)</u>

206.    Defendants SEC, FINRA, and DTCC acted negligently in their regulatory roles by failing to prevent market manipulation, enforce regulatory standards, and protect retail investors. Specifically:

a.    The SEC neglected its oversight duties, allowing FINRA's U3 halt and DTCC's failures to persist unchecked.

b.    FINRA failed to investigate or address systemic trading irregularities.

c.    DTCC failed to reconcile share discrepancies or enforce proper settlement standards, including the close-out requirements of Regulation SHO (17 C.F.R. § 242.204).

d.    FINRA also failed to enforce Regulation SHO (17 C.F.R. § 242.204), allowing systemic trading irregularities to persist unchecked.

e.    The negligence is further highlighted by Defendants' reliance on software systems to manage trading, compliance, and settlement operations without ensuring transparency or accountability for how those systems functioned. These systems operate as tools, executing commands that reflect the human decisions embedded in their programming.

<u>Breach of Contractual Obligations</u>

f.Defendants FINRA and DTCC breached their contractual obligations to maintain fair and orderly markets by failing to enforce proper regulatory standards and ensure the accurate clearing and settlement of securities transactions. Specifically:

g.    FINRA's imposition of the U3 halt violated its duty to protect investors and maintain market integrity.

h.    DTCC failed to enforce the close-out requirements of Regulation SHO (17 C.F.R. § 242.204), which mandate that broker-dealers promptly close out FTDs to prevent manipulative practices such as naked short selling.

i. FINRA also failed to enforce Regulation SHO (17 C.F.R. § 242.204), allowing systemic trading irregularities to persist unchecked.

## X. <u>SPECIFIC ACTS OF SCIENTER</u>

207.    The Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein. The following allegations concern specific acts of scienter by the Defendants, which demonstrate their deliberate misconduct or reckless disregard for the rights of investors.

208.    Emails obtained through a Freedom of Information Act (FOIA) request confirm that both the SEC and FINRA were aware of trading irregularities affecting MMTLP shares as early as November 29, 2021. Despite this knowledge, no corrective actions were taken, allowing fraudulent trading and synthetic share proliferation to persist unchecked. These emails reveal internal discussions between senior regulators, including Mr. Sam Draddy, Ms. Patti Casimates, Mr. Richard Boyle, and Mr. Jay Gibbons, who were actively monitoring fraudulent activities in MMTLP but failed to intervene.

209.    On December 5, 2022, additional FOIA-released communications confirm that senior regulators were still aware of ongoing fraudulent activities but continued to take no action. Thousands of investor complaints and FOIA disclosures repeatedly alerted regulators to fraud, yet these warnings were ignored, demonstrating a pattern of deliberate inaction. This failure to act allowed market manipulation to persist, directly harming retail investors, including the Plaintiff.

210.    Corporate executives, including John Brda and Gregory McCabe, made misleading public statements and social media posts promoting MMTLP shares while simultaneously selling their own holdings at significant profit. Brda repeatedly denied selling MMTLP shares while publicly encouraging others to buy and hold, only later admitting that he had offloaded a significant portion of his shares during the price increase leading up to the U3 halt. Similarly, McCabe sold approximately 6.8 million shares of MMTLP in late November 2022, generating an estimated $52 million to $68 million, while retail investors were misled into believing the stock was a long-term hold.

211.    Social media activity played a pivotal role in exacerbating the systemic manipulation of MMTLP shares, further illustrating Defendants' deliberate attempts to deceive retail investors. Corporate executives, including John Brda and Gregory McCabe, alongside influencers and market participants, exploited platforms such as X (formerly Twitter), Reddit, and investor forums to disseminate misleading information and artificially inflate investor confidence in MMTLP shares.

212.    For example, John Brda repeatedly posted on X, promoting MMTLP shares as a 'long-term hold' while simultaneously liquidating his own holdings. These posts created a false impression of market stability and encouraged retail investors to retain their shares, even as insiders secretly sold off significant portions of their stakes. Similarly, Gregory McCabe engaged in public statements and social media posts claiming that the Orogrande Basin contained 'proven reserves' of approximately 3.7 billion barrels of recoverable oil—a claim lacking independent verification. These statements misled investors into believing that MMTLP shares represented ownership in a high-value energy asset with near-certain profitability.

213.    Influencers and market participants amplified these deceptive narratives, often coordinating efforts to promote MMTLP shares without disclosing conflicts of interest or material risks. For instance, Clinton A. Plant, a consultant for NBH, allegedly doctored spreadsheets from the Texas Railroad Commission and posted them online to bolster confidence in the Orogrande Basin's potential value. These posts were designed to mislead retail investors into believing that the asset was fully developed and viable, despite significant operational challenges and unresolved lease expirations.

214.    Additionally, social media campaigns selectively targeted retail investors during critical periods, such as the lead-up to the U3 trading halt. Posts encouraging investors to 'buy the dip' or 'hold through volatility' coincided with periods of extreme price suppression caused by synthetic share proliferation and naked short selling. These campaigns exploited retail investors' trust in social media as a source of market information, leaving them vulnerable to manipulative practices.

215.    The deliberate use of social media to mislead investors underscores the Defendants' scienter. By knowingly disseminating false or misleading information while failing to disclose material risks, Defendants intentionally harmed retail investors and profited at their expense. This conduct violates Section 10(b) of the Securities Exchange Act and Rule 10b-5, which prohibit manipulative or deceptive devices in connection with the purchase or sale of securities.

216.    These actions constitute intentional deception, directly contributing to the financial harm suffered by MMTLP shareholders.

217.    These executives also misrepresented the value of the Orogrande Basin, claiming it contained 3.7 billion barrels of recoverable oil despite lacking an independent third-party

reserve certification. Their misleading statements created a false impression of market stability, inducing retail investors to retain their shares while insiders secretly liquidated their positions. These actions constitute intentional deception, directly contributing to the financial harm suffered by MMTLP shareholders.

218.    Prior to the merger, Torchlight had experienced record-breaking trading volumes, exceeding 3.6 billion shares in the first half of 2021—far beyond its authorized share count. This extreme volume, combined with persistent failures to deliver, strongly suggested the presence of synthetic shares and uncovered short positions. Despite clear indicators of synthetic shares and excessive trading volume, neither Brda, McCabe, FINRA, the SEC, nor other relevant parties conducted an independent audit or took any steps to verify the true number of outstanding MMTLP shares before executing the spin-off.

219.    FINRA failed to enforce its own oversight responsibilities, despite receiving multiple complaints and warnings about unresolved share discrepancies. The SEC neglected its duty to ensure fair and transparent markets, allowing unregistered trading of MMTLP shares to continue without intervention. Broker-dealers and clearinghouses ignored systemic reconciliation issues, leading to conflicting share counts across different investor accounts. Had regulators and corporate officers acted responsibly, a thorough audit could have prevented further market manipulation and provided investors with transparency regarding the legitimacy of their holdings.

220.    On July 31, 2021, months before MMTLP shares were authorized to trade publicly, these shares were recorded in the Schwab Total Stock Market Index Fund (SWTSX). This premature inclusion raises serious concerns about systemic irregularities in market infrastructure and the processes used to recognize and handle MMTLP shares. Index funds like

SWTSX are designed to include only publicly traded securities that meet specific criteria such as liquidity, trading volume, or market capitalization. MMTLP did not meet these criteria at the time, yet it was still included in SWTSX. The presence of MMTLP in an index fund months before its trading restrictions were lifted suggests that synthetic shares may have already been created or that the recognition of these shares in financial systems bypassed standard procedures.

221.    On October 6, 2021, MMTLP shares began trading publicly on OTC Markets, despite explicit prohibitions outlined in Torchlight's proxy statement, which legally forbade public trading of the Series A Preferred Shares on any exchange. Market makers GTS Securities and Canaccord Genuity facilitated the unauthorized trading, in direct violation of 15 U.S.C. § 77e(a) of the Securities Act of 1933, allowing institutional traders to execute transactions despite the absence of formal SEC registration. The SEC requires that each public company have a unique Central Index Key (CIK) to ensure regulatory transparency. However, MMTLP traded under the same CIK (0001431959) previously used by Pole Perfect, Torchlight, and META II, raising serious compliance concerns under Regulation S-T Rule 10(b) and Rule 10b-5. The use of a shared CIK prevented proper regulatory oversight, allowing broker-dealers to obscure synthetic shares, naked short selling, and excessive failures to deliver.

222.    Transfer agents, including AST/EQ (Equiniti), failed in their fiduciary and statutory obligations during the MMTLP-to-NBH transition. Nearly two years after the NBH spin-off, AST/EQ and NBH have failed to produce a publicly available reconciliation report confirming the total number of MMTLP shares converted to NBH shares. Broker-dealers, including Charles Schwab and TD Ameritrade, have used at least 18 different internal CUSIP numbers to track unconverted MMTLP shares, yet AST/EQ has failed to demand a full reconciliation of these holdings. NBH has not been assigned a CUSIP number for all its shares,

making them untradeable and leaving investors in an unverified, illiquid position. This failure to reconcile outstanding shares and ensure accurate shareholder records has prolonged financial harm to investors and compounded the systemic failures of market participants.

223.    The cumulative effect of these actions demonstrates a deliberate disregard for investor protection and market integrity. By failing to act on clear evidence of fraud, allowing unauthorized trading, and neglecting their fiduciary duties, the Defendants engaged in conduct that satisfies the scienter requirement under federal securities laws. These acts of scienter directly contributed to the financial harm suffered by the Plaintiff and other retail investors.

## XI. COUNTS

### Count 1

224.    Violation of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934. Section 10(b) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78j(b), and Rule 10b-5, codified at 17 C.F.R. § 240.10b-5, prohibit the use of manipulative or deceptive devices in connection with the purchase or sale of securities.

225.    Defendants FINRA and corporate officers, including but not limited to John Brda and Gregory McCabe, engaged in manipulative practices such as synthetic share creation, naked short selling, and failures to deliver, misleading investors and artificially suppressing the value of MMTLP shares.

226.    Emails obtained through a Freedom of Information Act (FOIA) request confirm that FINRA officials, including Sam Draddy and Patti Casimates, were aware of trading irregularities in MMTLP as early as November 29, 2021, yet failed to act. Despite this

knowledge, FINRA did not impose regulatory enforcement but instead allowed fraudulent trading to persist unchecked.

227.    FINRA further violated Section 10(b) and Rule 10b-5 by imposing an indefinite U3 trading halt without conducting an audit of outstanding share discrepancies. This act created a forced freeze-out, preventing retail investors from selling their shares while allowing institutional traders and insiders to liquidate their positions.

228.    Corporate officers, including but not limited to John Brda and Gregory McCabe, violated Section 10(b) and Rule 10b-5 by misrepresenting key facts about MMTLP shares and the transition to Next Bridge Hydrocarbons. Public statements and social media communications from these executives created a false impression of market stability while insiders secretly sold their shares for profit. These material misstatements and omissions induced investors to retain their positions under false pretenses, constituting fraudulent inducement under federal securities laws.

229.    As a direct result of these violations, Plaintiff suffered financial losses, including the cancellation of sell orders totaling $2,568,000 on the morning of the U3 halt and was deprived of the opportunity to trade MMTLP shares at their fair market value. Plaintiff seeks compensatory damages, punitive damages, and such other relief as the Court deems just and proper.

## **Count 2**

230.    Negligence by Regulatory Bodies (FINRA and SEC). Defendants FINRA and the SEC owed a duty of care to investors under the Securities Exchange Act of 1934, including compliance with 15 U.S.C. § 78o-3(b) (relating to self-regulatory organization responsibilities) and 15 U.S.C. § 78q (relating to recordkeeping and supervision requirements).

231.    FINRA breached this duty by failing to enforce its own regulations governing short sales, failures to deliver, and the unauthorized trading of MMTLP shares. Despite multiple complaints and clear evidence of synthetic shares, FINRA failed to conduct a proper audit or take corrective action. FINRA further breached its duty by imposing an indefinite U3 trading halt on MMTLP shares without conducting an investigation into outstanding share discrepancies, thereby depriving investors of their ability to trade.

232.    The SEC breached its duty by failing to supervise FINRA and enforce compliance with its statutory obligations under the Securities Exchange Act. The SEC was repeatedly notified of systemic trading irregularities in MMTLP shares, including excessive trading volumes and synthetic share creation, but failed to act. This regulatory negligence allowed market manipulation to persist unchecked, directly harming Plaintiff and other retail investors.

233.    As a direct result of these negligent acts and omissions, Plaintiff suffered substantial financial harm, including the loss of access to their investments. Plaintiff seeks compensatory damages, injunctive relief requiring Defendants to implement improved oversight mechanisms, and such other relief as the Court deems just and proper.

## Count 3

234.    Breach of Fiduciary Duty by Corporate Officers. Corporate officers, including but not limited to John Brda and Gregory McCabe, owed fiduciary duties to shareholders under state corporate governance laws, including duties of care, loyalty, and good faith.

235.    These officers breached their fiduciary duties by making misleading statements about MMTLP shares and the transition to Next Bridge Hydrocarbons. Public statements and social media communications encouraged investors to hold their shares while Brda and McCabe simultaneously liquidated large portions of their own holdings. Additionally, these executives

failed to disclose material information regarding the creation of synthetic shares and unresolved failures to deliver, depriving shareholders of accurate market information.

236.    Further, these officers failed to advocate for shareholder protections in response to the U3 trading halt imposed by FINRA. Instead of demanding transparency or an investigation into the legitimacy of outstanding shares, they remained silent while retail investors were locked out of trading.

237.    As a direct result of these breaches, Plaintiff suffered financial losses and was deprived of critical information necessary to protect their investments. Plaintiff seeks compensatory damages, punitive damages, and such other relief as the Court deems just and proper.

## **Count 4**

238.    Violation of the Sarbanes-Oxley Act. The Sarbanes-Oxley Act of 2002, codified at 15 U.S.C. § 7201 et seq., requires corporate officers and entities to maintain accurate financial disclosures and comply with internal control standards.

239.    Defendants, including corporate officers associated with MMTLP and Next Bridge Hydrocarbons, violated the Sarbanes-Oxley Act by failing to maintain accurate records regarding outstanding shares and synthetic share proliferation. These officers failed to disclose the material risk posed by synthetic shares and unresolved failures to deliver, depriving investors of essential market transparency.

240.    Additionally, the Defendants engaged in misleading public statements that obscured the true state of MMTLP's shareholder structure. The failure to provide full and accurate financial disclosures prevented investors from making informed decisions, contributing to substantial financial losses.

241.     Plaintiff seeks compensatory damages, injunctive relief mandating compliance with the Sarbanes-Oxley Act, and such other relief as the Court deems appropriate.

242.     Defendants' violations of the Sarbanes-Oxley Act are further evidenced by their failure to maintain accurate financial disclosures and internal control standards. Corporate officers associated with MMTLP and Next Bridge Hydrocarbons neglected to disclose material risks posed by synthetic shares and unresolved failures to deliver. These omissions deprived investors of essential market transparency and prevented them from making informed decisions. Additionally, Defendants engaged in misleading public statements that obscured the true state of MMTLP's shareholder structure. The failure to provide full and accurate financial disclosures contributed to substantial financial losses for retail investors, including the Plaintiff.

## **Count 5**

243.     Violation of Regulation FD. Regulation FD, codified at 17 C.F.R. § 243.100 et seq., prohibits selective disclosure of material information to ensure all investors have equal access to critical information about a company's operations.

244.     Corporate officers associated with MMTLP and Next Bridge Hydrocarbons violated Regulation FD by selectively providing material information to certain parties while withholding key disclosures from retail investors. Misrepresentations regarding synthetic shares, trade discrepancies, and the transition to Next Bridge Hydrocarbons deprived Plaintiff and similarly situated investors of the ability to make informed decisions regarding their investments.

245.     Additionally, these corporate officers made misleading or incomplete statements that encouraged investors to retain their shares, while they themselves liquidated substantial portions of their holdings. These actions violated Regulation FD's requirement for full and equal disclosure of material information.

246.    Plaintiff seeks compensatory damages, injunctive relief mandating compliance with Regulation FD, and such other relief as the Court deems just and proper.

## Count 6

247.    General Negligence by FINRA and SEC. Defendants FINRA and the SEC owed a duty of care to investors under federal securities laws, including but not limited to 15 U.S.C. §§ 78o-3, 78q, and 78s, to act reasonably in carrying out their regulatory and oversight responsibilities.

248.    FINRA and the SEC failed to prevent the creation and trading of synthetic shares, violating their obligations under federal law. The SEC, despite multiple investor complaints and regulatory warnings, failed to oversee FINRA and enforce compliance with existing regulations designed to prevent market manipulation.

249.    FINRA breached its duty of care by failing to take appropriate action to audit, monitor, or prevent widespread failures to deliver and synthetic share creation in MMTLP. Additionally, the imposition of the U3 trading halt without proper investigation compounded the harm by leaving investors trapped in an illiquid position.

250.    As a direct result of these negligent acts, Plaintiff suffered substantial financial losses and was deprived of access to their investments. Plaintiff seeks compensatory damages, punitive damages, and such other relief as the Court deems appropriate.

## Count 7

251.    Breach of Contract by FINRA. FINRA, as a self-regulatory organization, is required by 15 U.S.C. § 78o-3(b) and related regulations to enforce rules that promote fair trading practices, accurate recordkeeping, and efficient market operations.

252.    FINRA breached these obligations by failing to prevent synthetic share trading, permitting prolonged failures to deliver, and imposing a U3 halt without addressing share reconciliation. These failures deprived investors of market transparency and fair access to trading.

253.    FINRA's failure to enforce its contractual obligations under 15 U.S.C. § 78o-3(b) is evident in its inability to prevent synthetic share trading, permit prolonged failures to deliver, and impose a U3 halt without addressing share reconciliation. These actions directly contravene FINRA's mandate to ensure fair trading practices, accurate recordkeeping, and efficient market operations. Specifically, FINRA's governance structure, which lacks meaningful oversight by the SEC or other government entities, exacerbates these breaches. As established in *Jarkesy v. SEC*, private entities exercising quasi-governmental authority must operate within statutory and constitutional constraints. FINRA's indefinite halt violated the separation of powers doctrine, the Appointments Clause, and the private nondelegation doctrine, as there was no meaningful government oversight or statutory authority to justify its actions.

254.    As a direct result of these breaches, Plaintiff suffered financial harm. Plaintiff seeks compensatory damages, specific performance of contractual obligations, and such other relief as the Court deems just and proper.

## Count 8

255.    SEC's Failure to Oversee FINRA. The SEC, as the primary federal regulatory agency overseeing FINRA, has statutory obligations under 15 U.S.C. §§ 78q and 78s to supervise self-regulatory organizations and ensure compliance with securities laws.

256.    The SEC failed to fulfill its oversight duties by allowing systemic abuses, including synthetic share creation and unresolved failures to deliver, to persist within FINRA's

regulatory scope. The SEC also failed to intervene or investigate FINRA's imposition of the indefinite U3 trading halt, despite repeated investor complaints and warning signs of market manipulation.

257.    As a direct result of the SEC's oversight failures, Plaintiff suffered substantial financial losses. Plaintiff seeks compensatory damages, injunctive relief mandating improved SEC oversight, and such other relief as the Court deems appropriate.

## Count 9

258.    Fraudulent Inducement and Misrepresentation by Corporate Officers. Corporate officers, including but not limited to John Brda and Gregory McCabe, knowingly made false statements and omissions regarding the nature and value of MMTLP shares and the transition to Next Bridge Hydrocarbons.

259.    These misrepresentations and omissions violated federal securities laws, including 15 U.S.C. §§ 78j(b) and 78r, by misleading investors about material facts. Defendants misrepresented the existence and impact of synthetic shares and unresolved failures to deliver, depriving investors of accurate and complete market information.

260.    Plaintiff, relying on these false statements and omissions, was induced to retain their shares, resulting in substantial financial harm when the U3 trading halt rendered them unable to access or trade their investments.

261.    Plaintiff seeks compensatory damages, punitive damages, and such other relief as the Court deems just and proper.

## Count 10

262.    Failure to Supervise by FINRA and SEC. FINRA and the SEC, as regulatory bodies, owed a duty to supervise market participants and self-regulatory organizations under 15 U.S.C. § 78q and 15 U.S.C. § 78s to prevent fraudulent and manipulative practices.

263.    FINRA and the SEC failed to monitor and address the proliferation of synthetic shares and unresolved failures to deliver, breaching their statutory supervisory obligations. These agencies also failed to prevent manipulative trading practices, including naked short selling, which harmed retail investors.

264.    As a direct result of these supervisory failures, Plaintiff suffered substantial financial losses. Plaintiff seeks compensatory damages, injunctive relief mandating improved supervisory practices, and such other relief as the Court deems just and proper.

## Count 11

265.    Negligent and Intentional Infliction of Emotional Distress. Defendants, through their negligent and intentional actions, caused Plaintiff severe emotional distress.

266.    The imposition of the U3 trading halt deprived Plaintiff of access to their investments without notice or explanation, resulting in significant uncertainty and harm. Defendants also made misrepresentations and omissions that created prolonged uncertainty about the status and value of Plaintiff's shares, compounding the emotional harm.

267.    Defendants knew or should have known that their actions would cause significant emotional harm to investors, including Plaintiff, who relied on their regulatory and fiduciary duties.

268.    As a direct result, Plaintiff experienced severe anxiety, financial uncertainty, and emotional distress, warranting compensatory damages. Plaintiff seeks damages for emotional distress and such other relief as the Court deems just and proper.

**Count 12**

269.    Conspiracy to Commit Fraud. Defendants, including FINRA, corporate officers, and other market participants, conspired to commit fraud by facilitating the creation and proliferation of synthetic shares.

270.    Defendants engaged in manipulative practices, including naked short selling and failures to deliver, which suppressed the value of MMTLP shares in violation of 15 U.S.C. § 78j(b) and related securities laws. Defendants also misled investors through false statements, omissions, and the imposition of the U3 trading halt, coordinated to harm retail investors.

271.    The conspiratorial actions of Defendants were designed to deprive investors, including Plaintiff, of the fair market value of their shares.

272.    As a direct result of this conspiracy, Plaintiff suffered substantial financial losses. Plaintiff seeks compensatory damages, punitive damages, and such other relief as the Court deems just and proper.

**Count 13**

273.    Violation of Section 10(b) and Rule 10b-5 by the SEC. Section 10(b) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78j(b), and Rule 10b-5, codified at 17 C.F.R. § 240.10b-5, prohibit the use of manipulative or deceptive devices in connection with the purchase or sale of securities.

274.    The SEC, as the primary federal securities regulator, failed to prevent and address manipulative practices, including synthetic share creation, naked short selling, and failures to deliver, which violated Section 10(b) and Rule 10b-5. The SEC's inaction allowed these manipulative practices to persist unchecked, misleading investors and artificially suppressing the value of MMTLP shares.

275.    As a direct result of the SEC's violations, Plaintiff suffered substantial financial losses and was deprived of the opportunity to trade MMTLP shares at their fair market value.

276.    Plaintiff seeks compensatory damages, punitive damages, and such other relief as the Court deems just and proper.

## Count 14

277.    Violation of Section 17A of the Securities Exchange Act of 1934. Section 17A of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78q-1, requires the SEC to ensure the efficient and reliable clearing and settlement of securities transactions to protect investors and promote market integrity.

278.    The SEC failed to enforce compliance with Section 17A, allowing systemic abuses such as synthetic share creation and unresolved failures to deliver to persist. These failures directly contributed to market manipulation and disruptions in the clearing and settlement processes, causing financial harm to Plaintiff.

279.    Plaintiff seeks compensatory damages, declaratory relief affirming the SEC's obligations under Section 17A, and such other relief as the Court deems appropriate.

## Count 15

280.    Violation of Regulation SHO. Regulation SHO, codified at 17 C.F.R. § 242.204, requires broker-dealers to close out failures to deliver within a specified timeframe to prevent market manipulation and ensure fair trading practices.

281.    FINRA failed to enforce Regulation SHO by allowing persistent failures to deliver and naked short selling to persist unchecked. These violations artificially inflated the supply of MMTLP shares, suppressed their legitimate market price, and caused significant financial harm to Plaintiff and other retail investors.

282.    Plaintiff seeks compensatory damages, injunctive relief mandating compliance with Regulation SHO, and such other relief as the Court deems just and proper.

## Count 16

283.    Antitrust Violations Under the Sherman Act. The Sherman Act, codified at 15 U.S.C. § 1, prohibits agreements or conspiracies in restraint of trade.

284.    Defendants, including FINRA and certain market participants, engaged in anti-competitive practices that distorted the market for MMTLP shares. These practices included the proliferation of synthetic shares, naked short selling, and failures to deliver, which collectively suppressed the price of MMTLP shares and harmed competition.

285.    These actions constituted a conspiracy to manipulate the market, violating the Sherman Act and causing financial harm to Plaintiff.

286.    Plaintiff seeks treble damages under the Clayton Act, injunctive relief to prevent future anti-competitive conduct, and such other relief as the Court deems appropriate.

## Count 17

287.    Constitutional Claims Under the Nondelegation Doctrine and Separation of Powers. FINRA, as a private self-regulatory organization, exercised legislative, executive, and judicial powers without meaningful government oversight, violating the nondelegation doctrine and separation of powers principles.

288.    FINRA imposed the indefinite U3 trading halt on MMTLP shares without statutory authority or procedural safeguards, depriving Plaintiff and other investors of their constitutional rights under the Fifth Amendment's Due Process Clause. Additionally, FINRA's consolidation of powers constitutes an unconstitutional delegation of legislative authority by Congress, as reaffirmed in *West Virginia v. EPA*, 597 U.S. ___ (2022).

289.    Plaintiff seeks declaratory judgment declaring FINRA's structure and actions

unconstitutional, injunctive relief to restore constitutional protections, and such other relief as the

Court deems just and proper.

## XII. <u>PRAYER FOR RELIEF</u>

290.    Declaratory Relief:

a.    A declaratory judgment that the structure and authority of Defendant FINRA are

unconstitutional under the Appointments Clause, Nondelegation Doctrine, and Due Process

Clause of the U.S. Constitution. FINRA's consolidation of legislative, executive, and judicial

powers without meaningful government oversight violates constitutional principles, as

reaffirmed in *West Virginia v. EPA*, 597 U.S. ___ (2022).

b.    A declaratory judgment that FINRA's imposition of the indefinite U3 trading halt on

December 9, 2022, was improper, unjustified, and a violation of its statutory and fiduciary

duties. The halt deprived Plaintiff and other investors of their constitutional rights under the

Fifth Amendment's Due Process Clause by failing to provide adequate notice or procedural

safeguards.

c.    A declaratory judgment that Defendants violated federal securities laws, including

Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)), Rule 10b-5 (17

C.F.R. § 240.10b-5), and Regulation SHO (17 C.F.R. § 242.204). These violations include

the proliferation of synthetic shares, naked short selling, failures to deliver (FTDs), and

systemic market manipulation that artificially suppressed the value of MMTLP shares.

d.    A declaratory judgment affirming the SEC's obligations under Section 17A of the

Securities Exchange Act of 1934 (15 U.S.C. § 78q-1) to ensure the efficient and reliable

clearing and settlement of securities transactions. The SEC's failure to enforce these

obligations directly contributed to systemic abuses, including unresolved FTDs and synthetic share proliferation.

291.    Compensatory Damages

a.    $2,568,000 in direct financial losses resulting from the cancellation of Plaintiff's sell orders during the U3 trading halt on December 9, 2022. These losses were directly caused by Defendants' misconduct, including the improper imposition of the halt and the failure to reconcile outstanding share discrepancies.

292.    Treble Damages Under Antitrust Laws

a.    Treble damages under the Sherman Act (15 U.S.C. §§ 1–2) and the Clayton Act (15 U.S.C. §§ 12–27) for Defendants' anti-competitive practices, including the proliferation of synthetic shares, naked short selling, and systemic market manipulation. These practices distorted the market for MMTLP shares, suppressed legitimate share prices, and harmed competition, causing financial harm to Plaintiff and other retail investors.

b.    Based on compensatory damages of $2,568,000, treble damages amount to $7,704,000.

293.    Injunctive Relief

a.    An injunction requiring Defendants FINRA and the SEC to implement improved oversight mechanisms to prevent future violations of federal securities laws. This includes stricter enforcement of Regulation SHO, mandatory reconciliation of outstanding shares, and enhanced transparency in trading data.

b.    An injunction requiring the SEC to enforce its obligations under Section 17A of the Securities Exchange Act of 1934 (15 U.S.C. § 78q-1) to ensure the efficient and reliable clearing and settlement of securities transactions. The SEC's failure to enforce these

obligations directly contributed to systemic abuses, including unresolved FTDs and synthetic share proliferation.

c.    An injunction requiring FINRA to provide transparency and procedural safeguards in the imposition of trading halts, including adequate notice, justification, and an opportunity for investors to challenge such halts.

294.    Declaratory Judgment on Constitutional Rights

a.    A declaratory judgment affirming the constitutional rights of retail investors under the Fifth Amendment's Due Process Clause. The indefinite U3 trading halt, imposed without notice or explanation, deprived Plaintiff of property rights and the ability to realize the fair market value of his investments.

295.    Systemic Reforms

a.    An order requiring Defendants to implement systemic reforms to prevent future abuses, including mechanisms to eliminate synthetic shares, enforce Regulation SHO requirements, improve market transparency, and ensure accurate reconciliation of shareholder positions.

296.    Such Other Relief as the Court Deems Just and Proper:

a.    Any additional relief that the Court deems necessary to address the harm caused by Defendants' misconduct and to restore fairness, transparency, and accountability to the financial markets.


## XIII. <u>Evidence and Supporting Documentation</u>

The following evidence and supporting documentation, a non-exhaustive list, are integral to the Plaintiff's claims and will be provided to the Court by the Plaintiff or sought by the

Plaintiff as exhibits. These documents demonstrate the Defendants' misconduct, regulatory failures, and the harm suffered by retail investors.

297.    FOIA Disclosures. Documents obtained through Freedom of Information Act (FOIA) requests include emails, memos, and internal communications between regulatory bodies and market participants. These documents reveal early awareness of trading irregularities, synthetic share creation, and regulatory inaction. For example, FOIA-released emails from December 5, 2022, show communications between FINRA and the SEC regarding the MMTLP trading halt and market manipulation.

298.    Blue Sheet Trading Data. Detailed trading records submitted by broker-dealers to regulators, including timestamps, order sizes, and counterparties, provide transparency into trading activity. These records reveal patterns of market manipulation such as naked short selling, spoofing, and excessive failures to deliver (FTDs). For example, Blue Sheets show unusually high trade volumes that exceed the total outstanding shares of MMTLP, corroborating claims of synthetic share creation.

299.    Internal Communications. Emails, memos, and other internal communications from corporate executives, regulatory bodies, and market participants demonstrate knowledge of trading irregularities, misleading statements, and failures to address systemic issues. For instance, internal communications from Torchlight and NBH executives, including John Brda and Gregory McCabe, reference the Orogrande Basin asset valuations and the transition of MMTLP shares.

300.    Expert Testimonies. Reports, affidavits, and testimonies from securities experts analyze market manipulation, synthetic share creation, and regulatory failures. Expert opinions provide authoritative analysis of the Defendants' misconduct and its impact on retail investors.

For example, testimony from James "Wes" Christian addresses naked short selling, synthetic share creation, and systemic failures of FINRA and the SEC.

301.    Investor Impact Statements. Affidavits and statements from retail investors detail the financial and emotional harm caused by the Defendants' actions. These statements provide firsthand accounts of the harm suffered by investors, including the inability to trade or reconcile their holdings. For example, affidavits from MMTLP shareholders document their inability to access investments or recover the fair value of their shares.

302.    Corporate Filings and Disclosures. SEC filings, proxy statements, registration statements, and other corporate disclosures related to the merger, spin-off, and trading of MMTLP shares demonstrate misleading statements, omissions, and failures to disclose material information. For instance, Torchlight's proxy statement prohibits the public trading of MMTLP shares, a prohibition that was ignored by OTC Markets and FINRA.

303.    Regulatory Notices and Actions. Notices, FAQs, and other communications from FINRA, the SEC, and other regulatory bodies regarding the MMTLP trading halt and market irregularities reveal the lack of transparency, procedural fairness, and regulatory oversight. For example, FINRA's FAQ document, issued 97 days after the U3 halt, failed to provide meaningful clarity or justification for the halt.

304.    Social Media and Public Statements. Public statements, social media posts, and promotional materials from corporate executives, influencers, and market participants demonstrate misleading or fraudulent statements designed to induce investors to purchase or retain MMTLP shares. For example, John Brda's social media posts encouraged investors to purchase MMTLP shares while he sold his own holdings.

305.    Bankruptcy Filings. Documents related to META II's Chapter 7 bankruptcy filing and its impact on MMTLP shareholders demonstrate the financial harm caused by the Defendants' misconduct and the lack of recourse for retail investors. For example, bankruptcy court filings show the liquidation of META II's assets and the termination of shareholder rights.

306.    Congressional Correspondence. Letters and communications from Members of Congress to the SEC, FINRA, and other regulatory bodies regarding the MMTLP case highlight the systemic nature of the regulatory failures and the need for Congressional oversight. For instance, a letter from Representative Ralph Norman and over 70 co-signers requests an investigation into FINRA's U3 halt and unresolved trading discrepancies.

307.    Software Systems and Operational Logs. Evidence related to the software systems employed by FINRA, DTCC, and OTC Markets, including system logs, source code, configuration files, and developer communications, is critical to understanding how trading discrepancies occurred. These materials will reveal the specific instructions encoded into the systems, clarify how compliance and trading rules were implemented, and identify the individuals or entities responsible for those implementations. For example, logs could show how FINRA's U3 halt was implemented in the trading system, including timestamps, configuration changes, and related communications from system administrators or developers.

## XIV. <u>CONCLUSION</u>

308.    The Plaintiff, Matthew J. Pease, has brought this action to address systemic failures in the U.S. financial markets that have inflicted widespread harm on retail investors through a combination of regulatory negligence, market manipulation, breaches of fiduciary duty, and constitutional violations. Central to this case is FINRA's imposition of an indefinite U3 trading halt on MMTLP shares, which deprived investors of access to their assets without

adequate notice, explanation, or resolution. This unprecedented halt exemplifies the unchecked powers of a private self-regulatory organization operating without meaningful government oversight, raising constitutional concerns under the separation of powers doctrine, the Appointments Clause, and the private nondelegation doctrine. Precedents such as *SEC v. Sloan* and *Alpine Securities Corp. v. FINRA* underscore the statutory and constitutional violations inherent in FINRA's actions.

309.     The Plaintiff contends that FINRA's governance failures were further exacerbated by the SEC and DTCC, which neglected their statutory obligations to enforce market integrity. Despite clear responsibilities under Regulation SHO (17 C.F.R. § 242.204), these regulatory entities failed to investigate or remedy widespread market abuses, including synthetic share creation, naked short selling, and unresolved failures to deliver (FTDs). By failing to enforce critical close-out requirements, reconcile discrepancies, or provide transparency through critical Blue Sheets data, the Defendants enabled institutional participants to manipulate the market for MMTLP shares while retail investors bore the consequences.

310.     Broker-dealers and market makers, including GTS Securities and Canaccord Genuity, played a direct role in manipulating market dynamics. These entities exploited regulatory loopholes to create counterfeit shares, distort supply and demand, and profit from suppressed share prices at the expense of retail investors. Their conduct, enabled by regulatory inaction, demonstrates a coordinated effort to manipulate trading conditions while evading accountability.

311.     Transfer agents, such as AST/EQ (Equiniti), contributed to these systemic failures by neglecting their fiduciary and statutory obligations during the MMTLP-to-NBH transition. AST/EQ failed to reconcile outstanding share discrepancies and maintain accurate shareholder

records, facilitating the persistence of synthetic shares and leaving shareholders in prolonged financial uncertainty.

312.    Corporate leadership at Torchlight Energy Resources and Next Bridge Hydrocarbons compounded the harm by failing to address systemic trading irregularities and reconcile shareholder positions. Executives, including Gregory McCabe, John Brda, and Clifton DuBose, misrepresented critical information about asset valuations, particularly regarding the Orogrande Basin, and neglected their fiduciary duties to shareholders. Their collective inaction and misleading public statements left retail investors, including the Plaintiff, vulnerable to systemic market manipulation.

313.    The harm caused by these failures is significant, systemic, and ongoing. Tens of thousands of retail investors have been denied the ability to trade their shares, reconcile their holdings, or recover the fair value of their investments. Meanwhile, institutional participants who engaged in manipulative practices, including naked short selling, remain unaccountable. This disparity highlights critical vulnerabilities in the regulatory framework and underscores the urgent need for judicial intervention to restore fairness, transparency, and accountability to the markets.

314.    The Plaintiff emphasizes the glaring inconsistency in regulatory responses between the MMTLP case and the GameStop trading episode. In the aftermath of GameStop, swift Congressional hearings and regulatory interventions ensured market disruptions were addressed promptly. In contrast, MMTLP investors have endured nearly two years of inaction and neglect. This systemic bias in favor of institutional participants highlights the inequities faced by retail investors and demonstrates the need for consistent regulatory enforcement to uphold investor rights and market integrity.

315.    The refusal by FINRA, the SEC, and the DTCC to disclose critical trading data, such as Blue Sheets and settlement records, has further compounded investor harm. This lack of transparency has obstructed efforts to investigate market manipulation, reconcile discrepancies, and hold wrongdoers accountable. The systemic withholding of such vital information underscores broader vulnerabilities in regulatory frameworks and necessitates judicial oversight to ensure transparency and accountability.

316.    In bringing this action, the Plaintiff seeks more than individual relief. This case represents a broader challenge to the systemic deficiencies and constitutional violations that have allowed market abuses to flourish unchecked. The Plaintiff respectfully requests this Court to grant declaratory and injunctive relief to restore fairness to the markets, including addressing FINRA's unconstitutional governance structure, enforcing statutory limits on trading halts, and ensuring meaningful government oversight of private entities exercising delegated authority.

317.    The Plaintiff also demands accountability for the Defendants' violations of federal securities laws, antitrust statutes, and fiduciary obligations. Compensatory and punitive damages are necessary to redress the financial and emotional harm suffered by retail investors. In addition, systemic reforms must be implemented to prevent future abuses, including mechanisms to eliminate synthetic shares, enforce Regulation SHO requirements, improve market transparency, and ensure accurate reconciliation of shareholder positions.

318.    By adjudicating the claims presented, this Court has an opportunity to establish critical legal precedents that promote regulatory accountability, enforce transparency, and restore public confidence in the financial markets. The Plaintiff, joined by tens of thousands of similarly affected retail investors, seeks a ruling that upholds the rule of law, prioritizes market integrity, and delivers justice to those who have been unjustly harmed by systemic misconduct.

319.     Finally, this case calls upon the Court to safeguard the rights of retail investors and reaffirm the principles of constitutional governance. The Plaintiff urges the Court to deliver a ruling that holds the Defendants accountable for their misconduct, addresses systemic regulatory failures, and ensures the integrity of U.S. financial markets for all participants.

## XV. <u>DEMAND FOR JURY TRIAL</u>

320.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiff hereby demands a trial by jury for all claims and issues triable as of right.

321.     The claims and issues for which a jury trial is demanded include, but are not limited to:

322.     Claims for violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, including allegations of market manipulation, synthetic share creation, and naked short selling.

323.     Claims for breach of fiduciary duty by corporate officers, including John Brda and Gregory McCabe, under state corporate governance laws.

324.     Claims for negligence by regulatory bodies, including the Financial Industry Regulatory Authority (FINRA), the Securities and Exchange Commission (SEC), and the Depository Trust & Clearing Corporation (DTCC), in failing to enforce federal securities laws and protect investors.

325.     Claims for constitutional violations, including violations of the Appointments Clause, Nondelegation Doctrine, and Due Process Clause, arising from FINRA's imposition of the U3 trading halt and the SEC's failure to provide adequate oversight.

326.    Claims for compensatory and punitive damages arising from the Defendants' collective misconduct, including the suppression of MMTLP share prices, the inability to trade shares, and the prolonged financial harm suffered by the Plaintiff and other retail investors.

327.    The Plaintiff respectfully requests that this Court honor t he jury demand and ensure that all triable issues are presented to a jury for determination.

## XVI. <u>CERTIFICATION OF PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS</u>

328.    I, Matthew J. Pease, the Plaintiff in this action, hereby certify pursuant to 15 U.S.C. § 78u-4(a)(2) of the Private Securities Litigation Reform Act of 1995 and Rule 11 of the Federal Rules of Civil Procedure that:

a.    I have reviewed the complaint and authorized its filing.

b.    The complaint is based on my personal knowledge with respect to the facts alleged, except as to those matters specifically alleged on information and belief. As to those matters, I believe them to be true.

c.    The allegations in the complaint are true to the best of my knowledge, information, and belief, formed after a reasonable inquiry under the circumstances.

d.    This complaint is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.

e.    The claims and other legal contentions in the complaint are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law.

f.The factual contentions in the complaint have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

Executed On: _February 25, 2025_     Signature: _____

Matthew J. Pease, pro se

1 Cobbler Lane

Amherst, NH 03031

CERTIFICATION OF PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

I, Matthew J. Pease, duly certify and say, as to the claims asserted under the federal securities

laws, that I declare under penalty of perjury that the foregoing is true and correct to the best of

my knowledge and belief.

Executed On: _February 25, 2025_     Signature: _____

Name: Matthew J. Pease